UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MPM SILICONES, LLC,<br><br>*Plaintiff*,<br>v.<br><br>UNION CARBIDE CORPORATION,<br><br>*Defendant.* | No. 1:11-CV-1542 BKS/ATB |

**UNION CARBIDE CORPORATION'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Local Rules 7.1(a)(3) and 56.1, Defendant Union Carbide Corporation ("UCC") submits this statement of material facts as to which there is no genuine issue to be tried in support of its motion for partial summary judgment.

## I. OVERVIEW

1. The MPM Sistersville Site ("Site") is located at 3500 South State Route 2, Friendly, West Virginia, approximately six miles south of the city of Sistersville. (Segall Ex. 1, at CHEM_0013169).

2. The Site encompasses approximately 1300 acres of land which encompass manufacturing operations, a number of solid waste management units, and an active hazardous waste landfill. (Segall Ex. 2, at GE_001218-20).

3. The Site manufactures a broad range of silicone and silane products. The manufacturing areas are centrally located upon approximately 50 acres of land on the western edge of the Site. (Segall Ex. 1, at GE_001233, GE_001236; Segall Ex. 87, at MPM0015869; Segall Ex. 9).

4. The solid waste management units border the central manufacturing operations. The active hazardous waste landfill sits alone on the eastern side of the Site. (Segall Ex. 9; Segall Ex. 43, at MPM0008179, 81; Segall Ex. 87, at MPM0015871).

## II. OWNERSHIP OF THE SITE AT ISSUE

5. UCC owned the Site and conducted manufacturing operations there, from approximately 1955 to April 12, 1993. (Segall Ex. 88, at 2; Segall Ex. 28, at UCC_004474).

6. In 1993, UCC sold the Site to OSi Specialities, Inc. ("OSi"), pursuant to, and as part of, an Asset Purchase and Sale Agreement dated April 12, 1993 ("1993 Agreement"). (Segall Ex. 28, at UCC_004474).

7. As part of the ownership transfer, OSi acquired many former UCC employees, including employees who worked in the Environmental Protection department and had knowledge of historical Site environmental conditions, including Dennis Heintzman, Stephen Pierce, and Fred Dailey. (Segall Ex. 2, at GE_001228; Segall Ex. 8, at 23:11-26:5; Segall Ex. 77, at MPM0016234).

8. In 1995 Witco Corporation bought OSi, and as the result of a merger with Crompton & Knowles Corporation, became CK Witco Corporation in 1999. In 2000, CK Witco's name was changed to Crompton Corporation. (Segall Ex. 2, at GE_001238).

9. On April 24, 2003, Crompton and General Electric Company ("GE") executed a Purchase and Exchange Agreement ("2003 PEA") for the transfer of the real property and other assets associated with the Site to GE or one of its affiliates. (Segall Ex. 3).

10. The 2003 PEA included an indemnity from Crompton for pre-closing environmental contamination and provided for the conduct of a "Phase II investigation," stating

that the parties were to undertake "commercially reasonable efforts" to complete that investigation prior to the closing. (Segall Ex. 3, at MPM0052239-42, MPM0052286-93).

11. Many of the employees that worked for Crompton at the Site became employees of MPM after the ownership transfer, including, among others, Dennis Heintzman and Stephen Pierce. (Segall Ex. 8, at 23:11-26:5; Segall Ex. 77, at MPM0016234).

12. On July 31, 2003, the real property associated with the Site was transferred to GE Silicones WV, L.L.C., a GE affiliate. (Segall Ex. 4, at CHEM_003176).

13. On August 13, 2004, GE Silicones WV, L.L.C. merged with GE Silicones, LLC ("GE Silicones"). (Segall Ex. 5, at 13).

14. On September 14, 2006, Nautilus Holdings Acquisition Corporation ("Nautilus") bought the parent company of GE Silicones, making GE Silicones a wholly owned subsidiary of a Nautilus-owned company. Subsequently, GE Silicones was renamed MPM Silicones, LLC, the plaintiff in this case. (Segall Ex. 5, at 13; Segall Ex. 6, at 3; F-7, Ex. 3.10).

15. MPM is simply a subsequent name of the same GE entity that has owned the Site since July 31, 2003, (2012 Annual Report, Segall Ex. at 6, F-7, Ex. 3.10) and is the current owner of the Site. (Segall Ex. 88, Response No. 2).

## III. UCC'S HISTORICAL OPERATIONS AND INVESTIGATIONS INTO SPECULATED PCB DISPOSAL AT THE SITE

16. During the time UCC owned and operated the Site it manufactured various silicone and silane products at the Site. (Segall Ex. 87).

17. In the late 1970s and early 1980s, UCC employee Clem Schubert conducted an internal investigation seeking to identify, quantify, and determine the location of silicone and chlorosilane wastes that had been buried at the Site from the beginning of the Site's operations in the 1950s. (Segall Ex. 89, at MPM0034705-06).

18. Based on that investigation, UCC identified several disposal areas, including one at the north end of the Site, referred to as the North Inactive Site ("NIS"). (*Id.*, at MPM0034705-06).

19. Mr. Schubert concluded that up to 250,000 pounds of PCBs used during A-1100 distillation *may have* been disposed of "in the area of the Sistersville Plant site." (*Id.*, at MPM0034706).

20. Mr. Schubert also noted that certain wastes had "not been allowed to rest in peace" in that UCC had used sludge from lime ponds and other wastes to backfill a hillside east of the NIS. (*Id.*, at MPM0034705).

21. Around the same time, UCC also took a number of water samples from Sugar Camp Run (an onsite stream that was near the waste disposal/Environmental Protection area ("EP area")). Two of the samples showed PCB detections. (*Id.*, at MPM0034703-04.)

22. In March 1980, analysis for PCBs was conducted on samples from wells installed at both the NIS and the South Inactive Sites. PCBs were detected in one well, Well 2A located near the NIS, but not in samples collected from Sugar Camp Run. (*Id.*, at MPM0034704).

23. In March 1981, UCC collected additional samples from groundwater wells in the NIS, which showed no detection of PCBs. (Segall Ex. 26, at MPM001736-42).

24. In 1984, UCC undertook an investigation of the two inactive landfills at the Site—the NIS and the South Inactive Site. (Segall Ex. 10, at MPM0001873-89).

25. On September 14, 1984, UCC employee Dennis Heintzman concluded "[a]lthough ***no definite evidence can be found***, it is possible that up to 250,000 pounds of PCB's are buried at this site. . . . However, wells at this site when last monitored in 1981 showed no

significant leaching or contamination and no PCBs were found." (*Id.*, at MPM0001873 (emphasis added)).

