UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MPM SILICONES, LLC,<br>Plaintiff,<br>v.<br>UNION CARBIDE CORPORATION,<br>Defendant. | No. 1:11-CV-1542 LEK/ATB |

**MPM SILICONES, LLC'S SUPPLEMENTAL RESPONSES TO DEFENDANT UNION CARBIDE CORPORATION'S FIRST SET OF INTERROGATORIES TO PLAINTIFF MPM SILICONES, LLC**

Plaintiff MPM Silicones, LLC ("MPM") hereby supplements its responses and objections to Defendant Union Carbide Corporation's First Set of Interrogatories to Plaintiff MPM Silicones, LLC as follows:

## GENERAL OBJECTIONS

MPM incorporates the General Objections set forth in MPM's February 15, 2012 Responses to Defendant Union Carbide Corporation's First Set of Interrogatories to Plaintiff MPM Silicones, LLC into its supplemental response to each of the interrogatories propounded by Union Carbide Corporation ("UCC") as though restated in full therein.

## SUPPLEMENTAL RESPONSES TO INTERROGATORIES

**Interrogatory No. 1**

Identify each Person with knowledge Relating to any of the allegations and claims in the Complaint, briefly describing the factual area regarding which each such Person is knowledgeable.

**Supplemental Response to Interrogatory No. 1**

MPM objects to this interrogatory on the grounds that it is overbroad and unduly burdensome. MPM further objects to this interrogatory to the extent that it requests information not reasonably available to MPM. Subject to and without waiver of any of the foregoing general and specific objections and as a supplemental response, MPM states that it identified persons with knowledge relating to the allegations and claims in the Complaint, and provided a brief description of the factual area regarding which those persons were knowledgeable, in its Initial Disclosures. MPM further states that the allegations and claims in the Complaint relate primarily to the operations conducted by UCC at the Site from 1955 to 1993. The information MPM has about UCC's operations derives from UCC's operating records which UCC left at the Site when it sold the Site in 1993. MPM has no information about what knowledge any person may currently have about UCC's historical operations other than the names that appear on UCC's documents – which have been produced to UCC in discovery. Presumably, UCC is in a better position than MPM to determine what knowledge UCC's current or former employees have about UCC's historical operations at the Site. Further responding, MPM directs UCC's attention to MPM's response to EPA's Section 104(e) Information Request, dated August 1, 2012, where a subset of those documents, which MPM believes are most likely to contain information of the type sought by UCC, have been collected and explained. Without limiting the generality of the foregoing, MPM states that those documents produced to EPA in response to EPA's request number 9 (Bates Stamp Nos. MPM0019078-MPM0021110), EPA's request number 11 (Bates Stamp Nos. MPM00221111-MPM0021394), and documents attached to that response as Appendix A (Bates Stamp Nos. MPM0015737-MPM0015777), contain information regarding UCC's use, storage, disposal, and release of PCBs at the Site.

**Interrogatory No. 2.**

Separately for each Area at Issue, Describe in Detail All Facts and Identify all Documents supporting Your contention in paragraph 22 of the Complaint that "there has been a release of hazardous substances" within the meaning of CERCLA.

**Supplemental Response to Interrogatory No. 2**

MPM objects to this interrogatory on the grounds that it is overbroad and unduly burdensome. MPM further objects to this interrogatory to the extent that it assumes that there are separate "areas" at issue involving the release of PCBs; MPM believes that all of the PCBs released at the Site relate to the manufacturing operations conducted by UCC. Subject to and without waiver of any of the foregoing general and specific objections and as a supplemental response, MPM states that PCBs have been detected in the environment in several areas at the Site, evidencing releases of PCBs which originated with UCC's operations at the Site. PCBs were detected by MPM in the area where MPM was attempting to develop a new Wastewater Treatment Facility. The PCB test results documenting the release in this area are attached to MPM's response to EPA's Section 104(e) Information Request, dated August 1, 2012, request number 2 (Bates Stamp Nos. MPM0016610-MPM0018494). PCBs were detected at other locations at the Site as part of an investigation conducted on behalf of Chemtura Corporation. Documents relating to the detection of PCBs associated with that investigation are attached to MPM's response to EPA's Section 104(e) Information Request, dated August 1, 2012, request number 1 (Bates Stamp Nos. MPM0015778-MPM0016609) and request number 6 (Bates Stamp Nos. MPM0018872-MPM0018895). PCBs were also documented in the environment at the Site in the Environ Report (Bates Stamp Nos. MPM0015788-MPM0015972). MPM notes that the full vertical and horizontal extent of PCB contamination at the Site has not been determined and that UCC has declined MPM's requests that UCC perform the further investigation necessary to

complete the characterization of PCB contamination at the Site. Further responding, MPM states that documents left at the Site by UCC include documents evidencing and describing UCC's release of PCBs at the Site, including documents relating to an investigation of UCC's release and disposal of PCBs at the Site that appears to have been conducted by a UCC employee named C. F. Schubert. MPM has provided these documents to UCC, and specifically directs UCC's attention to MPM's response to EPA's Section 104(e) Information Request, dated August 1, 2012, where a subset of those documents, which MPM believes are most likely to contain information of the type sought by UCC, have been collected and explained. Without limiting the generality of the foregoing, MPM states that those documents produced to EPA in response to EPA's request number 9, as well as documents attached to that response as Appendix A, contain information regarding UCC's disposal and release of PCBs at the Site.

