## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| MPM SILICONES, LLC, <br><br> Plaintiff, <br><br> v. <br><br> UNION CARBIDE CORPORATION, <br><br> Defendant. | No. 1:11-CV-1542 BKS/ATB |

## <u>MPM SILICONES, LLC'S TRIAL BRIEF</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................................ii

BACKGROUND ........................................................................................................................... 1

ARGUMENT ................................................................................................................................ 4

    1.   UCC Is Liable for Cost Recovery Under Section 107(a) of CERCLA................................ 4

    2.   MPM Should Have No Share or Only a Nominal CERCLA Contribution Share. ............... 7

    3.   The Court Should Allocate Future Response Costs as Part of Its Declaratory
        Judgment. ...................................................................................................................... 11

    4.   MPM Is Entitled to Judgment On Its Restitution Claim. .................................................... 12

    5.   Expected Evidentiary Issues.............................................................................................. 14

CONCLUSION............................................................................................................................ 14

i

# TABLE OF AUTHORITIES

**Cases**

*Alcan-Toyo America, Inc. v. Northern Ill. Gas Co.*,
881 F. Supp. 342 (N.D. Ill. 1995) ........................................................................ 9, 12

*APL Co. Pte. Ltd. v. Kenmira Water Solutions, Inc.*,
999 F. Supp. 2d 590 (S.D.N.Y. 2014) ...................................................................... 6

*Bedford Affiliates v. Manheimer*,
1997 U.S. Dist. LEXIS 23903 (E.D.N.Y. Aug. 6, 1997),
*aff'd in relevant part*, 156 F.3d 416 (2nd Cir. 1998) ...................................... 9, 10, 12

*Boeing Co. v. Cascade Corp.*,
207 F.3d 1177 (9th Cir. 2000) ............................................................................... 12

*CBS, Inc. v. Hasbro, Inc.*,
1994 U.S. Dist. LEXIS 11317 (E.D. Pa. 1994) .................................................... 9, 12

*City of Wichita v. Trs. of the Apco Oil Corp. Liquidating Trust*,
306 F. Supp. 2d 1040 (D. Kan. 2003) ...................................................................... 6

*Gopher Oil Co., Inc. v. Union Oil Co.*,
955 F.2d 519 (8th Cir.1992) ............................................................................. 9, 10, 12

*Kalamazoo River Study Grp. v. Menasha Corp.*,
228 F.3d 648 (6th Cir. 2000) .................................................................................... 7

*Kelley v. E.I. DuPont de Nemours & Co.*,
17 F.3d 836 (6th Cir. 1994) ...................................................................................... 12

*N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*,
808 F. Supp. 2d 417 (N.D.N.Y. 2011),
*aff'd in part and vacated in part on other grounds*, 766 F.3d 212 (2d Cir. 2014) .................. 6, 7

*Nashua Corp. v. Norton Co.*,
116 F. Supp. 2d 330 (N.D.N.Y. 2000) .............................................................. passim

*New York v. Green*,
420 F.3d 99 (2d Cir. 2005) ....................................................................................... 12

*New York v. Next Millenium Realty, LLC*,
732 F.3d 117 (2d Cir. 2013) ...................................................................................... 8

*New York v. Westwood-Squibb Pharm. Co., Inc.*,
2004 U.S. Dist. LEXIS 13841 (W.D.N.Y. May 25, 2004) ................................... 9, 12

*Next Millennium Realty, L.L.C. v. Adchem Corp.*,
   2014 U.S. Dist. LEXIS 150582 (E.D.N.Y. Oct. 22, 2014) ........................................................ 5

*Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*,
   596 F.3d 112 (2d Cir. 2010) ................................................................................................. 4

*Physicians Comm. for Responsible Med. v. Johnson*,
   436 F.3d 326 (2d Cir. 2006) ................................................................................................. 7

*Price Trucking Corp. v. Norampac Indus., Inc.*,
   748 F.3d 75 (2d Cir. 2014) ................................................................................................... 5

*Realmark Devs., Inc. v. Ranson*,
   542 S.E.2d 880 (W. Va. 2000) ............................................................................................ 13

*Schiavone v. Pearce*,
   79 F.3d 248 (2d Cir. 1996) ................................................................................................... 5