26. In October 1984, additional groundwater samples were taken from the NIS and the South Inactive Site. PCBs were not detected in any of these samples. (Segall Ex. 11).

27. Based on these investigations, UCC concluded that there was no evidence to support the speculation that PCBs had had been disposed of at the NIS. (Segall Ex.8, at 32:13-37:11; Segall Ex. 11).

## IV. THE RCRA PERMITTING AND CORRECTIVE ACTION PROCESSES

### *A. The RCRA Hazardous Waste Permit for Regulated Hazardous Waste Management Units and Installation of a Recovery Well*

28. Pursuant to the Resource Conservation and Recovery Act ("RCRA"), UCC prepared several iterations of its RCRA Part B permit application for the Site between 1983 and 1988 due to its status as an owner and operator of a facility that managed certain RCRA hazardous waste. UCC received its final RCRA permit for active, regulated hazardous waste management units in 1988 ("RCRA Part B Permit"). (Segall Exs. 12-16).

29. Groundwater monitoring conducted in November 1985, as required by the Site's RCRA permit, detected groundwater contamination and led to discussions with the West Virginia Department of Natural Resources ("WVDNR") regarding further groundwater assessment. (Segall Ex. 14, at 22102).

30. Those discussions led to a determination that the source of the contamination was likely an area known as the Copper Sludge Removal Pond ("Copper Pond"), a then active hazardous waste management unit. (*Id.*)

31. To confirm the nature and extent of the groundwater contamination and how UCC should respond to it, UCC undertook a three year groundwater assessment, which included the

installation of more than 20 additional groundwater monitoring wells. (Segall Ex 17, at WESTVA_DEP_013335-40).

32. On May 15, 1986, EPA authorized WVDNR to issue and implement UCC's RCRA Part B Permit for active hazardous waste management units, like the Copper Pond. 51 Fed. Reg. 17739.

33. On September 30, 1988, the WVDNR issued a RCRA Part B permit to UCC for an initial term of ten years. (Segall Ex. 18, at MPM 0029432-33).

34. That permit set forth a "Remedial Action Plan" calling for the long-term pumping and treating of contaminated groundwater from the Copper Pond. (*Id.*, at MPM0029432-33, MPM0029477**)**.

35. The permit indicates that the purpose of the well and associated monitoring to determine its effectiveness were "to limit future releases," hydraulically control contaminated groundwater flow to "prevent further migration of constituents[,]" and improve groundwater quality over time. (*Id.*, at MPM0029726, 0029733-34).

36. The recovery well was part of a broader effort for a long-term, permanent remedy for the Copper Pond involving closure, dewatering, and removal of all waste from the pond under the 1988 permit. (Segall Ex.19, at WESTVA_DEP_008422).

37. The Part B Permit provided for a period of seven months before startup of the recovery well was to commence. Once started, the recovery well was "expected to operate continuously" to address "low levels" of certain hazardous constituents. (Segall Ex. 18, at MPM0029726, MPM0029733-34).

38. In January 1990, UCC sought an extension of the well installation date from the WVDNR, (Segall Ex. 20, at WESTVA_DEP_002571-72), which was approved by WVDNR on July 19, 1990 (Segall Ex. 21, at WESTVA_DEP_002402-03).

39. In February 1991, UCC installed the recovery well. (Segall Ex. 22, at WESTVA_DEP_010043; Segall Ex. 23, at 80, 82; Segall Ex.24, at MPM 0013860).

***B. The 1986 RCRA Facility Assessment and 1990 Corrective Action Permit***

40. In 1984, Congress enacted the "RCRA corrective action program" to require all facilities seeking a RCRA permit to undertake corrective action for releases of hazardous wastes or hazardous constituents from historical solid waste management units ("SWMUs") located on a facility. 42 U.S.C. § 6924(u), (v).

41. The first step of the corrective action process is a RCRA Facility Assessment ("RFA"), in which EPA identifies SWMUs at a facility from which there are releases or potential releases of RCRA "hazardous constituents" that may need to be addressed. 52 Fed. Reg. 45788, at 45789.

42. UCC began this corrective action process in 1985. Throughout this corrective action process (and the Site's RCRA permitting process), UCC operated under the philosophy of full disclosure to the governmental agencies. (Segall Ex.8, at 61:1-62:7).

43. In 1985 and 1986, EPA sought and acquired information from UCC regarding SWMUs at the Site in connection with the RFA, including analytical results for the evaluation of PCBs in groundwater. (Segall Ex. 90, at PA_EPA_000964; Segall Ex. 91, at MPM0006054; Segall Ex. 92, at MPM0005976; Segall Ex. 25, at MPM_INT_DISC_0020319; Segall Ex. 26 at MPM0001657; Segall Ex. 27 at MPM0001744).

44. In connection with EPA's SWMU information requests, on May 15, 1986, a meeting was held at the Site between representatives of UCC and EPA, as requested by UCC, to

discuss additional information requests from EPA regarding the identification of SWMUs at the Site. (Segall Ex. 89, at MPM0034711).

45. Mr. Fred Dailey, head of UCC's Environmental Protection Department at the Site, then wrote a memorandum to the file documenting comments he made to representatives from EPA at the May 15, 1986 meeting regarding the "speculat[ion]" that "as much as 500,000 lbs. of contaminated PCB heat fluid was generated during the plant's previous activities and its disposition was never determined. Thus, it could have been placed in an inactive site." Mr. Dailey further noted that he told EPA that "[a]s a result of that possibility groundwater and the inactive sites were examined for PCBs along with other materials. All the results of the tests and analyses conducted showed no PCBs and that data was included in the information provided [to EPA]." In Mr. Dailey's words, "[n]othing more was asked about PCBs by the inspectors." (*Id.*).

46. On May 29, 1986, UCC submitted supplemental information to EPA regarding the NIS. The information submitted to the EPA included a March 1980 water analysis that showed detections of PCBs at Well 2A in the NIS and water analyses from 1979 and 1980 that showed detections of PCBs in Sugar Camp Run. (Segall Exs. 25- 27).

47. Thereafter, in August 1986, EPA's contractor submitted a draft RFA detailing the potential history of, and potential release pathways for, SWMUs at the Site, with a recommendation that a year's worth of groundwater monitoring be conducted in the vicinity of the NIS ("NIS") and the No. 3 Sludge Pond. EPA's RFA did not recommend any cleanup measures. The RFA recommended further investigation at certain SWMUs. (Segall Ex. 1, at 013193–94, 13202–03, 13213–16).