**Interrogatory No. 3**

Separately for each Area at Issue, Describe in Detail All Facts and Identify all Documents Relating to any acts or omissions of UCC that You contend caused or contributed to contamination of the Environment at any Area at Issue.

**Supplemental Response to Interrogatory No. 3**

MPM objects to this interrogatory on the grounds that it is overbroad and unduly burdensome since it purports to require the identification of a significant portion of the over 100 boxes of UCC's operating records left at the Site. MPM further objects to this interrogatory to the extent that it assumes that there are separate "areas" at issue involving the release of PCBs; MPM believes that all of the PCBs released at the Site relate to the manufacturing operations conducted by UCC. Additionally, MPM objects to this interrogatory to the extent that it requests information not reasonably available to MPM. Subject to and without waiver of any of the

foregoing general and specific objections and as a supplemental response, MPM states that UCC purchased hundreds of thousands of pounds of PCBs as reflected in UCC's contemporaneous inventory records left at the Site as well as in a January 10, 1980 Memorandum prepared by C. F. Schubert (see MPM0015738-MPM0015739). By way of example only, a UCC record titled "Inventory" lists UCC as maintaining physical inventories of tens of thousands of pounds of Aroclors (a type of PCB) at various times during the late 1950s and early 1960s (this document has been produced to UCC with Bates Stamp Nos. MPM0021114-MPM0021123). UCC utilized PCBs as pot chasers in its manufacture of at least two products – A-1100 and Cyanoethyltriethoxsilane ("CNE"). For example, a document providing a "Cost Estimate for Distilled Cyanoethyltriethoxysilane" dated 11/25/59 (produced to UCC with the Bates No. MPM0021128), lists the raw materials as 12,000 pounds of Crude cyanoethyltriethoxysilane (72% product) and 1440 pounds of Arochlor-1242. The document goes on to report that there was "1 lb Arochlor -1242 per lb. of contained residues" indicating that all of the PCBs used in the manufacture of CNE remained as residue with none being incorporated into the final product. At the end of the manufacturing process, the PCBs remained in still bottoms or "heavies" which were discharged into a neutralization tank and/or into lime pits at the Site. As UCC employee C. F. Schubert explained in his January 10, 1980 Memorandum, large amount of PCBs were disposed of in ponds, lime pits, and elsewhere at the Site, which disposal areas MPM believes were in the vicinity of areas where PCBs have now been detected: "750,000 pounds would have been cyanoethyltriethoxysilane heavies, and A-1100 heavies with up to 250,000 pounds of PCBs used as chosen during A-1100 distillation." However, MPM notes that Mr. Schubert stated that UCC had moved waste from the vicinity of the buried waste area and lime pits to other areas: "To complicate the situation, all wastes have not been allowed to rest in peace. When the No. 1 Landfill was constructed, clay for the impermeable lining was obtained from the hillside east of

the buried waste area, and subsequently this area was backfilled with sludge from the lime ponds and other wastes in the area where the UNOX units now exist." Further responding, MPM states that documents relating to UCC's use and disposal of PCBs at the Site, including Mr. Schubert's investigation of the same, are attached to MPM's Response to EPA's Section 104(e) Information Request, dated August 1, 2012, request number 9 and request number 11, as well as in the documents attached to that response as Appendix A, which have been provided to UCC.

Further responding, MPM states that although UCC's documents indicate that UCC was aware of its use and disposal of PCBs at the Site (see by way of example the 1/10/80 C. F. Schubert Memorandum and a UCC Memorandum from Dennis R. Heintzman and E.L. Doerflien to R. L. Foster dated September 14, 1984 (which has been provided to UCC with the Bates Stamp Nos. MPM0015757-MPM0015773)), UCC did not disclose its use or disposal of PCBs at the Site in its CERCLA Section 103(c) notification nor in any of its RCRA permit application documents. Indeed, UCC considered disclosing its use, storage, disposal, and release of PCBs at the Site to regulators, but chose not to (see, by way of example only, the document marked MPM0000136, which was provided by MPM to UCC in January of 2011, and which was also included in MPM's August 1, 2012 response to EPA's Section 104(e) Information Request). MPM's review of the UCC records left at the Site, including RCRA permit applications, has not to date identified any disclosure of UCC's use, storage, disposal, and release of PCBs at the Site to regulators as part of any of its RCRA permit application documents. As an example of the types of documents included in the materials referenced above as evidencing UCC's awareness of PCB releases at the Site at the time it was submitting information relating to the site to regulators pursuant to CERCLA and RCRA, MPM directs UCC's attention to an October 15, 1979 Memorandum in which Mr. Schubert wrote to D. G. Mosher and A. W. Boyd of UCC that "I made sure that Ron [Van Mynen] understood that we may have 500,000 pounds of PCB in the

north landfill area and that 1 to 2 ppb may be found in Sugar Camp Run. He was not alarmed about this and doubts if we need to worry about it." That Memorandum was previously provided to UCC, including with the Bates Stamp No. MPM0015740.

**Interrogatory No. 4**

Separately for each Area at Issue, Describe in Detail All Facts and Identify all Documents Relating to any Release or Threatened Release of a Hazardous Substance that occurred at or from any Area at Issue as a result of UCC's actions, operations, inaction, or use of the Site or any portion of the Site.