*Seneca Meadows, Inc. v. ECI Liquidating, Inc.*,
   427 F. Supp. 2d 279 (W.D.N.Y. 2006) ............................................................................... 8

*Tosco Corp. v. Koch Indus.*,
   216 F.3d 886 (10th Cir. 2000) ............................................................................................ 12

*United States v. Davis*,
   261 F.3d 1 (1st Cir. 2001) ................................................................................................... 12

*W.R. Grace & Co. – Conn. v. Zotos Intern., Inc.*,
   559 F.3d 85 (2d Cir. 2009) ................................................................................................... 6

*Waste Mgmt. of Alameda County, Inc. v. East Bay Regional Park Dist.*,
   135 F. Supp. 2d 1071 (N.D. Cal. 2001) .............................................................................. 9

*Young v. United States*,
   394 F.3d 858 (10th Cir. 2005) .............................................................................................. 5

**Statutes**

42 U.S.C. § 6113(g)(2) ............................................................................................................ 11

**Rules and Regulations**

40 C.F.R. § 761.50 ........................................................................................................... 7, 14

40 C.F.R. § 761.60 ........................................................................................................... 7, 14

40 C.F.R. § 761.61 ........................................................................................................... 7, 14

iii

40 C.F.R. § 761.79 ................................................................................................................. 7, 14

**Other Authorities**

Restatement (First) Restitution (Am. Law Inst. 1937) ........................................................ 13, 14

Restatement (Third) of Restitution and Unjust Enrichment (Am. Law Inst. 2011) ..................... 13

## BACKGROUND

This is an environmental contamination case arising from the release of polychlorinated biphenyls (PCBs), used and disposed of by defendant Union Carbide Corporation ("UCC") at a facility it owned and operated from 1955 to 1993 in or about Sistersville, West Virginia (the "Site"). That property is now owned by MPM Silicones, LLC ("MPM"). At Summary Judgment, the Court determined that UCC was liable to MPM on MPM's claim for recovery of response costs under section 107 of the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607, declaring that "UCC is liable to MPM for past necessary costs of response incurred by MPM consistent with the National Contingency Plan for PCBs at the Site," and that "UCC is liable under CERCLA § 107(a) for future necessary removal response costs consistent with the National Contingency Plan for PCBs at the Site." (Dkt. No. 146, at 76). It also determined that at least some of MPM's response costs to date were recoverable. Subsequently, the Court entered summary judgment in UCC's favor on UCC's counterclaim for contribution under section 113 of CERCLA, 42 U.S.C. § 9613, but denied UCC's motion for summary judgment on MPM's claim for restitution.

The Court having either dismissed or entered judgment against MPM on its other claims,[1] the primary issues that remain for determination at trial are (1) a calculation of MPM's damages to date — i.e. the amount of MPM's past costs to be paid by UCC and 2) under UCC's counterclaim, a determination of what portion of the response costs can UCC prove should be borne by MPM; (3) a determination of whether MPM is entitled to restitution.[2]

---

[1] This Court dismissed Counts II, VIII, and IX (Dkt. No. 36), as well as Count VII. (Dkt. No. 165).

[2] As the Court and counsel for MPM discussed at a recent oral argument, MPM does not seek a double recovery.

As the evidence at trial will show and as is reflected in UCC's contemporaneous operating records, UCC used prior to the early 1970s hundreds of thousands of pounds of PCBs as pot chasers in the manufacture of two products -- A-1100 and Cyanoethyltriethoxsilane ('CNE').  Those PCBs were not incorporated into the A-1100 or CNE but remained as a liquid waste at the end of the distillation process, known as "heavies".  Those heavies were then either placed into burning pits at the Site or put into a neutralization tank and afterwards streamed into settling lagoons, where the liquids either evaporated or percolated into the ground leaving PCB-containing sludges to be disposed of in on-site landfills.