48. EPA issued a RCRA Corrective Action Permit ("permit") to UCC for the Site on November 8, 1988. (Segall Ex. 30).

49. UCC appealed the 1988 RCRA permit, (Segall Ex. 31), and a revised RCRA permit was issued by EPA on December 17, 1990. (Segall Ex. 33).

50. In the permit, EPA required UCC to undertake the remainder of the corrective action process at the Site for SWMUs requiring further attention. (Segall Ex. 33).

51. As EPA noted in UCC's permit, upon the agency's approval of the Corrective Measures Study ("CMS") for the Site, EPA would modify the permit "to specify the remedy selected" by the Agency. (*Id*. at MPM 0002913).

52. In a Fact Sheet prepared to accompany the 1990 permit, EPA briefly alluded to erosion of the then existing clay cap resulting in surface run-off flowing into Sugar Camp Run, and concluded that existing groundwater monitoring data showed "no strong evidence of contamination." (Segall Ex. 34, at MPM0026274, MPM0026283).

### *C. The 1992 RCRA Facility Investigation for the NIS, and Construction of the NIS Cap, Diversion Ditch, and Interceptor Trench*

53. In August 1992, ERM-Midwest, on behalf of UCC, submitted a RCRA Facility Investigation Report ("RFI Report") to EPA for the NIS. (Segall Ex. 38, GE_000031).

54. The NIS comprises a substantial solid waste management area at the Site. It encompasses approximately 5.5 acres and was used to store and dispose of various liquid and solid waste from 1961 to 1972. It also contains within its boundaries two other substantial SWMUs investigated and evaluated by UCC and EPA that were operated from 1970-82, such that remediation of the NIS also provides for remediation of two other SWMUs at the Site. (Segall Ex. 55, at CHEM_008379-80).

55. The RFI Report concluded that the NIS was a source of groundwater contamination and sediment contamination in Sugar Camp Run, and likely a source of source of surface water contamination. The Report recommended construction of an earthen cap to reduce

surface water, sediment, and groundwater impacts from the NIS. (Segall Ex. 38, at GE_000031, GE_000287-99).

56. The RFI Report also concluded that no contaminants associated with the NIS were above "action levels" proposed by EPA to determine whether further corrective action was warranted. Because of this absence of actionable contaminant levels, the Report recommended "no further action beyond the [recommended earthen cap.]" (*Id.*, at GE_000287-99).

57. Notably, the RFI Report found that potential exposure to human and environmental receptors was "very unlikely." (*Id.*, at GE_000295).

58. A month before the issuance of this RFI Report, on July 27, 1992, EPA had approved an earthen cap for the ten-acre landfill area of NIS. (Segall Ex. 36, at MPM0025023, MPM0025024).

59. The ten acre earthen cap was "designed to eliminate surface contamination runoff into Sugar Camp Run [an onsite creek at the Site] and to limit the surface water infiltration into the disposal area." (*Id.*, at MPM0025024, MPM 0025033).

60. UCC undertook construction of the EPA-approved earthen cap in the summer and fall of 1992 as a voluntary measure designed to decrease surface water infiltration into the NIS and improve run-on/runoff controls. (*Id.*, at MPM0025023, MPM0025024).

61. As part of its 1992 construction of the earthen cap, UCC also constructed a diversion ditch to "intercept surface water from the hillside and divert it away from the disposal area." (*Id.*; Segall Ex. 37, at WESTVA_DEP_007098).

62. On January 4, 1993, Stephen Pierce, UCC's Senior Environmental Engineer, notified EPA that UCC had discovered an inadvertent failure to perform PCB analysis on Sugar Camp Run surface water and sediment for purposes of the RFI Report because the laboratory

that conducted the analysis was instructed not to perform pesticide or herbicide analysis, which UCC subsequently learned included PCBs. (Segall Ex. 44, at MPM0019613).

63. The January 4, 1993 letter from UCC to EPA enclosed November 1992 UCC laboratory results, which showed detections of PCBs in a surface water sample and a sediment sample downstream from the NIS and a sediment sample upstream of the NIS. (*Id.*, at MPM0019614-28).

64. EPA, having been notified of the presence of low levels of PCBs in Sugar Camp Run in 1993, it required no further action of UCC regarding those PCBs during the corrective action process or otherwise. (Segall Ex. 8, at 68:5-69:15).

65. On July 1, 1993, after UCC sold the Site to OSi, the RCRA permit and corrective obligations were transferred to OSi. (Segall Ex. 37, at WESTVA_DEP_007097, 7098).

66. On October 5, 1993, EPA provided comments on the RFI report for the NIS to OSi Specialties, Inc. EPA comments on the contaminant characterization information provided in the RFI Report did not include any request for additional information regarding PCBs. (Segall Ex. 45, at MPM_INT_DISC_0009041; Segall Ex. 46, at MPM_INT_DISC_0009042-49).

67. After additional back and forth between OSi and EPA, on April 26, 1994, EPA approved the RFI report for the NIS, which originally and as revised recommended the construction of an earthen cap on the NIS. (Segall Ex. 47, at MPM_INT_DISC_0009086).

68. On June 21, 1994, EPA approved OSi's CMS/Stabilization Proposal for the Site, which had been initially submitted by OSi on April 15, 1994. (Segall Ex. 48, at MPM0003295; Segall Ex. 50, at WESTVA_DEP_006707; Segall Ex. 53, at MPM0025034).

69. As explained in the CMS/Stabilization Proposal, the CMS/Stabilization was meant "to mitigate the potential for future releases and to monitor groundwater to determine if

constituent concentrations may increase in the future to a level requiring further action." (Segall Ex. 37, at WESTVA_DEP_007097, WESTVA_DEP_007098; Segall Ex. 53, at MPM0025019, MPM0025020).

70. After describing the previous corrective actions taken at the NIS—construction of the earthen cap and the diversion ditch, stabilization of the banks of Sugar Camp Run, placement of fencing, and periodic inspections—the CMS/Stabilization Proposal *selected* "[a]n earthen cap and surface water diversion" as "*the* corrective action" for the NIS. (Segall Ex. 37, at WESTVA_DEP_00709798-100 (emphasis added)).