**Supplemental Response to Interrogatory No. 4**

MPM incorporates its objections and responses to Interrogatory Nos. 2 and 3 which identify areas where PCBs have been detected and the UCC operations which caused the release of those PCBs.

**Interrogatory No. 5**

Separately for each Area at Issue, Describe in Detail All Facts and Identify all Documents Relating to every Release or Threatened Release of a Hazardous Substance that occurred at or from any Area at Issue as a result of Your actions, operations, inaction, or use of the Site or any portion of the Site.

**Supplemental Response to Interrogatory No. 5**

MPM objects to this interrogatory on the grounds that it is overbroad and unduly burdensome to the extent it seeks information about releases of hazardous substances other than PCBs. MPM further objects to this interrogatory to the extent that it assumes that there are separate "areas" at issue involving the release of PCBs; MPM believes that all of the PCBs

released at the Site relate to the manufacturing operations conducted by UCC. MPM further objects to this interrogatory to the extent that it seeks information that is neither relevant nor likely to lead to the discovery of admissible evidence. Subject to the foregoing general and specific objections, MPM states that it has never used PCBs at the Site and to MPM's knowledge there have been no releases of PCBs at or from the Site caused by MPM.

**Interrogatory No. 6**

Specify by name and precise location each SWMU and PCB Area at or from which MPM contends there has been a Release or Threatened Release of a Hazardous Substance Relating to which MPM seeks relief in this action, and provide a map of the Site to scale identifying the location of each such area.

**Supplemental Response to Interrogatory No. 6**

MPM objects to this interrogatory on the grounds that it is overbroad and unduly burdensome to the extent it seeks information about hazardous substances other than PCBs. MPM further objects to this interrogatory to the extent that it duplicates Interrogatory No. 2. Subject to and without waiver of any of the foregoing general and specific objections and as a supplemental response, MPM refers to and incorporates by reference its response to Interrogatory No. 2 above, which provided specific Bates Stamps numbers for documents that identify the locations where PCBs have been confirmed to have been released so far at the Site. With respect to SWMUs, MPM states that the location of releases or threatened releases for which MPM seeks relief in this action, including the location of such releases or threatened releases relative to current or past SWMUS, is indicated, to the extent it is currently known, in the materials described in MPM's response to interrogatory No. 2.

**Interrogatory No. 7**

Separately for each Area at Issue, specify the precise location of each Release or Threatened Release of a Hazardous Substance Relating to which MPM seeks relief in this action, when each such Release occurred, and the cause of each such Release.

**Supplemental Response to Interrogatory No. 7**

MPM incorporates its objections and response to Interrogatory No. 6.

**Interrogatory No. 8**

Name each Hazardous Substance that was the subject of a Release or Threatened Release Relating to which MPM seeks relief in this action (regardless of whether listed in paragraph 10 of the Complaint), and with respect to each such Hazardous Substance, specify each Area at Issue where a Release or Threatened Release took place and Describe in Detail All Facts and Identify all Documents Relating to UCC's and MPM's use, Disposal, or Release of that Hazardous Substance.

**Supplemental Response to Interrogatory No. 8**

MPM objects to this interrogatory on the grounds that it is compound and is improperly characterized as a single interrogatory. Subject to and without waiver of any of the foregoing general and specific objections and as a supplemental response, MPM states that it seeks relief with respect to releases or threatened releases of PCBs and incorporates its objections and responses to Interrogatories No. 2 through 6. MPM notes that the relief it seeks to date with respect to the release and threatened release of hazardous substances is limited to PCBs; however, MPM further states that investigation of the releases and threatened releases of hazardous substances at the Site is ongoing and MPM reserves its right to seek relief with respect to releases or threatened releases at the Site of substances other than PCBs.

**Interrogatory No. 9**

Describe in Detail All Facts and Identify all Documents supporting Your contention in paragraph 11 of the Complaint that "[f]rom approximately the 1950s into the 1970s ... UCC disposed of the PCBs that were used in the manufacture of its products at several locations within the Sistersville Site, including without limitation in unlined lagoons. During this time period, UCC disposed of other wastes generated at the Sistersville Site, including hazardous substances, in the same manner."

**Supplemental Response to Interrogatory No. 9**

MPM objects to this interrogatory on the grounds that it is overbroad and unduly burdensome since the interrogatory purports to require MPM to identify a significant portion of the over 100 boxes of UCC's operating records left at the Site. MPM further objects to this interrogatory to the extent that it requests information not reasonably available to MPM. Subject to and without waiver of any of the foregoing general and specific objections and as a supplemental response, MPM incorporates its objections and response to Interrogatories No. 2 and 3 which lay out the basis of MPM's statement in paragraph 11 that "UCC disposed of the PCBs that were used in the manufacture of its products at several locations within the Sistersville Site, including without limitation in unlined lagoons." As to the next sentence in paragraph 11 of the Complaint, MPM notes that EPA's 12/17/90 Corrective Action Permit to UCC identified a number of Solid Waste Management Units where UCC had disposed of waste. Additionally, the May 2004 Report by Environ identifies numerous areas where UCC disposed of wastes, including hazardous substances.