No party other than UCC used and disposed of PCBs at the Site.  UCC did not disclose its use and disposal of PCBs in its 1981 notification pursuant to Section 103(c) of CERCLA, 42 U.S.C. § 9603(c), or in any of its written submissions for a RCRA Part B permit.  At the time UCC submitted its CERCLA 103(c) notification and its RCRA Part B permit application materials, UCC was aware of its use and potential disposal of PCBs.  In the late 1970s, UCC arranged for an investigation of buried wastes at the Site.  C.F. Schubert, a UCC employee, conducted that investigation.  He interviewed a number of employees who had knowledge of historical operations.  For instance, Mr. Schubert interviewed G.M. Fowles, who explained that "[s]till pot residues [i.e. heavies], like those from the A-1100 distillation, went into lime ponds and the neutralization tub or were dumped over the 'burning bank'".  Mr. Schubert summarized the results of his investigation in a January 10, 1980 internal memorandum, noting that UCC's manufacturing generated "A-1100 heavies with up to 250,000 pounds of PCBs used as chosen during A-1100 distillation".  In 1984, UCC conducted a Hazard Ranking for part of the Site – the north inactive landfill – which concluded that, "The contaminants of greatest concern are PCBs which may have been buried in the area."

Even though it knew of its use and disposal of PCBs at the Site, UCC repeatedly after 1980 either omitted to disclose or characterized as "speculative" whether it had used and disposed of PCBs at the Site.  For example, in a 1987 file memorandum, Fred Deily of UCC said that he advised an EPA inspector in 1986 that "it had been speculated that as much as 500,000 lbs of contaminated PCB heat fluid was generated during the plants previous activities" but that that speculation had been shown to be without basis.  Likewise, in a March 11, 1992 Memorandum, UCC's employee Dennis Heintzman assembled various documents relating to PCBs at the Site and concluded with the following:

> Based on the limited information available, it is not possible to state unequivocally that PCBs were not placed in the north inactive site.  Information suggesting disposal is purely speculative at this point, however.  Monitoring data to date do not substantiate the speculation.

A year later, Environmental Strategies Corporation performed a Phase I Site Assessment of the Site in connection with UCC's upcoming sale of the Site.  Noting that it had been assisted by Dennis Heintzman, Environmental Strategies concluded in that Phase I Site Assessment that, "According to facility personnel, soil samples were recently collected at a former transformer storage area and no PCBs above 1 mg/kg were detected.  There are no other areas of known or suspected PCB-containing areas."

Prior to purchasing the Site by its former parent General Electric Company, MPM Silicones, LLC ("MPM") retained a high quality environmental consultant, Environ International Corporation, to perform due diligence about environmental conditions at the Site.  That due diligence did not uncover that UCC had utilized PCBs in its manufacturing operation or that UCC had disposed of hundreds of thousands of pounds of PCBs at the Site.  It was not until six years after MPM acquired the Site that it discovered UCC's use and disposal of PCBs when

3

MPM encountered discolored soils during construction of an upgrade to its wastewater treatment facility.

Since the discovery of UCC's PCBs at the Site, UCC has been recalcitrant in refusing requests from the West Virginia regulators and MPM to participate in the investigation and cleanup of its PCBs.  MPM expended roughly $375,000 in response costs in connection with PCB sampling of soils in the vicinity of that excavation.

**ARGUMENT**

1.  <u>UCC Is Liable for Cost Recovery Under Section 107(a) of CERCLA.</u>

This court has already determined conclusively that UCC is liable to MPM for "past necessary costs of response incurred by MPM consistent with the National Contingency Plan for PCBs at the Site," as well as "future necessary removal costs consistent with the National Contingency Plan for PCBs at the Site." (Dkt. No. 146, at 76).

It is well settled under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601, *et seq*., that a party which incurs costs responding to a release of a hazardous substance can bring a cost recovery action under Section 107(a) to recover 100% of those costs from any potentially responsible party:  "Section 107 allows for complete cost recovery under a joint and several liability scheme; one PRP can potentially be accountable for the entire amount expended to remove or remediate hazardous materials."  *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 121 (2d Cir. 2010).

The Second Circuit recently described the typical CERCLA cost recovery claim in terms that seem applicable here:

> In the typical private cost-recovery action, an injured landowner
> undertakes a cleanup effort and then brings suit against a
> responsible facility owner or operator under CERCLA.  By holding

4

> the defendant liable in such a case, CERCLA ensures that defendant owners and operators "bear the cost of their actions."