71. To "insure continued integrity of the existing earthen cap and drainage ditches and to reduce the amount of surface and groundwater entering the [NIS,]" the CMS/Stabilization Proposal proposed further corrective actions—construction of an interceptor trench, inspections and maintenance of the NIS, and groundwater monitoring. (*Id.*, at WESTVA_DEP_007100-102; Segall Ex. 53, at MPM 0025023, MPM0025025).

72. The CMS/Stabilization Proposal also proposed the conduct of a comprehensive groundwater study to confirm that the 1991 groundwater recovery well was capturing all groundwater contaminants migrating from the NIS. (*Id.*, at WESTVA_DEP_007103).

73. The CMS/Stabilization Proposal did not find any emergency situation or any immediate threat to public health or the environment. (Segall Ex. 37, at WESTVA_DEP_007097-103).

74. OSi implemented those further corrective actions and the groundwater study, proposed in the June 1994-approved CMS/Stabilization Proposal, with EPA's concurrence and in accordance with a schedule approved by EPA. (Segall Ex. 53, at MPM 0025020; Segall Ex. 36, at MPM0025025-28, 34).

75. Pursuant to the approved CMS/Stabilization Proposal, in the fall of 1994, OSi constructed an interceptor trench at the base of a hillside in the northeast area of the Site to intercept a groundwater surface discharge that could potentially affect the integrity of the NIS cap. (Segall Ex. 36, at MPM0025025; Segall Ex. 49, at MPM0003309; Segall Ex. 94, at WESTVA_DEP_008219-21; Segall Ex. 37, at WESTVA_DEP_007100).

76. The construction of the interceptor trench required trenching to a depth of 25 feet and investigation of subsurface conditions to determine the need for shoring and blasting to complete the excavation in bedrock. The projected cost of the project, which ultimately did require blasting of bedrock, was $5.4 million. (Segall Ex. 35, at MPM0006293-96; Segall Ex. 49,_at MPM0003309; Segall Ex. 32, at WESTVA_DEP_006694.

77. In December 1994, OSi submitted to EPA a comprehensive groundwater study of the Site that it had undertaken as part of the CMS/Stabilization Proposal. That study demonstrated that the capture zone of the groundwater recovery well—previously constructed pursuant to the Site's RCRA Part B permit, *see supra* ¶¶ 33-39—effectively addressed contaminated groundwater emanating from the NIS and that no further groundwater recovery systems or hydraulic controls were necessary to protect human health and the environment. (Segall Ex. 36, at MPM 0025027; Segall Ex. 50, at WESTVA_DEP_006707).

### *D. The 1992 Verification Investigation, the 1994 RCRA Facility Investigation of the Other SWMUs, and EPA's Conclusion that the Groundwater Recovery Well Adequately Treated Onsite Groundwater Contamination*

78. In October 1992, UCC completed a RCRA Verification Investigation Report ("VI Report"), intended to determine whether hazardous wastes or constituents had been released into the environment, which addressed five SWMUs: the South Inactive Site, the No. 3 Sludge Pond, the Waste Water Treatment System (which includes the wastewater treatment unit ("WWTU")), Waste Drum Staging Areas, and the Copper Shanty. (Segall Ex. 51, at CHEM_017021).

79. EPA did not require a VI for the NIS, rather just a RCRA Facility Investigation ("RFI"), because UCC and EPA previously determined that releases of hazardous constituents from the NIS had occurred. (Segall Ex. 42, at WESTVA_DEP_014655).

80. The VI Report indicated that groundwater monitoring associated with the No. 3 Sludge Pond detected copper below the applicable action level and only one sample slightly above the action level for arsenic, which was subsequently determined not to be associated with the pond. The VI Report also revealed the presence of groundwater contamination in the area that became known as the BTEX Area, and recommended further investigations. (Segall Ex. 51, at CHEM_017099, 101-02; Segall Ex. 43, at MPM0008252).

81. The VI Report also revealed the presence of groundwater contamination in the area that became known as the BTEX Area, and recommended further investigations. (Segall Ex. 51, at CHEM_017101-02).

82. None of the recommendations in the VI Report called for cleanup measures. (Segall Ex. 51, at CHEM_017103-05).

83. After OSi, the then new owner of the Site, addressed EPA questions about the VI Report, EPA approved the VI Report on August 31, 1993. (Segall Ex. 36, at MPM0025036).

84. Based on the results of the VI Report, in December 1994, Kemron Environmental Services, Inc., on behalf of OSi, completed an RFI Report for the South Inactive Site, the No. 3 Sludge Pond, the BTEX Area, and the Wastewater Treatment System. (Segall Ex. 43, at MPM0008160).

85. This RFI Report concluded that although limited arsenic and BTEX contaminants had been found in soil and groundwater, the comprehensive 1994 groundwater study, *see supra* ¶ 74, had "demonstrated that groundwater in the Number 3 Sludge Pond and BTEX Areas is

effectively captured by the existing permitted recovery well." (Segall Ex.43, at MPM0008170, 8251-54).

86. The RFI Report did not find any emergency situation or any immediate threat to human health or the environment, and recommended no further investigative or corrective action for any of the SWMUs that it investigated. (Segall Ex. 43, at MPM0008251-55).

87. EPA approved this second RFI Report on February, 8 1995. (Segall Ex. 52, at MPM0007254-55).

### *E. The 1997 Site-Wide Corrective Action Permit Modification Incorporating the Final Remedy for the Site*

88. After the conduct of the VI, two RFIs, and a CMS encompassing the four aforementioned SWMUs, EPA modified the permit on September 24, 1997, as explained in a September 26, 1997 cover letter to Witco Corporation, owner of OSi Specialties, Inc., then the Site owner and operator and holder of the RCRA permit. (Segall Ex. 23, at PA_EPA_017475–82).

89. EPA's September 24, 1997 permit modification explained that the VI, RFIs, and CMS had been completed as required by the CAP, and identified each SWMU being addressed and the "corresponding remedial measure" that EPA selected for it. (*Id*., at PA_EPA_017477–78).

90. In a notice of intent to modify the permit issued to the public on August 6, 1997 ("NOI"), EPA had similarly stated that the purpose of the proposed permit modification was to "incorporate the remedies selected for the [SWMUs]" at the Site. (Segall Ex. 53, at MPM0025019). Accompanying the notice of intent was a fact sheet that explained the history of investigations and corrective measures at the Site. (Segall Ex. 36).

91. For the NIS in particular (referenced in the permit modification as the "NF Site"), EPA identified the previously constructed earthen cover/cap, the diversion ditch, and the interceptor trench as the principal components of the remedial measures, on which construction commenced in 1991 and 1992. (Segall Ex. 23, at PA_EPA_017478–79; Segall Ex. 53, at MPM 0025020).