**Interrogatory No. 10**

If You contend that UCC's alleged failure to "disclose the presence and historical use of PCBs in its 1981 Notice of Hazardous Waste Site form submitted to the United States Environmental Protection Agency" (Complaint ¶ 13) constituted a violation of section 103(c) of CERCLA, 42 U.S.C. § 9603(c), or that UCC's alleged failure to "disclose the presence of PCBs to EPA or West Virginia regulators during the RCRA and West Virginia Hazardous Waste Management permit application process for the Sistersville Site" (Complaint ¶ 13) constituted a violation of any federal or state law, Describe in Detail All Facts (Including the legal basis) and Identify all Documents supporting such contentions.

**Supplemental Response to Interrogatory No. 10**

MPM objects to this interrogatory on the grounds that it is overbroad and unduly burdensome since it purports to require MPM to identify a significant portion of the over 100 boxes of UCC's operating records left at the Site relate to UCC's purchase, use, storage, release, and disposal of PCBs. Further objecting, MPM objects to this interrogatory on the grounds that it is a confusingly compound question. Finally, MPM objects to this interrogatory to the extent it seeks MPM's legal analysis which is privileged work product. Subject to and without waiver of any of the foregoing general and specific objections and as a supplemental response, MPM states that it believes UCC's failure to disclose its use and disposal of PCBs at the Site to regulators was contrary to state and federal law including reporting and/or disclosure obligations under CERCLA and RCRA. As noted in MPM's response to Interrogatory No. 3 above, UCC knew prior to 1981 that it had used and disposed of hundreds of thousands of pounds of PCBs at the Site. For instance, Mr. Schubert in a number of memoranda, which have been provided to UCC and which can be found in those documents produced by MPM in response to requests 9 and 11 of EPA's Section 104(e) Information Request, advised UCC of its use and disposal of PCBs. By

way of example only, in 1979, Mr. Schubert told UCC: "I made sure that Ron [Van Mynen] understood that we may have 500,000 pounds of PCB in the north landfill area . . . ." As a further example, by 1984, internal memoranda show that UCC had determined, that for at least some portions of the Site, "The contaminants of greatest concern are PCB's which may have been buried in the area" (quotation from the page marked MPM0001877, which MPM provided to UCC in January of 2011 and which was also included in MPM's August 1, 2012 response to EPA's Section 104(e) Information Request).

Because UCC owned the Site at the time when PCBs, which were a listed hazardous substance, were known, or at least suspected, to have been used and disposed of at the Site, UCC had an obligation to give notification to the EPA of that fact under Section 103(c) of CERCLA. UCC failed to do so (see, for example, the document Bates No. MPM0002506, which was provided by MPM to UCC in January of 2011, and which was also included in MPM's August 1, 2012 response to EPA's Section 104(e) Information Request, in which UCC chose not to check the box on a Section 103(c) notification form that would have indicate that PCB wastes were present at the Site).

Regulations applicable when UCC applied for its RCRA Part B Permit required the disclosure of UCC's use and disposal of hazardous wastes and hazardous constituents, which include PCBs: "The owner or operator of any facility containing one or more solid waste management units must submit all available information pertaining to any release of hazardous wastes or hazardous constituents from such unit or units." 40 CFR § 270.14(d)(2); see also 40 CFR § 270.10(j)(2) and 40 CFR § 270.14(c). The first page of the 1990 RCRA Corrective Action Permit which UCC obtained for the Site states: "This permit is based on the assumption that the information provided to EPA by the Permittee is accurate. Further, this permit is based in part on the provisions of Sections 206, 212, and 224 of HSQA, which amend Sections 3004

and 3005 of RCRA. In particular, Section 206 requires corrective action for all releases of hazardous waste or hazardous waste constituents from any solid waste management unit at a treatment, storage, or disposal facility seeking a permit, regardless of the time at which waste was placed in such unit. Section 212 provides authority to review and amend the permit at any time. Any inaccuracies found in the submitted information may be grounds for termination, modification, or revocation, and reissuance of this permit (See 40 C.F.R. §§270.41, 270.42, and 270.43) and potential enforcement action." Part I, 1.15 of the 1990 Permit notes that "Whenever the Permittee becomes aware that it failed to submit any relevant facts in the permit application, or submitted incorrect information in a permit application or in any report to the Regional Administrator or Director, the Permittee shall notify the Regional Administrator or Director of such failure within seven days." The use and disposal of hundreds of thousands of pounds of PCBs, a hazardous constituent, was plainly a necessary disclosure in applying for a RCRA permit and UCC failed to make that required disclosure or to later amend or supplement its initial inaccurate or incomplete disclosures. Further responding, MPM directs UCC's attention to those documents that were included in MPM's August 1, 2012 response to EPA's Section 104(e) Information Request, particularly those produced in response to EPA's request number 9 and request number 11, and those documents attached to that response as Appendix A.

Further responding, MPM expects this issue of UCC's violation of law in failing to report its use and disposal of PCBs to be a subject of expert testimony.

**Interrogatory No. 11**

For each alleged Release or Threatened Release of a Hazardous Substance from Landfill No. 2, Describe in Detail All Facts Relating to such Release or Threatened Release, name the Hazardous Substances involved, state the cause of the Release or Threatened Release, specify the

actions or other steps taken by MPM in response to the Release or Threatened Release, and for each Release state the date it occurred and identify any monitoring equipment that detected such Release.