*Price Trucking Corp. v. Norampac Indus., Inc.*, 748 F.3d 75, 83 (2d Cir. 2014) (quoting

*Schiavone v. Pearce*, 79 F.3d 248, 253 (2d Cir. 1996)).  The elements necessary to make out a

Section 107(a) claim are clearly established:

> To make out a prima facie case for liability under the Act, a plaintiff must establish that: (1) the defendant is an 'owner' or is otherwise liable under 42 U.S.C. § 9607(a)(1)-(4); (2) the site is a 'facility' as defined by 42 U.S.C. § 9601(9); (3) there has been a release or threatened release of hazardous substances at the facility; (4) the plaintiff incurred costs responding to the release or the threat; and (5) the costs and response conform to the National Contingency Plan.

*Next Millennium Realty, L.L.C. v. Adchem Corp.*, 2014 U.S. Dist. LEXIS 150582, *23 (E.D.N.Y.

Oct. 22, 2014) (quoting *Price Trucking Corp.,* 748 F.3d at 80 (citations omitted)).

The Court has already determined each of the first four elements, entering summary

judgment in MPM's favor.  (Dkt. No. 146).  With respect to the final element, the Court

determined that, because "MPM only seeks a ruling on liability, and seeks to introduce expert

testimony on NCP compliance," further analysis was unnecessary for the purposes of summary

judgment.  The Court also noted that "costs of investigation may be recoverable even if they are

incurred before the existence of a threat is conclusively determined," and that "[m]any of the

NCP requirements do not apply" to preliminary investigations. (Dkt. No. 146, at 47, 50 (citing

*Nashua Corp. v. Norton Co.*, 116 F. Supp. 2d 330, 353 (N.D.N.Y. 2000)). Thus, at trial MPM

need not establish that its response costs in the early phases of its investigation were in strict

compliance with the NCP, because such costs are a "'classic example' of a 'preliminary step[]

taken in response to the discovery of the release or threatened release of hazardous substances.'"

(Dkt. No. 146, at 45 (quoting *Young v. United States*, 394 F.3d 858, 864 (10th Cir. 2005)).  MPM

5

will present evidence that it incurred costs in assessing and evaluating the release of PCBs, including by sampling soils, decontaminating equipment that came into contact with PCB-contaminated soils, and by treating and disposing of PCB-contaminated water and soils.  (Pl.'s 7.1 Statement ¶ 16.)  UCC has expressly admitted that MPM incurred costs in connection with its PCB testing.  (UCC Suppl. RFA Resp., Response to Request No. 29, Sanoff Decl. Ex. 1 ("**REQUEST NO. 29:**  Admit that MPM incurred costs in connection with its PCB testing. **SUPPLEMENTAL RESPONSE TO REQUEST NO. 29:** . . .  Without waiving these objection, and subject to them, admitted.") (objections omitted); Pl.'s 7.1 Statement ¶ 16.).

MPM will also demonstrate that those costs are recoverable as necessary costs of response.  Response costs are generally "liberally construed under CERCLA." *W.R. Grace & Co. – Conn. v. Zotos Intern., Inc.*, 559 F.3d 85, 92 (2d Cir. 2009). As this Court has already recognized, the relevant inquiry as to the necessity of response costs is "'not [] whether a party has a business or other motive for cleaning up the property, but [] whether there is a threat to human health or the environment and whether the response action is addressed to that threat.'" (Dkt. No. 146, at 48 (quoting *APL Co. Pte. Ltd. v. Kenmira Water Solutions, Inc.*, 999 F. Supp. 2d 590, 619 (S.D.N.Y. 2014)).  Necessary costs of response, "include not only the cost of actual cleanup, but also costs for investigation, planning, and remedial design." *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 808 F. Supp. 2d 417, 522 (N.D.N.Y. 2011), *aff'd in part and vacated in part on other grounds*, 766 F.3d 212 (2d Cir. 2014) (quoting *City of Wichita v. Trs. of the Apco Oil Corp. Liquidating Trust*, 306 F. Supp. 2d 1040, 1091 (D. Kan. 2003)).