92. The 1997 permit modification also included as one of EPA's chosen remedial measures the 1991 groundwater recovery well that had remained in operation continuously to pump and treat contaminated groundwater from both the NIS and the No. 3 Sludge Pond/BTEX Area. (Segall Ex. 23, at PA_EPA_017480, 82; Segall Ex. 24, at MPM 0013860).

93. In February 1995, EPA had approved OSi's 1994 comprehensive groundwater study, which concluded that use of the existing groundwater recovery well was adequate to control and remediate groundwater contaminants migrating from areas north of the well, including the NIS. (Segall Ex. 36).

94. Based on the 1994 RFI, EPA concluded in February 1995 that the recovery well effectively captured groundwater contamination from the No. 3 Sludge Pond and area surrounding it, as well as contamination from the BTEX Area.[1] (Segall Ex.52, at MPM0007254-55; Segall Ex. 43, at MPM0008252; Segall Ex. 36, at MPM0025029-31).

95. Following the 1997 permit modification, EPA issued a Statement of Basis ("SOB") and Final Decision ("FD") confirming that earthen cover/cap, the diversion ditch, and the interceptor trench constituted the principal components of the final remedy for the NIS and No. 3 Sludge Pond/BTEX Area SWMUs. (Segall Ex. 55, at CHEM_008378, 92-93, 96; Segall Ex. 24, at MPM0013856-57, 60-61).

[1] As discussed below, No. 3 Sludge Pond and the BTEX Area were separately studied as individual SWMUs but addressed together for purposes of a final remedy.

96. The FD states that the EPA had made a determination of "Corrective Action Complete With Controls" for the whole Site, i.e., that "the full set of corrective measures has been implemented and all that remains is performance of required operation and maintenance and monitoring actions, and compliance with and maintenance of any institutional controls[.]" (Segall Ex. 24, at MPM0013856). In order to effectuate that determination, EPA supplemented its previously selected final remedy with institutional controls regarding future land and groundwater use at the Site to prevent exposure to contamination remaining at the Site. (*Id.*)

97. EPA's Final Decision explains that it sets forth a final remedy under the RCRA corrective action program for the entire Site. (*Id.*)

98. The groundwater recovery well constructed in 1991, the earthen cap and the diversion ditch constructed in 1992, and the interceptor trench constructed in 1994, remain in place and are operating to this very day in the form in which they were originally constructed. (Segall Ex. 56, at PA_EPA_004658-66).

99. The groundwater recovery well, the earthen cap, the diversion ditch, and the interceptor trench were not implemented to address an emergency situation or an immediate threat to human health or the environment, but rather provided long-term containment and capture and treatment of contamination consistent with the permanent remedy for the Site. (*See supra* ¶¶ 34-39, 55-61, 67-77).

## V. LANDFILL NO. 2

100. In addition to the various SWMUs, the Site also includes an active, operating landfill, Landfill No.2, the construction of which was initially completed in 1979. (Segall Ex. 56, at PA_EPA_004646-48).

101. Landfill No. 2 is located in the head of a hollow on the wooded hillside portion of the Site, approximately 1/4 mile from the NIS. (*Id.* at PA_EPA_004646; Segall Ex. 67, at MPM 0015869).

102. The landfill is used primarily for the disposal of dewatered sludges from wastewater treatment at the Site, and also serves for disposal of other on-site generated wastes. (Segall Ex. 56, at PA_EPA_004646).

103. Landfill No. 2 is not a part of the EPA RCRA Corrective Action Program or the Site's Corrective Action Permit issued by EPA in 1990 and modified by it in 1997. Rather it is an active waste management unit permitted under the RCRA Part B Permit issued by the State in 1988, and is now permitted under a separate module in MPM's current RCRA permit. Upon the landfill's closure, the RCRA permit requires the landfill to comply with certain closure, post-closure, and financial assurance requirements. (*Id.*, at PA_EPA_004646-48, 50–53, 99–702, 711–715).

104. Landfill No. 2 is a lined landfill area, designed to EPA and industry standards to provide a safe disposal area and avert the spread of contamination into the environment. (*Id.*, at PA_EPA_004729–31).

105. Landfill No. 2 has continuously operated as a distinct surface impoundment/landfill at the Site since 1979. (*Id.*, at PA_EPA_004607, at 46; Segall Ex. 97, at MPM009775).

106. Although Landfill No. 2 was designed, constructed, and originally permitted as a landfill, it initially received free liquids and operated as a surface impoundment. Segall Ex. 97, at MPM009773-77; Segall Ex. 56, at PA_EPA_004646 ). Beginning in 1987, UCC petitioned

the state RCRA regulatory agency for the impoundment to be reclassified and permitted as a landfill under RCRA and analogous state hazardous waste regulations. (*Id.*).

107. The WVDNR granted UCC's request, and as noted above, the landfill was permitted as a landfill under the state portion of the Site's RCRA permit for active, regulated hazardous waste management units. (Segall Ex. 41; Segall Ex. 56, at PA_EPA_004646).

108. MPM has sought unopposed regulatory approval to extend the operating life of Landfill No. 2 for another ten years. (Segall Ex. 58, at 111:8–114:10; Segall Ex. 98).

109. To date, there are no known releases or threatened releases of hazardous substances that have occurred from Landfill No. 2. (Segall Ex. 74, at 207:13–208:20; Segall Ex. 40, at 13-14).

110. MPM has not incurred any response costs associated with the closure or post-closure care of Landfill No. 2. (Segall Ex. 74, at 205:5–8; Segall Ex. 40, at 20-21).

111. No contamination from other areas of the Site is present in the vicinity of the landfill. (Segall Ex. 38, GE_000297-99; Segall Ex. 43, at MPM0008251-55).

## VI. ENVIRONMENTAL DUE DILIGENCE RELATED TO THE 1993 TRANSACTION BETWEEN UCC AND OSI

112. In preparation for a possible future sale of the Site, on March 11, 1992, Environmental Protections Department Head Dennis Heintzman prepared an internal memorandum to David Liebeskind, attaching and summarizing "memoranda in the inactive site files relative to the potential of PCBs being disposed of in the NIS." (Segall Ex. 89).