**Supplemental Response to Interrogatory No. 11**

MPM objects to this interrogatory on the grounds that it is overbroad and unduly burdensome. MPM further objects to this interrogatory on the grounds that it seeks information not relevant to this action. Subject to the foregoing general and specific objections, MPM states that, to date, it has not conducted PCB testing in connection with Landfill No. 2 and is not currently alleging any release or threatened release of a hazardous substance other than PCBs from Landfill No. 2 as a basis for any relief sought in this action. MPM further states that it is not aware of any release of PCBs from Landfill No. 2 at this time, although investigation of PCB releases at the Site is ongoing.

**Interrogatory No. 12**

Provide Your best estimate of the total volume of hazardous waste and separately the total volume of non-hazardous solid waste (as "hazardous waste" and "non-hazardous solid waste" are used in RCRA and its implementing regulations, and without regard to whether any such waste was placed in Landfill No. 2 before or after the effective date of any RCRA hazardous waste listing or characteristic) disposed of in Landfill No. 2 by each past and present owner of the Site, Including MPM, and the basis for such estimate. In the event You are unable to determine whether a given quantity of waste is hazardous, provide separately Your best estimate of the total volume of such waste.

**No Supplemental Response to Interrogatory No. 12**

**Interrogatory No. 13**

Separately for each Area at Issue, Describe in Detail All Facts and Identify all Documents Relating to any Response Action for which MPM seeks Response Costs, Including when each such action took place or will take place, the individuals involved in any way in undertaking or supervising that action or having it undertaken, the reasons why that action was taken or will be taken, and an itemization of each specific Response Cost associated with that action.

**Supplemental Response to Interrogatory No. 13**

MPM objects to this interrogatory on the grounds that it is overbroad and unduly burdensome. Subject to and without waiver of any of the foregoing general and specific objections and as a supplemental response, MPM states that it undertook response actions subsequent to encountering PCBs in discolored soils at the Site. Those PCBs were encountered in connection with its effort to develop a new wastewater treatment facility at the Site in 2008. After sampling of the discolored soils revealed the presence of PCBs, additional testing over a grid in the vicinity of the discolored soils was undertaken. Those response actions included preparation of the sampling area, analysis of soil samples at the laboratory, decontamination of excavating equipment, disposal of PCB contaminated media, and documentation of those efforts. Further responding, MPM has provided to UCC documents that describe the response actions taken by MPM, when those actions were taken, sampling results, the individuals involved in undertaking and supervising those actions, why those actions were taken, and invoices which itemize the costs of specific response actions. MPM specifically directs UCC's attention to MPM's response to EPA's Section 104(e) Information Request, dated August 1, 2012, where a subset of those documents, which contain information of the type sought by UCC have been collected and explained. Without limiting the generality of the foregoing, MPM states that those

documents produced to EPA in response to EPA's requests number 2 and 12 contain information regarding MPM's response actions at the Site. MPM further states that MPM provided invoices for its response costs to UCC in May of 2011 and has subsequently produced those documents to UCC again. MPM directs UCC's attention to documents Bates Nos. MPM0023831-MPM0023870. MPM further states that the individuals involved in undertaking or supervising MPM's response actions were identified in MPM's Initial Disclosures and are further identified in the documents described above.

MPM further states that the reasons why these actions were taken, and that these actions were necessary, reasonable, consistent with the National Contingency Plan, and prudent actions to protect public health and the environment may be the subject of expert testimony.

**Interrogatory No. 14**

For each Response Action identified in response to Interrogatory No. 13, Describe in Detail All Facts (Including the legal basis) and Identify all Documents supporting Your contention that such Response Action and associated costs are consistent with each and every requirement referred to in 40 C.F.R. § 300.700(c)(3)(i), (c)(5), and (c)(6).

**Supplemental Response to Interrogatory No. 14**

MPM objects to this interrogatory on the ground that it improperly and misleadingly suggests that each and every requirement of 40 C.F.R. § 300.700(c)(3)(i), (c)(5), and (c)(6) applies to MPM's response actions and costs. MPM further objects to this interrogatory on the ground that it seeks no facts but only MPM's legal analysis which is privileged work product. Subject to and without waiver of any of the foregoing general and specific objections and as a supplemental response, MPM has identified the response actions it has taken to date and the costs of those actions in its responses to interrogatories number 13, 15, and 18. Further

responding, MPM expects the issue of whether its response costs were consistent with the National Contingency Plan, 40 CFR Part 300 *et seq.*, to be the subject of expert testimony.

**Interrogatory No. 15**

If You contend that the Response Costs You are seeking from UCC under CERCLA are "necessary costs of response" within the meaning of section 107(a) of CERCLA, 42 U.S.C. § 9607(a), separately for each such cost Describe in Detail All Facts (Including the legal basis) and Identify all Documents supporting such contention.