Evidence at trial will show that MPM's activities were necessary and thus recoverable as costs of response.  MPM encountered PCB-contaminated wastes in an area of active excavation, necessitating the immediate decontamination of equipment, disposal of contaminated soils, and

6

assessment and delineation of the contamination to determine the threat it posed.  Once the PCB-contaminated wastes were disturbed, MPM was required to undertake decontamination and disposal actions under federal Toxic Substances Control Act regulations governing the treatment of PCB wastes. *See, e.g.,* 40 C.F.R. §§ 761.50, 761.60, 761.61, 761.79.  TSCA and its attendant regulations were, of course, enacted "with the express purpose of limiting the public health and environmental risks associated with exposure to and release of toxic chemical substances and mixtures." *Physicians Comm. for Responsible Med. v. Johnson*, 436 F.3d 326, 327 (2d Cir. 2006).  UCC should not now be heard to argue, as it did in moving for summary judgment, that costs for actions *required* by federal regulations to protect health and the environment were not "incurred responding to a release or threatened release of hazardous substances." (Dk.t 90-1, at 9).  Indeed, two of UCC's own experts admitted at deposition that it was necessary for MPM to incur response costs in response to detection of PCBs in soils during excavation, and particularly that disposal of contaminated soil and delineation of the PCB contamination was necessary once PCBs were discovered. (Dkt. No. 76-1, citing Dkt. 76-3 at Exhs. 4 and 9).

      2.  <u>MPM Should Have No Share or Only a Nominal CERCLA Contribution Share.</u>

After the Court determined that UCC is liable under MPM's CERCLA § 107 claim, the Court ruled that MPM is liable in contribution for its equitable share of any recoverable past or future response costs under CERCLA §§ 113(f)(1), (g)(2).  UCC bears the burden of proof on its counterclaim. *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 808 F. Supp. 2d 417, 489 (N.D.N.Y. 2011) (citing *Kalamazoo River Study Grp. v. Menasha Corp.*, 228 F.3d 648, 656-57 (6th Cir. 2000)). Under the precedents of both the Second Circuit and other circuits, MPM's equitable share should be small or nonexistent, because MPM did not contribute to the contamination and voluntarily disclosed its discovery of contamination to regulators.  UCC, by contrast, caused all PCB contamination at the site, repeatedly refused to cooperate in the

7

investigation and cleanup of the contamination, and actively concealed the contamination from MPM.

Section 113(f)(1) of CERCLA permits a party liable for CERCLA cost recovery under Section 107(a) to seek contribution from other liable parties with response costs to be allocated "using such equitable factors as the court determines are appropriate."   The Second Circuit, like other courts, has been reluctant to reduce equitable factors to a prescribed list or a formula. *Nashua Corp.*, 116 F. Supp. 2d at 352.  Not surprisingly, however, the equitable factors that courts have used largely are based on CERCLA's "dual goals of cleaning up hazardous waste and holding polluters responsible for their actions." *New York v. Next Millenium Realty, LLC,* 732 F.3d 117, 124 (2d Cir. 2013).   Thus, contribution shares are heavily weighted to assign the largest share to the parties who actually caused the contamination and who failed to take responsibility for cleaning it up.[3]  Given that UCC is responsible for all of the PCBs at the Site and has repeatedly refused to cooperate in the investigation and cleanup of those PCBs, equitable factors dictate that UCC must bear all or virtually all of the responsibility for response costs at the Site.

New York courts have been guided by the "basic principles of equity' [that] would suggest that the party that profited […] from the creation and operation of a waste-producing

---

[3]  In contribution cases involving the liability of generators of waste shipped to hazardous waste sites, courts sometimes refer to the so called "Gore factors": "(1) the ability of the parties to demonstrate that their contribution to the site can be distinguished; (2) the amount of hazardous waste involved; (3) the degree of toxicity of the hazardous waste involved; (4) the degree of involvement by the parties in the generation, transportation, treatment, storage or disposal of the hazardous waste; (5) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristic of such waste; and (6) the degree of cooperation by the parties with federal, state or local officials to prevent any harm to the public health or the environment." *Seneca Meadows, Inc. v. ECI Liquidating, Inc.*, 427 F. Supp. 2d 279, 292 (W.D.N.Y. 2006).