113. Mr. Heintzman referenced and attached several documents relating to earlier investigations of PCB disposal at the NIS: (1) January and March 1980 PCB analytical data (provided to EPA in 1986); (2) the January 10, 1980 Schubert memorandum on buried waste, which stated that up to 250,000 pound of PCBs used during A-1100 distillation may have been

disposed of at the NIS; (3) Fred Dailey's June 8, 1987 memorandum to file regarding his conversation with EPA during the May 15, 1986 SWMUs inspection, which Mr. Heintzman identified as the "basis for speculation that PCB fluids might have been disposed of in the NIS;" and (4) a July 30, 1987 memorandum authored by UCC in-house counsel Carol Dudnick regarding UCC's CERCLA § 103(c) Notification to EPA that stated there was no basis to revise Union Carbide Corporation's 1981 notification form. (*Id.*).

114. Based on the information he reviewed, Mr. Heintzman concluded that disposal of PCBs in the NIS was "purely speculative" and that the monitoring data did "not substantiate the speculation." (*Id.*, at 2).

115. In connection with the sale of the Site to OSi in 1993, UCC and OSi negotiated environmental condition disclosures to OSi. (Segall Ex. 59, at CHEM_000360-362, CHEM_1305-1374).

116. The disclosure schedule specifically identified that on January 4, 1993, UCC submitted a letter to EPA regarding PCB detections in Sugar Camp Run. (*Id.*, at CHEM_001335).

117. UCC employees, including Dennis Heintzman, gathered various documents, regarding environmental conditions at the Site which were provided to OSi (or its agent) in an off-site data room for review prior to the transaction. (Segall Ex. 8, at 73:1–75:6). These documents included groundwater monitoring data, RCRA operating records, and investigations conducted at the Site, as well as documents concerning UCC's historical investigations of potential PCB and other hazardous waste disposal at the Site. (*Id.*)

118. UCC made available to OSi during the 1993 due diligence period all of the documents and information it had at that time regarding past historical waste disposal practices. (Segall Ex. 8, at 77:1–78:14).

## VII. DUE DILIGENCE RELATED TO THE 2003 TRANSACTION BETWEEN CROMPTON AND GE

119. In connection with the potential sale of the property from Crompton to GE (or one of its affiliates), Environmental Strategies Corporation ("ESC") prepared a Phase I Environmental Assessment of the Site on behalf of Crompton, dated December 4, 2002 ("2002 ESC Report"). (Segall Ex. 2, at GE_001215).

120. The report was provided to GE and its affiliate(s) on or around January 17, 2003. (*Id.*)

121. The 2002 ESC Report addressed historical use and detection of PCBs at the Site. Specifically, the report noted that: (1) in April 1992, PCBs were detected in soil at a construction site at levels below 25 mg/kg (the EPA "action level" for PCBs in soil); (2) a 1993 UCC report to EPA reflected sediment sampling at Sugar Camp Run that had detected PCBs at 2 mg/kg; and (3) a March 1992 UCC internal memorandum stated that PCBs were potentially disposed of in the NIS. (*Id.*, at 44-45).

122. The 2002 ESC Report also discussed several transformers at the facility that contained PCBs at levels less than the regulated 50 ppb level, and noted that an area in the transformer substation was stained black. (*Id.*)

123. The 2002 ESC report included a list of all references used in the report. The references included the March 1992 Heintzman memorandum regarding historical PCB investigation by UCC and the documents attached to that memo, including, Clem Schubert's January 10, 1980 memo, Fred Dailey's June 8, 1987 memo to the UCC SWMU file, and Carol

Dudnick's July 30, 1987 memo regarding UCC's 1981 CERCLA Section 103(c) notification. (*Id.*, at 66; *see supra* ¶¶ 112, 113).

124. In January 2003, ENVIRON, on behalf of GE (and its affiliates), completed a Stage I Environmental Assessment of the Site ("Stage 1 Assessment"). (Segall Ex. 60, at ENVIRON_004105).

125. The purpose of the Stage I Assessment was to identify environmental issues "that could reasonably result in liabilities or compliance costs in excess of $250,000." (*Id.*, at ENVIRON_004107).

126. Another purpose of the Stage I Assessment was to identify environmental, health and safety issues that needed to be further investigated as part of a Phase II investigation of the Site. (Segall Ex. 62, at 4).

127. ENVIRON's Stage I Assessment was based on, among other things: (1) a visit to the Site on January 9–10 2003, (2) interviews with Site personnel, including Fred Dailey (plant manager), Dennis Heintzman (Group Director, Environmental Health and Safety), and Steve Pierce (Safety, Health, and Environmental Affairs Team Leader); and (3) review of documents provided to ENVIRON Site personnel during the January Site visit (documents that were also made available in a "data room" in New York), including the 2002 ESC Report. (Segall Ex. 60, at ENVIRON_004105; Segall Ex. 63, at 51:18-54:7, 59:5-60:2, 68:19-69:22).

128. All of the documents referenced in the 2002 ESC Report, including the 1992 Heintzman memorandum that summarized the earlier PCB investigations at the Site and attachments thereto, also were made available to ENVIRON (and GE) in the 2003 data room during its due diligence review. (Segall Ex. 8, 119:18–125:5).

129. In its Stage I Assessment, ENVIRON stated that certain areas of the Site's manufacturing area had been identified as contaminated with low levels of PCBs during a RCRA Facility Investigation. Environ advised that "additional controls may be required [for] . . . certain sections of the manufacturing area (reportedly identified as contaminated with low levels of . . . PCBs) during the RCRA Facility Investigation (RFI)." (Segall Ex. 60, at ENVIRON_004105, ENVIRON_004111).

130. The Stage I Assessment also noted that "additional control actions may be required from some [of the SWMUs] in the future, including soil removal, RCRA-compliant landfill capping and, as a worst-case scenario, the installation of ground water control measures (e.g. slurry walls). (*Id.*, at ENVIRON_004110).

131. ENVIRON identified that additional controls may be required for the South Inactive Site, the NIS, the former asbestos disposal area, Landfill No. 1, the fly ash disposal area and certain sections of the manufacturing area. (*Id.*, at 4110-11).

132. A 48-Hour Red Flags Summary Report attached to the Stage I Assessment listed specific findings, implications and cost estimates for the "most likely" scenario and "reasonable worst case" scenario. Among other things, the summary indicated that (i) the current WWTU needed to be upgraded to avoid permit exceedances that may cost between $3.0 and $6 million; (ii) several SWMUs were being maintained under the Site's CAP which could require additional actions; (iii) maintenance and inspection of landfill caps on the South Inactive Site, NIS, and Landfill No. 1 could cost approximately $0.5 million annually; (iv) Landfill No. 2 would require a RCRA cap when it reached capacity (estimated between 7 and 10 years) that might cost between $2.5 and $3.5 million; and (iv) soils in some portions of the manufacturing area were

contaminated with PCBs, PAH, and dioxin, which could cost up to $2.0 million to remediate. (*Id.*, at ENVIRON_004121-28).