**Supplemental Response to Interrogatory No. 15**

MPM objects to this interrogatory on the ground that it is overbroad and unduly burdensome. Further objecting, MPM notes that the interrogatory seeks no facts but only MPM's legal analysis, which is privileged work product. Subject to and without waiver of any of the foregoing general and specific objections and as a supplemental response, MPM states that it does contend that the response costs it is seeking are "necessary costs of response" within the meaning of section 107(a) of CERCLA, 42 U.S.C. § 9607(a). Without limiting the generality of the foregoing, MPM states that once it encountered discolored soils in connection with the excavation undertaken for upgrading its Wastewater Treatment Facility it was necessary to sample those discolored soils before moving forward with further excavation to ensure that any materials would be handled in accordance with applicable environmental law, workers would not be exposed to potentially unsafe condition, any environmental impacts caused by the presence of contamination were not exacerbated, and issues requiring further investigation to protect human health, safety, and the environment were identified. Once the initial sampling showed high concentrations of PCBs, it was necessary for MPM to characterize the vertical and horizontal extent of the contamination to ensure that it did not unsafely dislodge and relocate hazardous

substances, to ensure that it did not install the upgraded facilities in the midst of unidentified environmental hazards, and to assess its obligations under applicable environmental laws. Further responding, MPM notes that the issue of whether its response costs were necessary costs of response may be the subject of expert testimony.

Further responding, MPM states that documents left at the Site by UCC evidencing the extent of PCB disposal and/or release at the Site, as well as documents demonstrating the discovery of PCBs at the Site, support the contention that response actions, including those that have been undertaken by MPM are necessary. MPM directs UCC's attention to the documents produced to EPA as part of MPM's response to EPA's Section 104(e) Information Request, dated August 1, 2012, and in particular to those documents produced in response to EPA's requests numbered 1, 2, 9, 11 and 12, and to Appendix A to that response, all of which have been provided to UCC.

**Interrogatory No. 16**

Specify by the number (or other designation) each groundwater monitoring well, and depict on a map drawn to scale the location of each such well, that MPM is currently using for monitoring or other purposes (or has employed at any time since it purchased the Site) pursuant to its RCRA permit to determine whether there have been any Releases of CERCLA hazardous substances or RCRA hazardous constituents from Landfill No 2.

**Supplemental Response to Interrogatory No. 16**

MPM objects to this interrogatory on the grounds that it seeks information not relevant to this action and is overly broad and unduly burdensome to the extent it seeks information about hazardous substances other than PCBs. Subject to and without waiver of any of the foregoing general and specific objections and as a supplemental response, MPM states that it has provided

numerous documents specifying the groundwater monitoring wells at the Site and depicting the same on scale maps. By way of example, MPM directs UCC's attention to the documents produced to EPA as part of MPM's response to EPA's Section 104(e) Information Request, dated August 1, 2012 in response to EPA's request number 4.

**Interrogatory No. 17**

If You contend that the Release of a Hazardous Substance at or from any Area at Issue poses a threat to human health or the Environment, separately for each such Release in each such Area at Issue Describe in Detail All Facts (Including any threat You allege was involved, any human health or environmental receptor at issue, and the precise nature and extent of the risk posed to each such receptor) and Identify all Documents supporting such contention.

**No Supplemental Response to Interrogatory No. 17.**

**Interrogatory No. 18**

Separately for each Area at Issue, Describe in Detail All Facts and Identify all Documents supporting Your contention that each Response Action Relating to which You seek relief in this action was, is, or will be necessary to protect human health or the Environment.

**Supplemental Response to Interrogatory No. 18**

MPM objects to this interrogatory to the extent it seeks expert conclusions or opinions. MPM further objects to this interrogatory on the grounds that it is overbroad and unduly burdensome. Subject to the foregoing general and specific objections, MPM states that once it encountered discolored soils in connection with the excavation undertaken for upgrading its Wastewater Treatment Facility it was necessary to sample those discolored soils before moving forward with further excavation to ensure that any materials would be handled in accordance

with applicable environmental law, workers would not be exposed to unsafe conditions, any environmental impacts caused by the presence of contamination were not exacerbated, and issues requiring further investigation to protect human health, safety, and the environment were identified. Once the initial sampling showed high concentrations of PCBs, it was necessary for MPM to characterize the vertical and horizontal extent of the contamination before it could continue with its excavation and construction activities to ensure that it did not unsafely dislodge and relocate hazardous substances, to ensure that it did not install the upgraded facilities in the midst of unidentified environmental hazards, and to assess its obligations under applicable environmental laws. Further responding, MPM notes that the issue of whether its response costs were necessary to protect human health and safety may be the subject of expert testimony.

Further responding, MPM directs UCC's attention to the documents produced to EPA as part of MPM's response to EPA's Section 104(e) Information Request, dated August 1, 2012, and in particular to those documents produced in response to EPA's requests numbered 1, 2, 9, 11 and 12, and to Appendix A to that response, all of which have been provided to UCC.

**Interrogatory No. 19**

Describe in Detail All Facts (Including the legal basis) and Identify all Documents supporting Your contention in paragraph 19 of the Complaint that UCC is liable for a "share" of the costs of closing Landfill No. 2, Including the percentage share of costs You attribute to UCC, MPM, and any other Person.

**Supplemental Response to Interrogatory No. 19**

MPM objects to this interrogatory on the grounds that it is overbroad and unduly burdensome. Subject to and without waiver of any of the foregoing general and specific objections and as a supplemental response, MPM states that wastes generated by UCC have been

disposed of in Landfill No. 2 and that UCC is liable for an equitable share of the costs associated with closing Landfill No. 2 under Common Law principles, including the doctrine of Restitution. Closure of Landfill No. 2 will benefit UCC by, among other things, reducing UCC's potential liability to third parties, including MPM. UCC opened Landfill No. 2 in or about 1979 and used that landfill until it departed the Site in 1993. MPM believes it is not possible at present to determine UCC's percentage share. Landfill No. 2 closure costs have not yet been determined since the Landfill continues to operate. Until closure costs are determined it will not be possible to know if those costs are strictly a function of volume of waste disposed or some other factors. For example, MPM has not yet conducted PCB testing at Landfill No. 2 so it is not yet known whether any PCBs present at Landfill No. 2 originating from UCC's operations will affect closure costs. Under these circumstances, it is not yet possible to determine UCC's share of closure costs.