enterprise 'should bear primary responsibility for the hazardous byproducts of its activity.'" *New York v. Westwood-Squibb Pharm. Co., Inc.*, 2004 U.S. Dist. LEXIS 13841, at \*22 (W.D.N.Y. May 25, 2004) (quoting *Waste Mgmt. of Alameda County, Inc. v. East Bay Regional Park Dist.*, 135 F. Supp. 2d 1071, 1090 (N.D. Cal. 2001)).  In CERCLA contribution cases, like this one, where a current owner who did not cause the contamination sues a prior owner who did cause the contamination, courts have again and again allocated all or nearly all the contribution liability to the prior owner.  *See Nashua Corp.*, 116 F.Supp. 2d at 352 (90% share given to former owner/operator even where current owner continued contaminating activity since most of the contamination occurred during former owner's time at the site); *Gopher Oil Co., Inc. v. Union Oil Co.*, 955 F.2d 519, 527 (8th Cir.1992) (100% share to party which caused the contamination); *CBS, Inc. v. Hasbro, Inc.*, 1994 U.S. Dist. LEXIS 11317, at \*2, \*68 (E.D. Pa. 1994) (100% share given to former owner that disposed of waste); *Bedford Affiliates v. Manheimer*, 1997 U.S. Dist. LEXIS 23903, at \*66-\*67 (E.D.N.Y. Aug. 6, 1997), *aff'd in relevant part*, 156 F.3d 416 (2nd Cir. 1998) (95% share to owner/operator who caused the contamination); *Alcan-Toyo America, Inc. v. Northern Ill. Gas Co*., 881 F. Supp. 342, 343 (N.D. Ill. 1995) (90% share to former owner/operator which caused the bulk of the contamination); *New York v. Westwood Squibb Pharm. Co.*, 2004 U.S. Dist. LEXIS 13841, at \*110 (W.D.N.Y. May 25, 2004) (90% share to former operator who caused the bulk of the contamination).

As these cases indicate, courts typically assign at least a 90% share to former owners of manufacturing facilities who caused the contamination.  In *Nashua Corp v. Norton*, which was decided in this District, the former owner was assigned a 90% share even though the new owner continued the polluting activity of the former owner for a short period of time.  The court

9

explained that of the eight factors it considered by far the most important was that the former

owner had released most of the contamination:

> I find eight factors relevant. First, by an order of many magnitudes, Norton contributed the major portion of the toxic substances released to the subsurface environment. Second, Norton apparently did nothing before January 1969 to ensure that its underground transfer lines were holding pressure despite the fact that these lines were a readily apparent source for the contamination noted within the Site and in neighboring areas. Third, although Norton's clean-up efforts may have been state-of-the art at the time, they were largely ineffective. Fourth, Norton did not disclose its massive leaks at the time of sale. Fifth, both Nashua and Norton are or have been owners of the Site. Sixth, Nashua contributed a very minor portion of the contamination at the Site. Seventh, upon discovering a significant amount of toluene in the Empire B-1 boring, Nashua did not immediately undertake clean-up efforts or notify appropriate environmental authorities.  Eighth, since notification by the EPA in 1989, Nashua's response has been appropriate. Based on these circumstances, I apportion both past response costs and future response costs 90% to Norton and 10% to Nashua.

*Nashua Corp.*, 116 F. Supp. 2d at 352.   Application of these eight factors here would result in

UCC getting a share more than 90%, since MPM did not contribute any of the PCBs to the Site.

Indeed, in other cases where the current owner did not contribute any of the contamination or

where the former owner sought to conceal its contamination of the property, the former owner

was assigned a share of more than 90%. *E.g.*, *Gopher Oil Co., Inc.*, 955 F.2d at 522-23, 527

(former owner which caused most of the contamination and sought to conceal it assigned a 100%

share); *Bedford Affiliates*, 1997 U.S. Dist. LEXIS 23903 at *59-60 (95% to former owner and

5% share to current owner who did nothing to contribute to the contamination).

Here, the evidence will show that all of the PCB contamination was caused by UCC.