133. In February 2003, ENVIRON prepared a report entitled "Project Carnival Remedial Cost Estimates for the Sistersville, WV Facility," which was sent to GE (and its affiliates) for review and comments. (Segall Ex. 64).

134. Similar to the 48-hour Red Flag Report, the Remedial Cost Estimate report set forth "most likely case" and "reasonable worst case" cost estimates for various environmental issues and conditions at the Site. (*Id.*)

135. The Remedial Cost Estimate report showed that the cost estimates for certain areas were revised. Some of these estimates are as follows: Landfill No. 2 cost estimates increased to between $3 and $4.5 million; Landfill No. 1 cost estimates increased to between $1 and $2.5 million; NIS cost estimates increased to between $1.5 and $4.5 million; and cost estimates for other SWMUs increased to between $1.5 and $3.1 million. (*Id.*)

136. With respect to the NIS, the Remedial Cost Estimate Report further states that "[l]imited information is available on the nature of the materials disposed in this area, but institutional knowledge indicates that the wastes likely include silicone gums, chlorosilanes, toluene solutions, acrylonitrile, gelled methyl silicones, distillation column pot residues, cyanoethyltiethoxysilane heavies, surfactant production filter cakes, copper containing wastewaters, chlorinated solvents, and, potentially, polychlorinated biphenyls (PCBs)." (*Id.*)

137. On April 19, 2003, a Phase II proposed work plan was sent to GE and its affiliates, which was subsequently revised on April 29, 2003. (Segall Ex. 65; Segall Ex. 66).

138. The Phase II proposed work plan recommended that PCB soil and/or groundwater sampling occur in 15 of 22 areas to be sampled at the Site, with a total of 108 soil samples to be analyzed for PCBs. (*Id.*)

139. In April 2003, Crompton and GE entered into an agreement, which included the sale of the Site to GE (and/or its affiliates), which included indemnity provisions for pre-closing environmental contamination at the Site, as well as a requirement for the parties to undertake "commercially reasonable efforts" to complete a "Phase II investigation," to the closing date. (Segall Ex.3, at MPM0052239-42, MPM0052286-93).

140. In May 2003, prior to transfer of title to the Site to GE Silicones WV, L.L.C. (MPM's predecessor), *see* Segall Ex. at 14, all of the sampling for the Phase II investigation was conducted. (Segall Ex. 87, at MPM0015812-15).

141. The Phase II sampling results indicated that PCBs were found in subsurface soils and groundwater at numerous locations within the manufacturing area and Environmental Protection Area of the Site, where much historic waste management had occurred. Specifically, PCBs were found in soil and groundwater samples in 12 of 24 areas (36 samples), some of which exceeded federal regulatory soil and water quality standards. (Segall Ex. 87).

142. GE and its affiliates received the Phase II sampling results sometime prior to July 30, 2003, no later than when GE received a copy of the draft Phase II report containing the results, which it had and commented on prior to the July 31, 2003 closing date. (Segall Ex. 68, at Segall Ex. 69; Segall Ex. 63, at 125:5-127:14; Segall Ex. 61, at 118:9-119:22; Segall Ex. 71, at ENVIRON_001912-3; Segall Ex. 70, at 63:13-64:3).

143. Between July 2003 and May 2004, GE Silicones (i.e., MPM) received and commented on several drafts of the Phase II report. (Segall Ex. 70, at 69:8-70:21; Segall Ex. 72; Segall Ex. 73; Segall Ex. 74, at 66:22-66:17).

144. In its final May 2004 Phase II report, based on the sampling results, ENVIRON recommended further investigation of the scope of PCB contamination at the Site to determine what actions, if any, would be necessary to comply with federal regulatory requirements. Specifically, the report stated:

> Although Facility representatives are no longer concerned about PCBs in the North Inactive Area, unexpected levels of PCBs were found in some Facility soils and groundwater samples during the Phase II investigation. As there is no obvious source for those PCBs, *resampling of groundwater, and further investigation of soils, is suggested*. . . this Phase II investigation *identified the presence of PCB contamination in several locations at the site in concentrations exceeding federal regulatory soil and water quality standards*. PCBs were found in the following media exceeding regulatory standards: **Soils** – Surficial soils in the waste incineration area and the waste storage area contain PCBs ranging from ND to 370 mg/kg. These concentrations exceed the [Toxic Substances Control Act] low occupancy level of 25 mg/kg. . . . **Groundwater** – PCBs were detected up to 1.7 µg/L, exceeding the US EPA MCL of 0.5 µg/L. With respect to soils, because PCB concentrations are present in excess of regulatory standards, *it is recommended that additional sampling and analysis be completed to determine the nature and extent of the PCB impacts so that the appropriate remedial actions can be developed and implemented* to comply with 40 C.F.R. § 761.3. Regarding groundwater, the detection of PCBs up to 1.7 µg/L is unexpected due to the very low solubility of PCBs in water. *It is recommended that additional sampling and analysis be conducted. . . to determine whether PCBs are really present in groundwater at the site.*

( Segall Ex. 87, at MPM 0015861, MPM 0015799 (emphasis added)).

## VIII. POST-2003 TRANSACTION PCB INVESTIGATIONS AND CHARACTERIZATIONS

145. On July 23, 2004, GE and its affiliates sent a copy of ENVIRON's May 2004 Phase II report to Crompton with a cover letter identifying the PCB sampling detections in two areas of the Site (the Waste Incineration Area and Permitted Hazardous Waste Storage Area) and asserting that Crompton was responsible under the 2003 PEA for the costs associated with needed investigation and remediation of these PCBs. (Segall Ex. 76, at MPM0021401).

146. In 2005, Crompton engaged ESC to investigate and characterize the PCB contamination in the Waste Incineration Area and Permitted Hazardous Waste Storage Area. (Segall Ex. 77).

147. In May 2006, ESC, on behalf of Chemtura (f/k/a Crompton), completed a Phase I PCB Characterization Report. (*Id.*, at MPM0016228).

148. The PCB concentrations for 35 of the 50 samples collected in the Waste Incineration Area exceeded the Toxic Substances Control Act ("TSCA") cleanup criterion cited by ENVIRON. (*Id.*, at MPM0016239). Therefore, ESC recommended additional delineation of the area to identify the vertical and horizontal extent of soil containing PCBs in that area. *Id*.