**Interrogatory No. 20**

If You contend that You are not liable under CERCLA for any of the Response Costs You seek in this action, Identify each such Response Cost and every fact, Document, and Person with knowledge that supports that contention and Identify the legal basis for that contention.

**Supplemental Response to Interrogatory No. 20**

MPM objects to this interrogatory on the grounds that it is vague, ambiguous and confusing. MPM further notes that in light of the dismissal of its contribution claim under CERCLA Section 113(f), the issue of whether it might be liable under CERCLA for any of its response costs is moot.

**Interrogatory No. 21**

Describe in Detail All Facts (Including the legal basis) and Identify all Documents supporting Your contention in paragraph 33 of the Complaint that UCC "unreasonably and illegally us[ed], handl[ed], stor[ed], dispos[ed] of, and/or releas[ed] hazardous substances, including PCBs, at the Sistersville Site; ... fail[ed] to report the storage, disposal, and release of such substances as required by law; and ... fail[ed] to take reasonable precautions necessary to avoid releases of hazardous substances at the Sistersville Site."

**Supplemental Response to Interrogatory No. 21**

MPM objects to this interrogatory on the ground that it is overbroad and unduly burdensome in seeking all facts and the identification of all documents. Subject to and without waiver of any of the foregoing general and specific objections and as a supplemental response, MPM states that the basis of its assertion as to UCC's use, handling, storage, disposal, and release of PCBs is set forth in its responses to Interrogatories 2 and 3 herein. As to UCC's failure to report its storage, disposal, and release of PCBs, MPM refers to its response to Interrogatories 3 and 10 herein. MPM incorporates its objections and response to interrogatories number 2, 3, and 10. Further responding as to UCC's failure to take precautions necessary to avoid releases of PCBs at the Site, MPM notes, as stated in response to Interrogatory No. 3 above, that UCC routinely discharged heavies and still bottoms from its manufacturing operations into unlined lagoons with full knowledge that those heavies and still bottoms contained PCBs and subsequently failed to take steps, such as proper disclosure to regulators, that might have limited, reduced, or mitigated releases of PCBs at the Site, or prevented the continuation of releases at the Site.

**Interrogatory No. 22**

Describe in Detail All Facts and Identify all Documents supporting Your contention in paragraph 34 of the Complaint that "UCC deliberately concealed the disposal and release of PCBs at the Sistersville Site, as well as the dangers posed to human and [sic] health and the environment by that disposal and release, from regulators, from the public, and from subsequent owners, including MPM."

**Supplemental Response to Interrogatory No. 22**

MPM incorporates its objections and response to Interrogatory Nos. 3 and 10.

**Interrogatory No. 23**

Describe in Detail All Facts (Including the legal basis) and Identify all Documents supporting Your contention in paragraph 40 of the Complaint that "UCC's use, handling, storage, disposal, and release of hazardous substances, including PCBs, at the Sistersville Site constitutes an abnormally and inherently dangerous activity for which UCC is strictly liable under the common law."

**Supplemental Response to Interrogatory No. 23**

MPM objects to this interrogatory on the grounds of overbreadth and undue burden. MPM further objects on the grounds that the interrogatory calls for the identification of no facts but only legal analysis that is privileged work product. Subject to and without waiver of any of the foregoing general and specific objections and as a supplemental response, MPM states that it has identified in its response to Interrogatory No. 3 herein precisely the actions of UCC that led to the release of PCBs at the Site. PCBs are a hazardous substance. UCC's use and handling of PCBs at the Site, UCC's discharge of PCBs into unlined lagoons, UCC's movement of the sediments containing PCBs from the unlined lagoons to new locations at the Site, and UCC's

failure to disclose its use and disposal of PCBs at the Site so that those PCBs could be cleaned up under CERCLA and RCRA – all constituted abnormally and inherently dangerous actions. Further responding, MPM states that MPM has made those documents which it has identified as documenting UCC's use, handling, storage, disposal, and release of PCBs at the Site available to UCC and specifically directs UCC's attention to MPM's response to EPA's Section 104(e) Information Request, dated August 1, 2012, where a subset of those documents, which MPM believes are most likely to contain information of the type sought by UCC, have been collected and explained. Without limiting the generality of the foregoing, MPM states that those documents produced to EPA in response to EPA's requests number 9 and number 11, as well as documents attached to that response as Appendix A, contain information regarding UCC's use, handling, storage, disposal, and release of PCBs at the Site. Those documents support the conclusion that UCC's actions and inactions with respect to its use, handling, storage, disposal, and release of PCBs at the Site constitute an abnormally and inherently dangerous activity or otherwise establish the imposition of strict liability under the applicable common law standards and principles.

**Interrogatory No. 24**

With respect to each cause of action asserted in the Complaint, itemize separately for each cost, damage, or other relief that You seek in such count the dollar amount sought or the specific details of the claimed injunctive relief, and Identify all Documents supporting Your claim for such costs or other relief.