UCC failed to disclose its use and disposal of PCBs at the Site to regulators in its CERCLA

103(c) notification and its RCRA Part B permit submissions.  Even though UCC had confirmed

in a 1980 investigation that it used hundreds of thousands of pounds of PCBs in manufacturing

and that none of those PCBs went off-site, UCC repeatedly told regulators and potential buyers

that its disposal of PCBs was speculative.  MPM expects that UCC will attempt to rely upon a 1993 deed notice as evidence of the disclosure of PCBs.  However, this deed notice does not mention PCBs at all and, in fact, could be interpreted to advise that following closure "no hazardous waste will remain" in the area of the Site where PCBs have been found.

MPM also anticipates that UCC may argue that allocating 100% to it would provide a "windfall" to MPM.  However, MPM expects the evidence to show that following the discovery of PCBs in the due diligence process, no adjustment was made to account for PCB contamination, monetarily or otherwise, to the transaction by which MPM acquired the Site. Thus, there is no windfall.

Further, when asked by regulators and by MPM to take responsibility for its PCBs, UCC was recalcitrant and refused.  In contrast, MPM never used PCBs at the Site and never contributed to the contamination. MPM voluntarily disclosed its discovery of the PCBs at the Site and has never been asked by regulators to take responsibility for that contamination.  Based on the equitable factor test, UCC should be allocated a 100% share.

    3.  <u>The Court Should Allocate Future Response Costs as Part of Its Declaratory Judgment.</u>

This Court has ruled that "UCC is liable under CERCLA § 107(a) for future necessary removal response costs consistent with the National Contingency Plan for PCBs at the Site." (Dkt. No. 146, at 76).  Because the Court has also ruled that MPM is also liable to UCC in contribution, it is appropriate at this stage for the court to enter a declaratory judgment allocating liability for future costs between the parties.  Such an allocation will serve both the principle of judicial economy, as well as the statutory purposes of CERCLA.

Section 113(g)(2) of CERCLA requires the court to enter a declaratory judgment on liability for future response costs. 42 U.S.C. § 6113(g)(2). Section 113(g)(2) applies to "any such

11

action described in this subsection." Courts have concluded time and again that this language

applies in contribution actions. *See United States v. Davis*, 261 F.3d 1, 46 (1st Cir. 2001); *Boeing*

*Co. v. Cascade Corp.*, 207 F.3d 1177, 1191 (9th Cir. 2000); *Tosco Corp. v. Koch Indus.*, 216

F.3d 886, 897 (10th Cir. 2000). This is because allocation of liability at the declaratory judgment

stage serves the purpose of section 113(g)(2):

> CERCLA was intended to encourage quick response and to place the costs on those
> responsible. Declaratory relief serves these purposes because parties, like those in
> this case, will know their share of costs before they are incurred . . . . The costs and
> time involved in relitigating issues as complex as these where new costs are incurred
> would be massive and wasteful. Declaratory relief allocating future costs is therefore
> consistent with the broader purposes of CERCLA.

*Davis*, 261 F.3d at 46-47 (quoting *Boeing Co.*, 207 F.3d at 1191). Failing to allocate liability now

would necessitate additional proceedings, which would necessarily re-hear much of the same

information that will be presented at trial. Congress enacted section 113(g)(2) in order to avoid

such an outcome. *See New York v. Green*, 420 F.3d 99, 111 (2d Cir. 2005) (quoting *Kelley v. E.I.*

*DuPont de Nemours & Co.*, 17 F.3d 836, 844 (6th Cir. 1994) ("'Congress included language [in

section 113(g)(2)] to ensure that a responsible party's liability, once established, would not have

to be relitigated.'"). Indeed, in the CERCLA contribution cases cited above, no district court has

saved the allocation of liability for future proceedings. *See Nashua Corp.*, 116 F. Supp. 2d at 352

(90%:10%); *Gopher Oil Co., Inc.*, 955 F.2d at 527 (district court allocated all of the liability to

one party); *CBS, Inc.*, 1994 U.S. Dist. LEXIS 11317, at *68 (district court allocated all of the

liability to one party); *Bedford Affiliates*,1997 U.S. Dist. LEXIS 23903, at *67 (95%:5%); *Alcan-*

*Toyo America, Inc.*, 881 F. Supp. at 343 (90%:10%); *Westwood Squibb Pharm. Co.*, 2004 U.S.