149. ESC recommended to Chemtura that no further activities were warranted in the SB-74 area,[2] located in the Permitted Hazardous Waste Storage Area, because samples there did not exceed the TSCA criterion. (*Id.*, at MPM0016240). Sampling from SB-67, also in the Permitted Hazardous Waste Storage Area, similarly did not show concentrations of PCBs above the TSCA cleanup criterion cited by ENVIRON. However, because access to SB-67 was limited, ESC was unable to sample soil immediately surrounding the area and recommended further confirmatory sampling. (*Id.*)

[2] "SB-x" refers to a soil boring location at the Site.

150. Although a Phase III PCB characterization report was prepared by WSP Environmental Strategies ("WSP" f/k/a ESC) for the Waste Incineration Area, (Segall Ex. 78, at MPM0016306), MPM has not conducted that Phase III investigation or taken any other steps to further delineate the contamination in the Waste Incineration Area. (Segall Ex. 58, at 107:13–109:6; Segall Ex. 74, at 171:22–177:21).

## IX. UPGRADE OF THE WASTEWATER TREATMENT UNIT

151. In 2008, MPM began an upgrade to the WWTU at the Site to avoid exceedances of wastewater discharge limitations in its permit and overflows that were occurring. (Segall Ex. 74, at 57:8-15, 61:6-10; Segall Ex. 79, at 30:18-24).

152. The WWTU planned upgrades included construction of a 2.2 MG equalization tank and pump station to allow the existing equalization basin to be converted into an emergency storage basin. The pump station was to be constructed beneath the concrete base of a former equalization basin that had been backfilled. (Segall Ex. 79, at 74-76).

153. The planned excavation area of the pump station construction for the WWTU upgrade was 60 feet by 100 feet. (Segall Ex. 79, at 74-76).

154. During excavation in June 2008 for the construction project, an area of discolored soil was identified. (Segall Ex. 79, at 48:15-49:16).

155. A June 9, 2008 laboratory analysis of a subsurface soil sample detected PCBs at a concentration of 179 mg/kg. (Segall Ex. 80, at MPM0055056).

156. In an August 25, 2008 letter to Chemtura, MPM noticed a claim for a newly discovered "small area" of PCB contamination near the WWTU requiring remediation and stated that Chemtura was responsible for the contamination under GE/Chemtura's 2003 PEA. (Segall

Ex. 81, at MPM0021442). MPM did not contact UCC regarding the PCB contamination at this time before proceeding with PCB sampling that occurred over the next fourteen months.

157. In 2009, MPM hired Clean Harbors to conduct PCB analysis and remediation in this area. (Segall Ex. 82, at MPM0055605).

158. The proposal submitted by Clean Harbors included a four-phased approach for the PCB analysis and remediation, which Clean Harbors estimated to cost $366,270 in total. (*Id.*, at MPM0055612).

159. As part of the first phase of the Clean Harbors PCB analysis and remediation proposal, Clean Harbors sampled soils in the WWTU area between July 9, 2009 and September 9, 2009. (Segall Ex. 57).

160. As soon as the PCB sampling undertaken by Clean Harbors was stopped, MPM filled in the excavation areas in the WWTU area where PCBs were uncovered. (Segall Ex. 58, at 102-03).

161. MPM has not conducted any further soil sampling in the WWTU area since September 2009. (Segall Ex. 58, at 49:9-12; (Segall Ex. 74, at 142:18–143:4).

162. MPM has not undertaken any further work on the WWTU upgrade since September 2009. (Segall Ex. 58, at 49:13-16). In particular, it has not removed or remediated the PCB-contaminated soil remaining in the area it had excavated. (*Id.*)

163. MPM waited until September 2010 before informing UCC about the PCB contamination in the WWTU area for the first time and asking it to participate in the cleanup. (Segall Ex. 40, Response 13; Segall Ex. 83).

164. At present, MPM has not approved any plans or authorized any funds to complete the WWTU upgrade. (Segall Ex. 58, at 49:20-50:3).

165. MPM has not performed any risk assessment of potential threats to human health or the environment posed by PCB contamination at the WWTU. (Segall Ex. 74, at 127:3-21; Segall Ex. 58, at 46:2-22; Segall Ex. 79, at 77:18-78:16; Segall Ex. 93, at 109:8-110:14).

166. The only PCB-related remedial work conducted by MPM at the Site was performed in connection with PCB contamination at the WWTU. (Segall Ex. 74, at 44:18–49:21).

167. The only past costs for which MPM seeks relief are those incurred in the course of its PCB investigation at the WWTU. (*Id.*, at 44:18–49:21).

## X. JUDICIAL ADMISSIONS BY MPM

168. The only past response costs for which MPM seeks reimbursement under CERCLA are those incurred in the course of its PCB investigation at the WWTU. (Segall Ex. 7, Response No. 8; Segall Ex. 40, Response Nos. 13, 24; Segall Ex. 84, at 5; Segall Ex. 85; Segall Ex. 74, at 44:18–49:21).

169. MPM admits that PCBs are the only hazardous substance for which it seeks relief in this action. (Segall Ex. 7, Response No. 3; Segall Ex. 86, at 36:11-37:15).

170. MPM admits that it disposed of PCBs in Landfill No. 2. (Segall Ex. 7, Response No. 30).

171. MPM admits that when it took ownership of the Site, it knew some SWMUs at the Site required ongoing corrective action. (Segall Ex. 7, Response Nos. 25-27).

172. MPM admits that when it took ownership of the Site, it knew that Landfill No. 2 could be subject to closure and post-closure requirements. (Segall Ex. 7, Response Nos. 38-39).

Dated: May 4, 2015

BEVERIDGE & DIAMOND, P.C.

By: s/ Harold L. Segall
Karl S. Bourdeau (Bar Roll No. 103740)
Harold L. Segall (Bar Roll No. 103741)
1350 I Street, N.W., Suite 700
Washington, DC 20005
Tel.: (202) 789-6000
Fax: (202) 789-6190
kbourdeau@bdlaw.com
hsegall@bdlaw.com

Megan R. Brillault (Bar Roll No. 511541)
477 Madison Avenue, 15th Floor
New York, NY 10022
Tel.: (212) 702-5400
Fax: (212) 702-5450
mbrillault@bdlaw.com

*Attorneys for Defendant*
*Union Carbide Corporation*