**Supplemental Response to Interrogatory No. 24**

MPM objects to this interrogatory on the grounds that it is overbroad and unduly burdensome. Subject to and without waiver of any of the foregoing general and specific

objections and as a supplemental response, MPM states that it quantified its damages in its Initial Disclosures to UCC. Further responding, MPM states that to the best of its current ability to quantify its costs, damages, or other relief, it seeks:

- Pursuant to Count I of the Complaint, approximately $427,005.60 in incurred response costs, interest on incurred response costs, and declaratory relief as to UCC's liability for future response costs;
- Pursuant to Count III of the Complaint, declaratory relief as to UCC's liability for future response costs which at present cannot be quantified;
- Pursuant to Count IV, damages sufficient to compensate MPM for the costs imposed on MPM by UCC's negligent actions and inactions, including but not limited to the costs of responding to UCC's release of PCBs at the Site, currently calculated at $427,005.60, and the other damages described in paragraph 37 and Prayer for Relief C of the Complaint, which MPM has not yet converted to a dollar figure and which may be the subject of expert testimony;
- Pursuant to Count V, damages sufficient to compensate MPM for the costs imposed on MPM by UCC's actions and inactions, including but not limited to the costs of responding to UCC's release of PCBs at the Site, currently calculated at $427,005.60, and the other damages described in paragraph 44 and Prayer for Relief D of the Complaint, which MPM has not yet converted to a dollar figure and which may be the subject of expert testimony;
- Pursuant to Count VI, restitution sufficient to compensate MPM for the costs imposed on MPM by UCC's actions and inactions, including but not limited to the costs of responding to UCC's release of PCBs at the Site, currently calculated at $427,005.60, and the other damages described in paragraphs 52 and Prayer for

Relief E of the Complaint, which MPM has not yet converted to a dollar figure and which may be the subject of expert testimony;

- Pursuant to Count VII, declaratory relief with respect to future costs incurred by MPM in responding to UCC's disposal and release of hazardous substances at the Site, including but not limited to response costs associated with responding to UCC's use, storage, disposal, and release of PCBs at the Site and UCC's share of costs associated with the future closure of Landfill No. 2; and
- Pursuant to all counts and to the extent provided for by law:
  - interest, costs, expenses, attorney's fees, and punitive damages;
  - injunctive relief in the form of an order requiring UCC to participate in the cleanup of environmental contamination at and emanating from the Site; and
  - such other and further relief as the court deems just and proper.

Further responding, MPM states that identifying all documents supporting its claims for the above-listed relief would be unduly burdensome; however, MPM has provided UCC with invoices in connection with PCB investigation work in the vicinity of the Wastewater Treatment Facility in the amount of $427,005.60 which is the only item of MPM's unreimbursed response costs or damages which is capable of being calculated at this time without the assistance of an expert.

**Interrogatory No. 25**

Describe in Detail All Facts (Including the legal basis) and Identify all Documents supporting Your claim in the Complaint for punitive damages.

**Supplemental Response to Interrogatory No. 25**

MPM objects to this interrogatory on the grounds that it is overly broad and unduly burdensome to the extent it seeks the identification of all supporting documents. MPM further objects to the extent that this interrogatory seeks MPM's legal analysis which is privileged work product. Subject to and without waiver of any of the foregoing general and specific objections and as a supplemental response, MPM directs UCC's attention to MPM's objections and responses to interrogatories number 2, 3, and 10, which show that UCC deliberately disposed of PCBs into unlined lagoons, knowingly elected not to disclose to regulators its use of PCBs under CERCLA or RCRA, thereby evading an obligation to investigate and remediate PCB contamination at the Site, and failed to disclose its PCB use and disposal at the Site to subsequent purchasers of the site, thereby experiencing financial benefits as a result while imposing costs on future owners such as MPM and creating unnecessary risks to human health and the environment – all of which support MPM's claim for punitive damages.

**AS TO OBJECTIONS**

MPM SILICONES, LLC

By its attorneys,

Robert S. Sanoff (Bar Roll No. 106915)
rsanoff@foleyhoag.com
Adam P. Kahn (Bar Roll No. 106913)
akahn@foleyhoag.com
Zachary Gerson (Bar Roll No. 106914)
zgerson@foleyhoag.com
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, Massachusetts 02210-2600
Telephone: (617) 832-1000
Facsimile: (617) 832-7000

and

Margaret J. Gillis, Esq. (Bar Roll No. 101776)
WHITEMAN OSTERMAN & HANNA, LLP
One Commerce Plaza
Albany, NY 12260
Telephone: (518) 487-7600

Dated: March 22, 2013

**CERTIFICATE OF SERVICE**

I hereby certify that on March 22, 2013, I served a true copy of the foregoing Supplemental Responses to Defendant Union Carbide Corporation's First Set of Interrogatories to Plaintiff MPM Silicones, LLC via first class mail to:

Harold L. Segall
Beveridge & Diamond P.C.
1350 I Street, N.W., Suite 700
Washington DC 20005

and via e-mail to kbourdeau@bdlaw.com, hsegall@bdlaw.com, mbrillault@bdlaw.com, and egrauman@bdlaw.com.

Zachary Gerson



B4114570.