Dist. LEXIS 13841, at *110 (90%:10%). Allocation of future costs is appropriate here, and both

parties are prepared to put on evidence at trial to inform an allocation decision.

4.   <u>MPM Is Entitled to Judgment On Its Restitution Claim.</u>

12

UCC is also liable to MPM under a restitution theory because MPM rendered aid to UCC in responding to UCC's contamination at the Site, and because it would be unfair to allow UCC to retain that aid without payment for it. To state a claim for restitution under West Virginia law, MPM must show that it has conferred a benefit on UCC, and that acceptance of that benefit without payment by UCC would be "inequitable and unconscionable" under the circumstances. *Realmark Devs., Inc. v. Ranson*, 542 S.E.2d 880, 885 (W. Va. 2000) (citing Restatement (First) Restitution § 53 (Am. Law Inst. 1937)).

MPM's actions in responding to the contamination conferred a benefit on UCC by reducing UCC's obligations under both statutory and tort-based duties. This court has already held that UCC is liable for removal costs under CERCLA, meaning that UCC had a statutory duty, not only to MPM, but also to the United States. MPM's actions in responding to UCC's contamination reduced UCC's responsibilities under this statutory duty.

Additionally, MPM's actions reduced UCC's obligations as to a host of tort-based duties to various third parties. As the entity responsible for disposing and releasing PCBs at the Site, UCC had a duty to act so as to prevent harm to persons and/or the environment, which UCC failed to do. By responding to UCC's release of PCBs at the Site and addressing immediate concerns (such as by decontaminating certain equipment and conducting preliminary sampling to assess ongoing risk), MPM reduced the obligations of UCC to respond to its own wrongful acts and thereby benefitted UCC.

UCC should not be heard to complain that MPM's restitution claim is barred because it did not seek UCC's permission to provide this aid. It is true that the Restatement generally takes a skeptical view of aid provided without consent. *See* Restatement (Third) of Restitution and Unjust Enrichment § 22 cmt. a (Am. Law Inst. 2011) ("The law does not favor unrequested

13

intervention in the affairs of another."). However, this general principle does not apply where aid is rendered under circumstances which create an "immediate necessity." Restatement (First) Restitution § 115 cmt. a (Am. Law Inst. 1937). MPM's discovery of PCBs during construction created such an "immediate necessity": PCBs had been encountered in an area of active excavation, equipment needed to be decontaminated, contaminated media needed to be disposed of, and steps needed to be taken immediately to assess whether the presence of PCBs posed a risk to human health or the environment. Federal regulations required MPM to undertake this response. *See, e.g.,* 40 C.F.R. §§ 761.50, 761.60, 761.61, and 761.79. Moreover, it would particularly inappropriate to penalize MPM for failing to seek UCC's permission when UCC deliberately obscured its role in causing the PCB contamination.

For these reasons, it would be "inequitable and unconscionable" to allow UCC to retain the benefits conferred by MPM in responding to UCC's contamination, and MPM is entitled to judgment on its restitution claim.

5. Expected Evidentiary Issues.

MPM foresees no substantial evidentiary issues at trial.

## CONCLUSION

For the above-stated reasons, judgment should be entered in favor of MPM for 100% of the amount of response costs proven with a declaration that UCC is liable for 100% of future response costs that are necessary and consistent with the National Contingency Plan; and MPM should be assigned a share of 0% on UCC's contribution claim.

14

MPM SILICONES, LLC

By its attorneys,

**/s/ Jonathan M. Ettinger**
Jonathan M. Ettinger (Bar Roll No. 107348)
jme@foleyhoag.com
Zachary Gerson (Bar Roll No. 106914)
zgerson@foleyhoag.com
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, Massachusetts 02210-2600
Telephone: (617) 832-1000
Facsimile: (617) 832-7000

Dated:  January 9, 2017

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2017, I electronically filed the foregoing document

with the Clerk of Court using the CM/ECF system, which will send notification of such filing to

all counsel of record.

/s/ *Jonathan M. Ettinger*
Jonathan M. Ettinger

B4636249.2

15