**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

---

MPM SILICONES, LLC,

                *Plaintiff*,

    v.

UNION CARBIDE CORPORATION,

                *Defendant.*

No. 1:11-CV-1542 BKS/ATB

---

## <u>DEFENDANT UNION CARBIDE CORPORATION'S TRIAL BRIEF</u>

BEVERIDGE & DIAMOND, P.C.

Karl S. Bourdeau (Bar Roll No. 103740)
Harold L. Segall (Bar Roll No. 103741)
1350 I Street, N.W., Suite 700
Washington, DC 20005
Tel.: (202) 789-6000
Fax: (202) 789-6190
kbourdeau@bdlaw.com
hsegall@bdlaw.com

Edward M. Grauman (Bar Roll No. 517387)
98 San Jacinto Boulevard, Suite 1420
Austin, TX 78701
Tel.: (512) 391-8000
Fax: (512) 391-8099
egrauman@bdlaw.com

Megan R. Brillault (Bar Roll No. 511541)
477 Madison Avenue, 15th Floor
New York, NY 10022
Tel.: (212) 702-5400
Fax: (212) 702-5450
mbrillault@bdlaw.com

*Attorneys for Defendant Union Carbide Corporation*

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

LEGAL ARGUMENT ..........................................................................................................2

I.   VIRTUALLY ALL OF MPM'S PAST COSTS WERE NOT
     "NECESSARY COSTS OF RESPONSE" UNDER CERCLA..........................................2

II.  ALL OF MPM'S PAST INVESTIGATION COSTS WERE NOT
     CONSISTENT WITH THE NATIONAL CONTINGENCY PLAN. ................................7

III. MPM SHOULD BE ALLOCATED A SIGNIFICANT MAJORITY OF
     THOSE COSTS FOR WHICH ALLOCATION IS CURRENTLY APPROPRIATE......11

    A.  MPM Should Be Allocated a Significant Majority of Those Past Removal Costs
        That Are Recoverable Under CERCLA. ...............................................................12

        1.  MPM Was on Notice of the Risk of PCB Response Costs When
            It Acquired the Site. .......................................................................................14

        2.  MPM Has an Indemnity That It Appears to Have Forfeited Through
            Its Own Inaction.............................................................................................19

        3.  MPM's Past Costs Arise from MPM's Decision to Perform Construction
            in an Area That It Knew Contained Historical Hazardous Waste Management
            Operations When It Purchased the Site. .........................................................19

        4.  MPM's Past Sampling Costs Were Incurred to Serve, and Have Served,
            MPM's Commercial Interests in Upgrading the WWTU. ...........................21

        5.  MPM's Past Sampling Costs Were Excessive.............................................22

        6.  MPM Deprived UCC of Any Opportunity to Comment on or Participate
            in MPM's Incomplete Investigation. .............................................................23

        7.  UCC Did Not Engage in Deception as MPM Contends. ...............................23

    B.  Allocation of Future Removal Costs Is Inappropriate at this Time.................................25

    C.  If the Court Were to Allocate Future Removal Costs at the WWTU,
        It Should Allocate a Significant Majority of Such Costs to MPM.................................26

IV.  MPM'S RESTITUTION CLAIM FOR PAST COSTS FAILS.........................................30

    A.  MPM Has Not Conferred a Benefit on UCC.................................................................33

        1.  UCC Owed No Duty Under CERCLA. .........................................................33

        2.  UCC Owed No Duty Under Public Nuisance Law........................................35

    B.  There Are Not "Inequitable and Unconscionable" Circumstances. ................................36

CONCLUSION....................................................................................................................39

## TABLE OF AUTHORITIES

**Federal Court Cases**

*Amoco Oil Co. v. Borden Inc.*,
　889 F.2d 664 (5th Cir. 1989)........................................................................................ 2

*APL Co. PTE. Ltd. v. Kemira Water Solutions, Inc.*,
　999 F. Supp. 2d 590 (S.D.N.Y. 2014)......................................................................... 7

*BCW Assocs., Ltd. v. Occidental Chem. Corp.*,
　No. CIV.A. 86-5947, 1988 WL 102641 (E.D. Pa. Sept. 29, 1988)................. 14, 19, 21, 22, 28

*Bedford Affiliates v. Sills*,
　156 F.3d 416 (2d Cir. 1998).......................................................................................... 11

*Benzman v. Whitman*,
　523 F.3d 119 (2d Cir. 2008)........................................................................................... 8

*Bethlehem Iron Works, Inc. v. Lewis Indus., Inc.*,
　No. CIV.A. 94-0752, 1996 WL 557592 (E.D. Pa. Oct. 1, 1996)................................ 14, 19, 23

*Boeing Co. v. Cascade Corp.*,
　207 F.3d 1177 (9th Cir. 2000)...................................................................................... 25

*Carson Harbor Vill., Ltd v. Unocal Corp.*,
　270 F.3d 863 (9th Cir. 2001) (en banc)........................................................................ 2

*Chase Manhattan Bank, N.A., v. T&N plc.*,
　No. 87 Civ. 4436, 1996 WL 603934 (S.D.N.Y. Oct. 22, 1996)........................................ 36, 37

*City of Detroit v. Simon*,
　247 F.3d 619 (6th Cir. 2001)......................................................................................... 6, 7

*City of New York v. Nat'l R.R. Passenger Corp.*,
　960 F. Supp. 2d 84 (D.D.C. 2013), *aff'd*, 776 F.3d 11 (D.C. Cir. 2015) ........................... 36, 37

*Corp. of Mercer Univ. v. Nat'l Gypsum Co.*,
　No. CIV.A. 85-126-3-MAC, 1986 WL 12447 (M.D. Ga. Mar. 9, 1986) ............................... 37

*CUMIS Ins. Soc'y, Inc. v. Raines*,
　No. CIV.A. 3:12-6277, 2013 WL 500305 (S.D.W. Va. Feb. 11, 2013) ................................. 30

*Diverse Real Estate Holdings Ltd. P'ship v. Int'l Mineral and Chemical Corp.*,
　No. 91 C 8090, 1995 WL 110138 (N.D. Ill. Mar. 13, 1995). ........................................... 28, 29

*Farmland Indus., Inc. v. Colo. & E. R. Co.*,
　944 F. Supp. 1492 (D. Colo. 1996)............................................................................... 22, 29

*G.J. Leasing Co. v. Union Elec. Co.*,
　854 F. Supp. 539 (S.D. Ill. 1994), *aff'd*, 54 F.3d 379 (7th Cir. 1995) ................................. 8, 9

*In re Sterling Steel Treating, Inc.*,
　94 B.R. 924 (E.D. Mich. 1989) ..................................................................................... 14

*Johnson v. Ross*,
　419 F. App'x 357 (4th Cir. 2011)................................................................................... 30

*Litgo New Jersey, Inc. v. Martin*,
No. CIV. 06-2891, 2012 WL 32200 (D.N.J. Jan. 5, 2012), *aff'd sub. nom. Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Envt'l. Prot.*,
725 F.3d 369 (3d Cir. 2013) ...................................................................................... 5

*Nashua Corp. v. Norton Co.*,
116 F. Supp. 2d 330 (N.D.N.Y. 2000) ................................................................. 9, 10

*NCR Corp. v. George A. Whiting Paper Co.*,
768 F.3d 682 (7th Cir. 2014) .................................................................................. 38

*New York v. Shore Realty Corp.*,
759 F.2d 1032 (2d Cir. 1985) .................................................................................. 36

*New York v. Solvent Chem. Co.*,
664 F.3d 22 (2d Cir. 2011) ................................................................................. 25, 26

*New York State Electric & Gas v. FirstEnergy Corp.*,
766 F.3d 212 (2d Cir. 2014) ............................................................. 11, 18, 29, 34

*New York State Electric & Gas v. FirstEnergy Corp.*,
808 F. Supp. 2d 417 (N.D.N.Y. 2010) ..................................................................... 2

*Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*,
596 F.3d 112 (2d Cir. 2010) ................................................................................ 8, 11

*Norfolk S. Ry. Co. v. Gee Co.*,
No. 98 C 1619, 2002 WL 31163777 (N.D. Ill. Sept. 30, 2002) .............................. 23

*Price Trucking Corp. v. Norampac Indus., Inc.*,
748 F.3d 75 (2d Cir. 2014) ...................................................................................... 33

*Royal Indem. Co. v. Caleco, Inc.*,
No. CIV.A.03-CV-2281, 2004 WL 2612288 (E.D. Pa. Nov. 9, 2004) ..................... 36

*Syms v. Olin Corp.*,
408 F.3d 95 (2d Cir. 2005) ........................................................................................ 2

*Town of Cowen v. Cobb*,
No. 15-0438, 2016 WL 2969917 (W. Va. May 20, 2016) ....................................... 30

*United States v. M/V SANCTUARY*,
540 F.3d 295 (4th Cir. 2008) .................................................................................. 38

*Veolia Es Special Servs., Inc. v. Techsol Chemical Co.*,
No. CIV. A. 3:07-0153, 2007 WL 4255280 (S.D.W. Va. Nov. 30, 2007) ............. 30, 31, 33

*W.R. Grace & Co.-Conn. v. Zotos Int'l, Inc.*,
559 F.3d 85 (2d Cir. 2009) .......................................................................... 2, 4, 5, 22

*W. Props. Serv. Corp. v. Shell Oil Co.*, negative treatment
358 F.3d 678 (9th Cir. 2004) ....................................................................... 14, 15, 18

*Yankee Gas Servs. Co. v. UGI Utils., Inc.*,
852 F. Supp. 2d 229 (D. Conn. 2012) ..................................................................... 11

iii

**State Court Cases**

*Dunlap v. Hinkle*,
  317 S.E.2d 508 (W. Va. 1984) ........................................................................................... 31

*Heartwood Forestland Fund IV, LP v. Hoosier*,
  781 S.E.2d 391 (W. Va. 2015) .......................................................................................... 30

*Realmark Devs., Inc. v. Ranson*,
  542 S.E.2d 880 (W. Va. 2000) .......................................................................................... 30

*Sharon Steel Corp. v. City of Fairmont*,
  334 S.E.2d 616 (W. Va. 1985) .......................................................................................... 35

*State ex rel. Smith v. Kermit Lumber & Pressure Treating Co.*,
  488 S.E.2d 901 (W. Va. 1997) .......................................................................................... 35

**Federal Statutory Authorities**

15 U.S.C. § 2605(e)(2) ........................................................................................................... 38

42 U.S.C. § 9601 ...................................................................................................................... 2

42 U.S.C. § 9603(c) ............................................................................................................... 25

42 U.S.C. § 9607(a) ..................................................................................................... 2, 8, 11

42 U.S.C. § 9613(f)(1) ................................................................................................. 1, 11, 14

42 U.S.C. § 9614(b) ............................................................................................................... 34

**Federal Rules and Regulations**

40 C.F.R. § 300.150 ............................................................................................................... 10

40 C.F.R. § 300.155 ............................................................................................................... 23

40 C.F.R. § 300.400(a) .................................................................................................. 8, 10, 29

40 C.F.R. § 300.405 ............................................................................................................... 10

40 C.F.R. § 300.410 ............................................................................................................... 8, 9

40 C.F.R. § 300.415(b)(2) ..................................................................................................... 8, 9

40 C.F.R. § 300.420 .......................................................................................................... 8, 9, 10

40 C.F.R. § 300.700(c) ............................................................................................... 7, 8, 9, 10, 23

40 C.F.R. § 761.1 ................................................................................................................... 38

40 C.F.R. § 761.50(b)(3)(i) ...................................................................................................... 6

40 C.F.R. § 761.50(b)(3)(i)(A) ......................................................................................... 3, 6, 27

Nat'l Oil & Hazardous Substances Pollution Contingency Plan, 53 Fed. Reg. 51394 (Dec. 21,
  1988) ..................................................................................................................................... 7, 8, 9

Hazardous Substances: Notification of Transportation, Storage and Disposal Facilities,
  46 Fed. Reg. 22144, 22145  (Apr. 15, 1981) ......................................................................... 25

iv

**Additional Authorities**

Restatement (Second) of Torts § 840A........................................................................................... 36

Restatement (First) of Restitution § 115 ................................................................................ 31, 36

Restatement (Third) of Restitution and Unjust Enrichment § 2 .................................................. 32

Restatement (Third) of Restitution and Unjust Enrichment § 22 .................... 30, 32, 33, 34, 36, 37

Interim Guidance Regarding Criteria Landowners Must Meet in Order to Qualify for BFPP, Contiguous Property Owner, or Innocent Landowner Limitations on CERCLA Liability, EPA, March 6, 2003.................................................................................................................... 22

**INTRODUCTION**

Defendant Union Carbide Corporation ("UCC") hereby submits this trial brief detailing its arguments on remaining legal issues in this case and previewing the evidence it intends to present at trial. The issues remaining for trial are (1) which of plaintiff MPM Silicones, LLC's ("MPM") alleged past costs were response (and in particular, removal) costs under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), and necessary and consistent with the National Contingency Plan ("NCP") such that they are recoverable; (2) what share of the past removal costs should be allocated to MPM and to UCC respectively pursuant to CERCLA § 113(f) in light of the Court's finding that both parties are liable under CERCLA; (3) whether there can be allocation of any of MPM's potential future removal costs under CERCLA, and if so, what is the allocation; and (4) whether MPM may recover in restitution for the same past costs it claims under CERCLA.

The evidence will show that: (1) virtually all of MPM's past costs are not recoverable under CERCLA; (2) MPM should be allocated a significant majority of any past recoverable removal costs; (3) there is no basis for an allocation of future costs at this time, as MPM's potential future costs either are remedial in nature and thus time-barred from recovery (as with its planned upgrade of the Site's[1] wastewater treatment unit ("WWTU"), to the extent that is even a response action) or are entirely unknown and speculative; and (4) there is no legitimate restitution claim here.

---

[1] "Site" refers to MPM's chemical manufacturing facility located near Sistersville, West Virginia.

## LEGAL ARGUMENT

**I.     VIRTUALLY ALL OF MPM'S PAST COSTS WERE NOT "NECESSARY COSTS OF RESPONSE" UNDER CERCLA.**

Under CERCLA § 107(a), a private party may recover only those costs that constitute "necessary costs of response." 42 U.S.C. § 9607(a). Although "necessary costs of response" is not defined in CERCLA, the Second Circuit has determined that to be a "cost of response," the cost must be incurred as part of a party's efforts "to clean up a site, prevent the threatened release of hazardous substances, and dispose of removed material." *Syms v. Olin Corp.*, 408 F.3d 95, 103 (2d Cir. 2005); *see also* 42 U.S.C. §§ 9601(23), (25). Further, the party must have been acting "'to contain a release threatening the public health or the environment.'" *W.R. Grace & Co.-Conn. v. Zotos Int'l, In*c., 559 F.3d 85, 91 (2d Cir. 2009) (quoting *Amoco Oil Co. v. Borden Inc.*, 886 F.2d 664, 669-70 (5th Cir. 1989)); *see also* Summ. J. Order at 42 (Dkt. No. 148). Similarly, whether response costs are "necessary" under CERCLA depends on "'whether there is a threat to human health or the environment and whether the response action is addressed to that threat.'" Summ. J. Order at 42 (quoting *Carson Harbor Vill., Ltd. V. Unocal Corp.,* 270 F.3d 863, 872 (9th Cir. 2001) (en banc)); *see also id.* (quoting *New York State Electric & Gas v. FirstEnergy Corp.*, 808 F. Supp. 2d 417, 522-24 (N.D.N.Y. 2010) ("*NYSEG I*") ("[T]his standard requires that an actual and real threat to human health or the environment exist before initiating a response action . . . .")).

To be "necessary" and therefore recoverable, response costs must also be "cost-effective," meaning that they were incurred using "the most cost effective method of alleviating the threat to human health and the environment in the specific location, surroundings, and likely uses for the land." Summ. J. Order at 43 (quoting *NYSEG I*, 808 F. Supp. 2d at 524 (internal quotation marks omitted) (citation omitted)). The evidence at trial will demonstrate that many of

MPM's alleged costs were neither response costs nor necessary because (i) there was no demonstrated risk to public health or the environment posed by the PCB[2]-contaminated soils MPM encountered at the WWTU, (ii) MPM's costs were not incurred as part of an action to contain a threat to public health and the environment; and (iii) MPM's costs were wasteful, excessive, and unnecessary to address the PCB-contaminated soils.

First, MPM's costs were incurred as part of a construction process and were not triggered by a risk to public health or the environment. They came about because MPM was upgrading the WWTU to increase its plant processing capacity, avoid permit exceedances, and thereby increase the value of its plant and operations. Moreover, MPM cannot demonstrate that there was a threat to public health or the environment posed by the PCB-contaminated soils that it encountered in the area it was excavating for its WWTU upgrade. PCBs disposed of prior to 1978, such as those here, are presumed as a matter of law "not to present an unreasonable risk of injury to health or the environment" unless there has been a contrary finding by the United States Environmental Protection Agency ("EPA"). 40 C.F.R. § 761.50(b)(3)(i)(A). There is no evidence that EPA or West Virginia Department of Environmental Protection ("WVDEP") made any such determination with respect to the soils encountered in 2008. MPM's designated Rule 30(b)(6) representative, Kristen Smith, among others, also admitted in deposition that there was no risk to public health or the environment posed by the PCB-contaminated soils at the WWTU. Rather, the only risk about which MPM even speculated was to the construction workers in the excavation area—a risk that MPM created by excavating in an area that it had long known to have been used to manage hazardous waste. This was a risk that could have been be addressed

---

[2] "PCB" refers to polychlorinated biphenyls.

3

with quite modest Occupational Safety and Health Act measures, including personal protective equipment.

In addition, MPM seeks recovery of $84,095.16 related to its purchase of steel shoring, which had nothing to do with PCB sampling.  MPM rented and installed the steel shoring to secure the excavation area as part of its WWTU upgrade, not with respect to PCBs.  Only after it rented and installed the shoring did MPM encounter PCB-contaminated soils in the WWTU upgrade area.  UCC expert Malcolm Beeler will explain that steel shoring is not required for and is wholly unrelated to the investigation of PCBs.  There is no evidence that the steel shoring was ever used as part MPM's sampling efforts, let alone to protect against a threat to public health or the environment.  In fact, MPM filled in the excavated area to facilitate sampling by its contractor, Clean Harbors, demonstrating that the shoring had no relation to the PCB sampling.  Therefore, MPM's rental and purchase of the steel shoring did not further MPM's alleged efforts to "contain a release threatening the public health or the environment."  *W.R. Grace*, 559 F.3d at 91.

MPM also seeks recovery for daily invoices billed by Clean Harbors for PCB sampling activity from June 2009 to September 2009.  During that time, Clean Harbors charged MPM a daily set rate of $4,385 for 28 days, $2,650 for 18 days, and $2,500 for 7 days.  The invoiced daily rates include charges for construction-related equipment (and personnel operating the equipment), including an excavator, a loader, and a dump truck.  The evidence fails to show that this equipment—normally used for construction—was deployed for PCB sampling.  Indeed, Mr. Beeler will opine that this equipment is not—and in MPM's case, was not—used for PCB sampling.  This construction-related equipment sat idle while racking up daily charges from June 2009 until August 2009, when Clean Harbors finally removed this equipment from the Site (and

4

adjusted its daily rates accordingly), even though Clean Harbors continued its sampling at the Site until September 2009.  MPM cannot show that any of these construction-related costs were incurred as a result of its actions to abate any threat to the public health or the environment; to the contrary, the costs were incurred only as part of its WWTU upgrade efforts and therefore cannot be considered a "necessary cost of response."  *See W.R. Grace*, 559 F.3d at 91.

The evidence also does not demonstrate that certain other costs MPM incurred were "necessary," as those costs were not cost-effective but rather "wasteful, or otherwise unnecessary to address the [PCBs at the Site]," *Litgo N.J., Inc. v. Martin*, No. CIV. 06-2891, 2012 WL 32200, at *6 (D.N.J. Jan. 5, 2012) (quotation marks omitted) (reducing recovery of costs incurred by environmental consultant by 30% as duplicative and wasteful), *aff'd sub nom. Litgo N.J. Inc. v. Comm'r N.J. Dep't of Envtl. Prot.*, 725 F.3d 369 (3d Cir. 2013).

In conducting the PCB sampling in the WWTU upgrade area in 2009, MPM undertook an unnecessarily expansive and expensive approach to characterizing the PCB-contaminated soils.  MPM's contractor, Clean Harbors, applied a 10 ft. x 10 ft. sampling grid, meaning that soil borings were taken every ten feet.  MPM could have proceeded (but chose not to) using a risk-based approach, which would have allowed the use of a less dense sampling grid and therefore many fewer soil borings.  EPA had already approved a less dense grid for PCB sampling on an area adjacent to the WWTU only two years before (in 2007).  MPM, contrary to what already had been approved, used a much more costly grid.  Application of a denser sampling grid resulted in 40 additional soil borings in just the initial sampling grid (which was 60 ft. x 100 ft. area), and Clean Harbors continued to use a 10 ft. x 10 ft. sampling grid as it expanded the sampling area, resulting in a total of 151 soil borings.  UCC's expert will opine that using a grid size similar to what EPA had already approved for the other area and taking 20 soil

borings—at the most—would have been sufficient to characterize these soils.  Thus, $10,083 in laboratory analysis costs were unnecessary because MPM's sampling grid was far too dense, and resulted in excessive, wasteful, and otherwise unnecessary sampling costs.

Similarly, MPM seeks recovery of costs related to PCB sampling in areas well beyond the excavation footprint of the WWTU project, but there is no evidence that MPM needed to engage in this excessive sampling effort to protect against any alleged threat to public health or the environment.  MPM had no plans to excavate down to and expose all of the buried PCBs in the sampling area outside of the excavation footprint for purposes of the upgrade—and thus those PCBs posed no risk and required no sampling or remedial work.  As noted above, moreover, the PCBs in the WWTU soils are presumed not to pose a risk to human health or the environment because they were disposed of prior to 1978.  *See* 40 C.F.R. § 761.50(b)(3)(i)(A). Therefore, MPM cannot demonstrate that the sampling conducted by Clean Harbors outside the excavation footprint was needed.  *See City of Detroit v. Simon*, 247 F.3d 619, 630 (6th Cir. 2001) (costs beyond what would make property safe for industrial use were not "necessary" under CERCLA).

Additional unnecessary costs incurred by MPM include $16,165 in water disposal costs that stemmed from (1) MPM's failure to properly protect roll-offs containing PCB-contaminated soils from rainwater and (2) the pooling of rainwater in the unnecessary sampling excavation dug by Clean Harbors.  Had MPM properly secured and covered the roll-offs and had Clean Harbors sampled using borings (not an unneeded excavation), the costs to test and dispose of PCB-contaminated rainwater would not have otherwise been incurred.  These costs are similarly "wasteful" and cannot be considered "necessary costs of response."  *See Litgo N.J.*, 2012 WL 32200, at *6.

6

In total, the evidence at trial will show that at least approximately $345,000 of the past costs associated with MPM's unfocused and poorly managed actions in 2008 and 2009 did not address any threat to public health or the environment, "exceeded what was necessary to conduct a cost-effective [investigation]," were "wasteful or otherwise unnecessary," *APL Co. Pte. v. Kemira Water Sols., Inc.*, 999 F. Supp. 2d 590, 619 (S.D.N.Y. 2014) (quotation marks omitted), and were more than what was needed to keep the Site safe for industrial use, *see City of Detroit*, 247 F.3d at 630.  Those costs were not "necessary costs of response" and cannot legitimately be recovered by MPM under CERCLA.[3]

## II.    ALL OF MPM'S PAST INVESTIGATION COSTS WERE NOT CONSISTENT WITH THE NATIONAL CONTINGENCY PLAN.

To recover response costs under CERCLA, a party must have incurred such costs consistent with the NCP.  42 U.S.C. § 9607(a)(4)(B).  A response action is only deemed NCP-consistent "if the action when evaluated as a whole, is in substantial compliance with the applicable requirements . . . and results in a CERCLA-quality cleanup." Summ. J. Order at 50 (quoting 40 C.F.R. § 300.700(c)(3)(i)).  The NCP requirements potentially applicable to private-party responses—"potentially applicable" meaning a party "must" comply with all pertinent provisions[4]—are listed at 40 C.F.R. § 300.700(c)(5) and (c)(6).  The evidence at trial will show that MPM's 2009 investigation at the WWTU did not comply with either the overall purpose or certain applicable provisions of the NCP.  Indeed, the MPM environmental engineer overseeing

---

[3] In fact, as Mr. Beeler has testified, all of MPM's past costs could have been avoided because it was unreasonable for MPM to undertake a construction project involving soil excavation in an area that was known to have PCB contamination nearby and was subject to deed restrictions without first doing appropriate planning.

[4] Nat'l Oil & Hazardous Substances Pollution Contingency Plan, 53 Fed. Reg. 51394, 51461 (Dec. 21, 1988).

MPM's 2009 investigation, Steven Klarman, was not even familiar with the NCP at the time of his deposition (2015), years after the haphazard investigation had been terminated.  Accordingly, all of MPM's past investigation costs are not NCP-consistent and cannot be recovered.

The NCP is intended to establish "methods and criteria for determining *the appropriate extent of response*" under CERCLA.  40 C.F.R. § 300.400(a) (emphasis added); *see also Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 136 (2d Cir. 2010) (NCP details steps necessary to "identify, evaluate, and respond to hazardous substances in the environment").  To do so, the NCP requires responding parties to undertake a preliminary investigation, called a "site evaluation," that (i) evaluates the potential threat to public health and the environment posed by a release of hazardous substances, and (ii) determines what kind of response (i.e., removal or remedial action) is needed, if any.  *See* 40 C.F.R. §§ 300.410 (removal site evaluation), 300.420 (remedial site evaluation); 53 Fed. Reg. at 51404.

During the site evaluation process, a responding party must evaluate a set of risk factors set forth in 40 C.F.R. § 300.415(b)(2) to determine if there is the type of immediate threat to public health and safety that would ordinarily require a removal, rather than remedial, action.  *See Benzman v. Whitman*, 523 F.3d 119, 131 (2d Cir. 2008); *G.J. Leasing Co. v. Union Elec. Co.*, 854 F. Supp. 539, 564 (S.D. Ill. 1994), *aff'd*, 54 F.3d 379 (7th Cir. 1995); 40 C.F.R. §§ 300.410(c)(1)(iv), 300.420(b)(3), (c)(3) (made applicable by § 300.700(c)(5)).  If it initially appears that a removal action may be warranted, the responding party must undertake a removal site evaluation "as promptly as possible."  40 C.F.R. § 300.410(b).  Even if initial indications are that a non-urgent remedial site evaluation is appropriate, the responding party must evaluate the § 300.415(b)(2) risk factors *as the site evaluation progresses* to determine whether, in light of new information, a removal action may indeed be appropriate.  *See* 40 C.F.R. § 300.420(b)(3),

8

(c)(3).  The clear purpose of this scheme is to determine if there is an imminent threat that the

NCP requires be addressed promptly.  *See* 53 Fed. Reg. at 51404.

MPM's abortive 2009 investigation at the WWTU—which was unquestionably subject to

the NCP's site evaluation provisions, *see Nashua Corp. v. Norton Co.*, 116 F. Supp. 2d 330, 354

(N.D.N.Y. 2000) (applying remedial site evaluation provision to preliminary investigation)[5]—

failed in this purpose.  There is no evidence that in 2009—or even to the present day—MPM

ever evaluated the § 300.415(b)(2) risk factors to determine whether the PCB contamination at

the WWTU might warrant a removal action.  Given the now more than seven-year gap in its

investigative efforts, insofar as MPM can be said to be undertaking any type of investigation, it

must be a remedial site evaluation, yet there is no evidence it ever made an interim assessment of

whether a removal action might in fact be the more appropriate response, as required under

§ 300.420(b)(3) and (c)(3).  After more than seven years, MPM's moment for making the time-

sensitive evaluation of whether prompt removal action is required has long since passed.[6]

The NCP also requires that during a remedial site evaluation, like MPM's, "'[p]rior to

conducting field sampling . . . the [responding party] shall develop' . . . [a quality assurance

project plan ('QAPP')] explaining 'policy, organization, and functional activities and the data

quality objectives and measures necessary to achieve adequate data for use in site evaluation and

hazard ranking system activities.'"  *Nashua Corp.*, 116 F. Supp. at 354 (quoting 40 C.F.R.

---

[5] After the discovery of a release of hazardous substances, the first step in any NCP response is a site evaluation; there is no earlier investigatory phase.  *See G.J. Leasing*, 854 F. Supp. at 564; 40 C.F.R. § 300.405(f) (directing performance of either a removal or remedial site evaluation when "notified of a release"); 53 Fed. Reg. at 51404 ("When notice of a release is received, EPA will . . . determine whether a removal or a remedial site evaluation should be undertaken.").

[6] Although MPM has sought to analogize its response to the remedial site evaluation undertaken in *Nashua Corp.*, 116 F. Supp. 2d at 354, its seven-year delay shows that it is not proceeding with the "reasonable diligence" present in that case, *see id.* at 353.  For that reason alone, *Nashua* is inapposite.

§ 300.420(c)(4)) (internal quotation marks omitted) (applying QAPP provision to preliminary investigation).  MPM prepared no such plan before its 2009 investigation.  As a result, its sampling data, at once both excessive and incomplete, have failed to serve or lead to any bona fide site evaluation aimed at evaluating the potential threat, if any, posed by the WWTU PCBs and determining what type of action (removal or remedial) is needed, if any.  MPM's sampling data, generated without the guidance of a QAPP, failed to serve the core purposes of an NCP site evaluation.

MPM also failed to comply with certain other NCP provisions.  Under § 300.405(c) (referencing § 300.405(a)(4) and made applicable by § 300.700(c)(5)(iv)), MPM was required to report the WWTU PCBs to the National Response Center pursuant to its Resource Conservation and Recovery Act ("RCRA") permit reporting obligations.  Those obligations required notice to the proper authorities within 30 days of discovering the PCB release, yet MPM did not report until 2012, four years later, depriving regulators of (i) the opportunity to guide MPM's investigation in a more useful and cost-effective manner if in fact they had any concern about the Site and (ii) the opportunity to evaluate MPM's data on a timely basis to determine if prompt removal action was needed.  In addition, MPM did not prepare a site-specific worker health and safety plan for its investigation, as required by § 300.150 (made applicable by § 300.700(c)(5)(i)).  All MPM has offered is a generic health and safety plan with no mention of the Site or PCBs.  *Cf. Nashua Corp.*, 116 F. Supp. 2d at 353 (applying NCP's health and safety plan provision to preliminary investigation costs).

For all of the above reasons, most, if not all, of MPM's 2009 investigation costs were not incurred consistent with the NCP, and MPM's claim for those costs should be denied.

10

### III.   MPM SHOULD BE ALLOCATED A SIGNIFICANT MAJORITY OF THOSE COSTS FOR WHICH ALLOCATION IS CURRENTLY APPROPRIATE.

CERCLA § 113(f)(1) "directs courts to allocate cleanup costs between responsible parties 'using such equitable factors as the court determines are appropriate.'" *Bedford Affiliates v. Sills*, 156 F.3d 416, 429 (2d Cir. 1998) (quoting 42 U.S.C. § 9613(f)(1)); *see also N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 238 (2d Cir. 2014) ("*NYSEG II*"). Section 113(f)(1) does not "limit courts to any particular list of factors," but instead "affords a district court broad discretion to balance the equities in the interests of justice." *Bedford Affiliates*, 156 F.3d at 429. In this case, the Court has already ruled that MPM is a liable party. *See* Renewed Summ. J. Hr'g Tr. at 35-40 (Dkt. No. 168). It also has ruled that MPM's claims for past and future *remedial* costs are time-barred, leaving only MPM's claims for *removal* costs at issue. *See* Summ. J. Order at 77. Thus, the only questions left now before the Court are (i) what is the appropriate allocation of MPM's past recoverable removal costs between MPM and UCC, and (ii) whether—and, if so, which—future removal costs are properly allocated now and what any such allocation should be. At this stage of the Court's inquiry, the burden of proof falls on both parties to prove the facts on which they wish to rely for allocation purposes. *See Yankee Gas Servs. Co. v. UGI Utils., Inc.*, 852 F. Supp. 2d 229, 242 (D. Conn. 2012); *see also Niagara Mohawk Power Corp.*, 596 F.3d at 121 n.8 (holding that § 113(f)(1) counterclaim for contribution converts § 107(a) action into "an apportionment of liability among jointly *and severally liable parties*").

For the reasons discussed below, MPM should be allocated a substantial majority of any past recoverable response costs. With respect to future costs, however, an allocation would be inappropriate at this time. As described in more detail in UCC's accompanying motion *in limine*, the possibility that MPM might incur recoverable removal costs in the future, and the

relevant facts and equitable factors surrounding such potential costs, are too speculative at this

point to allow for a fair and accurate allocation in this proceeding.

> **A.     MPM Should Be Allocated a Significant Majority of Those Past Removal Costs That Are Recoverable Under CERCLA.**

At trial, UCC will present evidence on multiple factors that warrant the allocation of a

significant majority of MPM's past recoverable removal costs to MPM, including the following:

1. When it acquired the Site, MPM was on notice of potential PCB-related costs at the Site, and thus had the opportunity to account for them and assumed the risk.  MPM also knew it would be performing substantial WWTU upgrade work in the Site's Environmental Protection Area ("EP Area")—where MPM had notice of historical waste management and deed notices.  To allow MPM to recover costs for which it has already accounted or had the opportunity to take into account would constitute an inequitable windfall.

2. MPM is indemnified by Chemtura Corporation (f/k/a Crompton Corporation), the party from whom it purchased the Site, for preexisting contamination at the Site.  Although MPM appears to have forfeited that indemnity by failing to timely notify Chemtura under the relevant contractual terms, it is MPM who should bear the costs of its failure.

3. MPM's past removal costs arise solely from MPM's decision to perform construction in an area that it knew when it purchased the Site contained historical hazardous waste management operations.  There is no evidence of a preexisting threat posed by the PCBs that otherwise engendered MPM's costs.

4. MPM's investigation of PCB contamination in the vicinity of the WWTU was performed to serve, and has served, only MPM's commercial interests in upgrading the WWTU.

5. MPM's past recoverable costs were grossly excessive with no guiding plan.

6. MPM deprived UCC of any opportunity to comment on and avert MPM's wasteful and abortive approach to investigating PCB-contaminated soils in the vicinity of the WWTU, notwithstanding that a year passed between MPM's 2008 discovery of the PCBs and the 2009 investigative activities for which it now seeks costs.

7. UCC did not, as MPM contends, fail to disclose legally required information about PCB disposal at the Site to regulators, and the material information regarding potential PCB use and disposal at the Site was made available to subsequent purchasers and MPM prior to MPM's 2003 acquisition of the Site.  Moreover, UCC had no dealings with MPM, and UCC's conduct is a minimal factor in comparison to the pre-purchase notice and opportunities available to MPM.  GE/MPM was a sophisticated party, and had it wished, prior to purchasing the Site, it could have negotiated pre-purchase onsite sampling, an opt-out provision tied to such sampling results, a price commensurate with site conditions, or protective contract provisions such as the indemnity that it did in fact

12

obtain.  MPM was free to *not* purchase the Site in the event it could not obtain any protective terms regarding environmental risks at the Site that it desired.

Of the above factors, the first four are especially important in allocating costs in the particular circumstances of this Site.  Most importantly, the evidence shows that MPM would reap an inequitable windfall were it permitted to recover costs related to risks of which it was on notice and accounted for when it purchased the Site.  Beyond this major overarching factor, the circumstances of MPM's response to the WWTU PCBs further warrant the allocation of a significant majority of related costs to MPM.  First, MPM has a contractual indemnity to mitigate the PCB risks it assumed but appears to have forfeited it by failing to comply with the terms of the indemnity.  Second, MPM has voluntarily excavated in an area that its own environmental due diligence and the Site's deed notices indicated had been used for historical waste management, thereby creating the only (quite limited) risk it has contended exists at the Site: potential exposure of its workers to contamination that is presumed to present no risk otherwise.  Finally, MPM took (and will take) the actions for which it seeks costs at the WWTU not to further the fundamental CERCLA objective of addressing known preexisting threats to public health or the environment but solely for its own commercial benefit—i.e., to avoid costly shutdowns and reduced profits due to an antiquated WWTU that MPM knew when it purchased the Site would have to be upgraded in order to meet environmental performance standards.

UCC also recognizes that it was responsible for disposal of PCB-containing wastes at the Site and that is a relevant factor for allocation.  However, it should also be relevant for allocation that that disposal occurred before the enactment of modern-day environmental laws designed to govern the management of industrial waste.  It is also relevant that MPM has not alleged, nor do the facts show, any unlawful disposal of PCBs by UCC.

### 1. *MPM Was on Notice of the Risk of PCB Response Costs When It Acquired the Site.*

Pre-purchase notice of environmental risk is a significant allocation factor for an owner, like MPM, because it means the owner had an opportunity to account for the environmental risk when negotiating the purchase agreement and voluntarily assumed such risk upon purchasing the site. *See, e.g.*, *Bethlehem Iron Works, Inc. v. Lewis Indus., Inc.*, No. CIV.A. 94-0752, 1996 WL 557592, at *72-73 (E.D. Pa. Oct. 1, 1996) (allocating 65% to current owner in part because it was on pre-purchase notice of contamination through available records and employees, elected not to investigate the site before the purchase, and received an indemnity); *BCW Assocs., Ltd. v. Occidental Chem. Corp.*, No. CIV.A. 86-5947, 1988 WL 102641, at *10-12, 22 (E.D. Pa. Sept. 29, 1988) (allocating two-thirds of costs to current owner and its tenant in part because they knew they were acquiring environmental risks in "a dusty, old warehouse"); *In re Sterling Steel Treating, Inc.*, 94 B.R. 924, 931 (Bankr. E.D. Mich. 1989) (allocating 50% of costs to current owner in part because it knew it was purchasing an environmental risk). In fact, an owner with pre-purchase knowledge of environmental risks is presumed to have accounted for such risk in the purchase price. *See W. Props. Serv. Corp. v. Shell Oil Co.*, 358 F.3d 678, 691 (9th Cir. 2004) ("[W]hen a buyer knows of a cleanup liability prior to purchase, proper allocation under the equitable factors of § 113(f)(1) requires that the PRP buyer not be relieved of the entire expense of cleanup. . . . No sensible person would pay as much for a property with a known liability as for one without, whether the price expressly discounted for the cleanup or not.").

When MPM (as GE) acquired the Site, it was a sophisticated purchaser and well versed in PCB issues, as demonstrated by GE's primary responsibility for the massive PCB investigation and remedy at the Hudson River. MPM knew that it was acquiring a large chemical manufacturing facility with a long history that predated today's more-stringent environmental

14

regulatory regime.  Moreover, MPM was on notice that significant PCB contamination might exist at the Site, including in the EP Area where the WWTU is located.  To account for this risk, MPM obtained from the seller Crompton Corporation (later known as Chemtura Corporation) a conditional indemnity for remediation of preexisting contamination and is presumed to have negotiated a reduced purchase price reflecting the residual risks.  *See W. Props. Serv. Corp.*, 358 F.3d at 691.

Significantly, MPM relied solely on its indemnity and the purchase price.  Although it is not unusual to include an opt-out provision in commercial contracts based on the results of onsite sampling, MPM's contract included no such clause.  MPM (as GE) certainly had the commercial sophistication to include an opt-out provision, but chose not to.  Alternatively, MPM could have awaited the onsite sampling results before purchasing the property or negotiated an unconditional indemnity.  Yet, it did none of those things, and instead relied entirely on the conditional indemnity from the seller, Crompton, and its presumptive purchase price.  Because MPM voluntarily assumed the risk that its indemnity from Chemtura might not be sufficient to protect it from the incurrence of  costs to respond to PCB contamination (e.g. because of limits in the indemnity or Chemtura's ability to pay), MPM should bear a significant majority of its past recoverable removal costs.

At trial, UCC will offer the following evidence supporting a significant majority allocation to MPM:

- **The December 2002 Phase I Environmental Site Assessment prepared by Environmental Strategies Corporation ("ESC") and the Stage I Assessment and related documents prepared in early 2003 by GE/MPM's due diligence consultant, ENVIRON International Corporation.**  MPM possessed or otherwise was provided these documents.  They document and discuss (i) actual and potential PCB releases at the Site (including in soils), (ii) historical lime ponds used to manage plant wastewater in the

EP Area, and (iii) potential liabilities up to $2 million for MPM arising from PCB-contaminated soils and other contamination.  They also put MPM on notice that it would be necessary to upgrade the WWTU (located in the EP Area) extensively in order to meet environmental permit requirements and avoid costly plant-wide shutdowns.  MPM bases its past cost claim on costs allegedly incurred relating to this upgrade.

- **Historical internal UCC waste management memoranda available during the due diligence.**  Before MPM's 2003 purchase of the Site, MPM and ENVIRON were on notice of and had access to historical UCC memoranda that document UCC's investigations into the Site's historical use and potential disposal of PCBs.  In particular, a 1980 memorandum drafted by former UCC employee Clem Schubert (the "1980 Schubert Memorandum") provided notice of historical use of PCBs in chemical manufacturing at the Site, the potential for management of wastes that may have contained PCBs in lime ponds in the EP Area, and the potential disposal of such PCBs on the Site.  MPM admits that Mr. Schubert's memorandum provides "uncontroverted evidence" of PCB use and disposal at the Site.  *See* Dkt. No. 89 at 14.  Also, a 1992 memorandum drafted by longtime Site employee Dennis Heintzman (the "1992 Heintzman Memorandum") discussed the potential disposal of PCBs in the NIS, included attachments such as the 1980 Schubert Memorandum, and was quoted in the 2002 ESC Phase I Assessment, which MPM and ENVIRON had by January 2003.

- **Access to longtime Site employees.**  MPM had access to three of the Site's longtime employees who had also been employed by UCC and were directly involved in waste management investigations and discussions during UCC's operation of the Site, including those discussions related to PCB use and potential disposal.  In fact, those three individuals were directly involved in the pre-purchase environmental due diligence activities of ENVIRON.

- **Deed disclosure instruments recorded by UCC in 1986, 1988, and 1993.**  Deed disclosures available at the time of MPM's purchase of the Site indicated that the EP Area had been historically used for hazardous waste management and thus might contain

16

environmental contamination as a result of such operations.  MPM purchased the Site subject to these notices and the land use limitations within them.

- **ENVIRON's April 2003 PCB sampling plan.**  This plan, a draft of which was submitted to MPM even before it signed the purchase agreement for the Site, proposed 108 soil samples and 35 groundwater samples to be taken from the Site and analyzed for PCBs, indicating ENVIRON's and MPM's focus on the potential for PCB contamination at the Site.

- **PCB sampling results.**  ENVIRON did extensive sampling for PCBs in connection with a Phase II Environmental Assessment.  Often such assessments are done before a party is unconditionally committed to the purchase of a property.  While it appears that the sampling was done before MPM closed on the acquisition of the Site, MPM opted to acquire the Site without providing for any ability to opt out based on the Phase II sampling results.  MPM thus assumed the risk of PCB contamination.  A draft Environ Phase II report indicates the detection of PCBs in 28 soil samples from the Site (16 of which were in two areas within the historic EP Area), in groundwater from three wells at the Site (two of which are immediately downgradient of the EP Area), and in sediment samples from an onsite stream Sugar Camp Run which borders the EP Area and a historical onsite landfill, the North Inactive Site ("NIS").  The draft report noted that the detection of PCBs in the historic EP Area indicated a "significant release," that the groundwater detections nearby the EP Area were "in excess of standards," and "a release of PCBs has significantly affected Sugar Camp Run sediments."

- **ENVIRON employees Gordon Cobb and Jason Miller.**  Mr. Cobb and Mr. Miller will testify (via deposition) that they reviewed the 2002 ESC Phase I report and the Site's RCRA submissions, and would have requested and reviewed the historical memoranda and sampling data cited in the 2002 ESC report as part of standard transactional environmental due diligence practice.  Prior to the contract on the Site, they also toured the Site, had access to all onsite records, and as noted above, interviewed three former UCC employees who were heavily involved in UCC's investigations into PCB use and potential disposal at the Site.

17

- **Longtime Site employee, Dennis Heintzman.**  Mr. Heintzman—who served in various environmental roles at the Site from 1984 until 2012 and participated substantially in the due diligence for the Site sales in both 1993 and 2003—will testify (via videotaped deposition) that UCC fully disclosed to potential purchasers PCB-related information available to it, and that UCC's historical memoranda cited above were provided to the purchaser when UCC sold the Site in 1993 and would have been made available to MPM by Crompton in 2003 as well.

- **Expert testimony from Philip Newton.**  Mr. Newton, an expert on environmental due diligence and investigation, among other things, will explain how the above documents and information put MPM on notice that there was a significant presence and risk of PCB contamination that might require a response, both at the Site generally and in the EP Area (containing the WWTU) specifically.

As the evidence will show, the information available in the 2003 due diligence was more than enough for a company like GE to be on notice of the risk of significant PCB contamination at the Site, including in the EP Area.  This risk should have been especially significant to MPM (as GE) because it knew that it would likely need to perform significant upgrades at the WWTU, which sits squarely within the EP Area.  Despite these warnings, MPM proceeded with the transaction.  The Court should not allow MPM to reap a windfall by unfairly recovering costs for which it did or could account in its acquisition of the Site, as to which it negotiated an indemnity, and as to which it voluntarily assumed the risk that the indemnity would be insufficient for any number of reasons.  *See NYSEG II*, 766 F.3d at 238 (concluding that CERCLA is not meant to provide parties with windfalls); *W. Props. Serv. Corp.*, 358 F.3d at 691 (discussing use of pre-purchase knowledge as equitable factor to prevent double recovery).

18

### 2. MPM Has an Indemnity That It Appears to Have Forfeited Through Its Own Inaction.

A party's possession of an indemnity for the costs in question warrants a significant allocation share. *Bethlehem Iron Works*, 1996 WL 557592, at \*72-73 (allocating 65% to current owner in part because it received an indemnity yet failed to redeem it). As discussed above, MPM was on notice of substantial PCB-related risks when it purchased the Site. To mitigate the risks it was assuming, MPM negotiated a contractual indemnity with the seller, Chemtura, for preexisting contamination. Yet MPM appears to have forfeited that indemnity with regard to the PCBs in the WWTU area because it failed to comply with the terms of the indemnity provision. Because MPM had an indemnity for its past (and future) PCB-related costs at the WWTU and forfeited its right to recover through its own inaction, it should bear a significant majority of those costs.

### 3. MPM's Past Costs Arise from MPM's Decision to Perform Construction in an Area That It Knew Contained Historical Hazardous Waste Management Operations When It Purchased the Site.

The fact that a party has created or aggravated the potentially hazardous condition that precipitated the response costs warrants a significant allocation share. *See, e.g.*, *BCW Assocs., Ltd.*, 1988 WL 102641, at \*10-12, 22 (allocating two-thirds of cleanup costs to current owner and tenant in part because both knew they were acquiring an environmental risk and the tenant created the hazardous condition). As discussed above in Part III.A.1, when MPM acquired the Site, it knew that it would likely be performing construction as part of a WWTU upgrade in the EP Area, was on notice that PCB-containing wastes may have been managed in that area in the past, and knew that PCBs and other hazardous substances had been detected there. Nonetheless, MPM excavated in this known historical hazardous waste management area without first performing an investigation of the subsurface, thereby creating the circumstances that led to all

19

of its past costs.[7]  Thus, MPM is responsible for and should bear a significant majority of those costs.

Due diligence documentation confirms that ENVIRON's Phase II investigation put MPM on notice of PCB contamination at the Site, including in the area of the WWTU upgrade.  It is not unusual for parties make a purchase agreement for an industrial facility contingent on the results of a Phase II Report.  MPM voluntarily entered into a contact that had no such contingency.  After the closing, and before MPM began the WWTU upgrade in 2008, MPM's and the seller, Chemtura's environmental consultants issued reports that further confirmed the risks of which MPM was on notice when it purchased the Site—the potential for significant PCB contamination in the EP Area where the WWTU is located.  At trial, UCC will present the following evidence:

- **ENVIRON Phase II due diligence report containing PCB sampling data for the Site.** The final version of ENVIRON's report, completed in May 2004, described the presence of PCBs above regulatory levels at multiple areas of the Site and recommended further investigation and evaluation of the need for remediation.  The final version also quoted the 1980 Schubert Memorandum, of which MPM was on notice before its 2003 purchase and which provided notice of the historical use of PCBs in onsite manufacturing and the potential use of lime ponds in the EP Area to manage wastes that may have contained PCBs.  Significantly, the Phase II report states that those historical lime ponds existed "in the area currently occupied by the now-closed equalization basin," exactly where MPM encountered PCBs four years later, in 2008.

---

[7] PCBs from historical operations had resided in that location for over four decades without any indication that they posed an environmental or public health risk—a conclusion supported by the fact that no regulatory agency has demanded or even requested further environmental investigation or remediation of those PCBs since MPM belatedly gave notice of them in 2012. In fact, MPM has admitted that it is under no legal obligation to remediate the PCBs as they lay—buried and undisturbed.  *See* MPM Suppl. Ltr. Br. at 9 (ECF No. 130).

- **PCB characterization reports prepared by ESC in 2006.**  These reports were provided to MPM in 2006.  They note that ESC's sampling efforts were unable to fully delineate PCB contamination in the Waste Incineration Area, which is in the EP Area in the general vicinity of the WWTU, and recommended further investigation.  Thus, these sampling results indicated that PCB contamination in soils in the general area of the WWTU could not be ruled out, and in fact were a possibility.

Based on the 1980 Schubert Memorandum and the ENVIRON Phase II report alone, MPM was on notice before commencing its upgrade work in 2008 that PCB-containing wastes may have been managed in EP Area lime ponds that existed in the area of the now-closed equalization basin, the exact location where MPM excavated for its 2008 WWTU upgrade and encountered PCBs.  Despite the evident potential for encountering more subsurface PCB contamination in that area, MPM chose not to investigate the subsurface around the WWTU before beginning its excavation for the WWTU upgrade.  MPM's own recklessness and voluntary actions directly caused subsurface PCBs, buried for decades and posing no discernible threat, to become the potential hazard that MPM has alleged now needs to be addressed.  Therefore, MPM should bear a significant majority of the resulting past recoverable costs at the WWTU.  *See, e.g.*, *BCW Assocs., Ltd.*, 1988 WL 102641, at *10-12, 22.

### 4.    *MPM's Past Sampling Costs Were Incurred to Serve, and Have Served, MPM's Commercial Interests in Upgrading the WWTU.*

The motivations behind response costs are another significant allocation factor.  *See, e.g.*, *BCW Assocs., Ltd.*, 1988 WL 102641, at *10-12, 22 (allocating two-thirds of cleanup costs to current owner and its tenant in part because the cleanup was precipitated by commercial motivations).  The evidence at trial will show that MPM performed its incomplete PCB investigation in order to move forward with the WWTU upgrade, which in turn was done to increase the production capacity of the plant, rather than out of any general concern for public

21

health or the environment.  For instance, when MPM decided to suspend construction of the WWTU upgrade, it also terminated its PCB investigation, and since MPM's suspension of the construction, MPM has not performed any more PCB-related sampling or excavation at the Site. More importantly, there is no evidence that MPM used the sampling to conduct a risk assessment with respect to public health or the environment—a key purpose of CERCLA, *see W.R. Grace & Co.-Conn.*, 559 F.3d at 92.  Because MPM's investigative costs were incurred primarily to further its commercial interest in performing the WWTU upgrade, MPM should bear a significant majority of those costs.  *See BCW Assocs., Ltd.*, 1988 WL 102641, at *10-12, 22.[8]

### 5.    *MPM's Past Sampling Costs Were Excessive.*

The excessiveness of costs is a relevant allocation factor.  *See, e.g.*, *BCW Assocs., Ltd.*, 1988 WL 102641, at *10-12, 22 (allocating two thirds of costs to current owner and its tenant in part because cleanup was excessive).  Here, as noted, MPM's sampling costs were grossly excessive, *see supra* Section I, and the sampling results were not used for any CERCLA objective—no evaluation of any potential threat has been performed and the delineation was neither necessary nor completed, *see supra* Section II.  Accordingly, MPM should bear a substantial majority of those costs.

---

[8] MPM's failure to timely report its 2008 discovery of the PCBs in the WWTU area—as already determined by this Court, *see* Renewed Summ. J. Hr'g Tr. at 35-40—further highlights MPM's overriding concern with its commercial interests.  This failure blatantly undermined "Congress' intent in including [the 'legally required notices' condition in the bona fide prospective purchaser ('BFPP') defense] . . . to ensure that EPA and other appropriate entities are made aware of hazardous substance releases in a timely manner."  Interim Guidance Regarding Criteria Landowners Must Meet in Order to Qualify for BFPP, Contiguous Property Owner, or Innocent Landowner Limitations on CERCLA Liability, EPA, March 6, 2003, at 13.  It also highlights MPM's lack of care with respect to its environmental reporting obligations, an additional equitable factor that weighs against MPM.  *See Farmland Indus., Inc. v. Colo. & E. R. Co.*, 944 F. Supp. 1492, 1500-01 (D. Colo. 1996) (allocating 85% of costs to current owners in part because they failed to exercise due care and showed "little concern for anything beyond their own interests").

### 6. MPM Deprived UCC of Any Opportunity to Comment on or Participate in MPM's Incomplete Investigation.

When feasible, every liable party under CERCLA deserves to participate in or at least comment on another party's incurrence of costs on its behalf. *See Norfolk S. Ry. Co. v. Gee Co.*, No. 98 C 1619, 2002 WL 31163777, at *31 (N.D. Ill. Sept. 30, 2002) (holding that policy of NCP is "to allow potentially responsible parties an opportunity to comment before costs are incurred"). For instance, under NCP provision 40 C.F.R. § 300.155(a) (made applicable at § 300.700(c)(6)), when MPM first encountered the WWTU PCBs and began planning its haphazard response, it was required to "ensure that all appropriate public and private interests [we]re kept informed," including UCC as a prior historical owner and operator of the Site during the time that PCBs were generally in use in the United States and thus an obvious candidate for potential responsibility. Yet, MPM gave no such notice, depriving UCC of the opportunity to inform MPM that its sampling plans were misguided and excessive. Because MPM deprived UCC of this opportunity, despite having a full year before it ultimately commissioned its wasteful and now-aborted WWTU investigation, MPM should bear a significant majority of those past costs that are recoverable. *See Bethlehem Iron Works*, 1996 WL 557592, at *72 (allocating 65% to current owner in part because it failed to notify other potentially liable parties before incurring response costs).

### 7. UCC Did Not Engage in Deception as MPM Contends.

Throughout these proceedings, MPM has attempted to weave a tale of UCC deception where there is none. Any suggestion that UCC should have a greater allocation due to its supposed deception would be unfounded. UCC could not possibly have deceived MPM because it had nothing to do with MPM's acquisition of the Site, having sold the Site to an unrelated entity ten years earlier. In addition, the evidence will show that UCC disclosed information on

23

potential PCB disposal both to regulators and to the prospective purchasers with which it actually dealt:

- Former UCC environmental manager Dennis Heitnzman, who worked for every owner of the Site including MPM, will testify that UCC had a policy of full disclosure and disclosed information on PCB use, management, and potential disposal to all prospective purchasers.  This information, according to Mr. Heintzman, would have included, among other things, the 1992 Heintzman Memorandum and the attached 1980 Schubert Memorandum.

- A 1988 slideshow presented to potential joint-venture partner GE, parent of MPM and handler of MPM's due diligence in 2003, reports potential PCB disposal issues at the Site.

- The 2002 ESC Phase I report, which MPM possessed before its purchase of the Site, quotes and cites the 1992 Heintzman Memorandum.  It also cites the 1980 Schubert Memorandum attached thereto, which MPM admits provides "uncontroverted evidence" of PCB use and disposal at the Site., *see* Dkt. No. 89 at 14.

- The ENVIRON Phase II report prepared during and after MPM's acquisition of the Site quotes the same 1980 Schubert Memorandum, describing use, management, and potential disposal of PCBs at the Site.

- RCRA submissions, the 1987 memorandum drafted by Mr. Dailey, and related letters will demonstrate UCC's submission to regulators, both orally and in writing, of reasonably available known PCB-related information regarding the Site, including (1) sampling data showing PCB detections in Sugar Camp Run and Well 2A in the vicinity of the NIS and (2) unconfirmed information that PCBs used at the Site may have been disposed of in an inactive solid waste management unit at the Site (e.g., the NIS).

- UCC's expert, Laura Kelmar, will explain that UCC's reporting decisions were consistent with legally required disclosures at the time, that UCC disclosed to EPA that substantial amounts of PCBs may have been disposed of at the Site, and that the record does not

24

indicate that UCC failed to provide any information that EPA requested in response to UCC's disclosures.

Moreover, while MPM makes much of UCC's 1981 report to EPA under CERCLA § 103(c), EPA expressly excluded PCBs from the reporting requirement. *See* Hazardous Substances: Notification of Treatment, Storage and Disposal Facilities, 46 Fed. Reg. 22144, 22145 (Apr. 15, 1981). Therefore, reporting of PCB disposal was not required under CERCLA § 103(c) as a matter of law. In addition, notwithstanding MPM's contentions, historical use (as opposed to disposal) of hazardous constituents or substances was not required to be reported under the relevant provisions in either RCRA or CERCLA. In sum, UCC's conduct provides no basis to mitigate the allocation of a substantial majority of MPM's past costs to MPM.

## B.       Allocation of Future Removal Costs Is Inappropriate at this Time.

When future costs are too speculative, a court cannot fairly and accurately allocate such costs and should refrain from doing so. *See New York v. Solvent Chem. Co.*, 664 F.3d 22, 26 (2d Cir. 2011) (opining that uncertainty of future remedy could "justify a refusal to allocate cleanup responsibility" (emphasis removed)); *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1192 (9th Cir. 2000) (holding that declaratory judgment at to allocation is only appropriate where "the facts bringing about [parties'] relative responsibility have already occurred"). As set forth in UCC's brief in support of its accompanying motion *in limine*, filed separately as part of the January 9 pretrial filings, there is no basis for an allocation of future costs outside the WWTU area because it is unknown whether MPM will ever have to undertake any work relating to PCBs outside that area, much less incur any costs relating to such work that are recoverable under CERCLA. Indeed, in the five years that this case has been pending, MPM has produced no evidence of PCB-related plans for the Site beyond the WWTU area. Such costs, if any should ever arise, and

25

the equitable factors appropriate for such costs are too speculative at this point to allow for a fair and accurate allocation. Thus, such an allocation, if ever necessary, should await the development of the relevant facts essential for making such a determination, and should only be determined in future litigation if the parties cannot resolve them voluntarily.[9] *See Solvent Chem. Co.*, 664 F.3d 26-27.

Moreover, the plans for future work in the WWTU area—generated by MPM in just the past few months, belatedly, as the parties proceeded to mediation this fall and the trial date approached—demonstrate that such work, even if a response action under CERCLA in the first place, would be remedial in nature and therefore unrecoverable under this Court's ruling that any CERCLA claim for remedial costs is time-barred.[10] UCC respectfully again refers the Court to its motion *in limine* with respect to the legal issues precluding any allocation of future costs in this case, filed herewith. *See* Dkt. No. 181 (filed Jan. 9, 2017).

### C.  If the Court Were to Allocate Future Removal Costs at the WWTU, It Should Allocate a Significant Majority of Such Costs to MPM.

While any future WWTU-related PCB response costs are remedial in nature and therefore cannot be recovered, if the Court nevertheless were to deem them removal costs, a significant

---

[9] Some of the equitable factors that might be appropriate to allocation of future removal costs, depending on the circumstances, include: (1) MPM's pre-purchase notice of PCB-related risks at the Site; (2) MPM's creation of the PCB-related costs by voluntarily constructing in an area known to contain historical hazardous waste management operations; (3) MPM's solely commercial motivations for excavating PCB-contaminated soils; (4) MPM's lack of care for the PCBs in the vicinity of the future removal work and at the Site more broadly; (5) MPM's economic benefits from increases in the Site's value resulting from any cleanup; and (6) the presence of other hazardous substances in the PCB-contaminated area that could prove to be the primary driver of future removal costs.

[10] Per the Court's second order on summary judgment, MPM cannot recover any future costs under a restitution theory. *See* Renewed Summ. J. Hr'g Tr. at 31-34. As argued separately in this brief, MPM may not employ a restitution claim to recover any of its past response costs.

26

majority of such costs should be allocated to MPM based on the factors noted above as well as the additional factors noted below:

- MPM's excavation of PCB-contaminated soils is only being performed to serve, and will only serve, MPM's commercial interests in upgrading the WWTU.

- All such future response costs arise solely from MPM's voluntary decision to perform construction in the vicinity of the WWTU, an area that it knew contained historical hazardous waste management operations when it purchased the Site.

- MPM has demonstrated a lack of care for the PCB-contamination in the vicinity of the WWTU.

- The Site's value will increase as a result of any cleanup, and MPM should bear a share of costs equal to such economic benefit, on top of its equitable share based on other factors.

First, MPM's future PCB costs associated with the WWTU will only serve its own commercial interests. Under Toxic Substances Control Act ("TSCA") regulations, the PCBs, which exist in subsurface soils, are presumed to present no threat to public health or the environment because they were disposed of before 1978. *See* 40 C.F.R. § 761.50(b)(3)(i)(A). In fact, MPM has aptly admitted that it is under no legal obligation to remediate the PCBs as they lie—buried and undisturbed. *See* MPM Suppl. Ltr. Br. at 9 (Dkt. No. 130). Moreover, neither EPA nor WVDEP has requested that MPM remediate PCBs at the WWTU or elsewhere at the Site. Thus, the only reason that MPM will be excavating and disposing of PCBs is for MPM's own commercial operations and gain. This is best illustrated by the fact that MPM will be excavating only those PCB-contaminated soils required to be excavated for its WWTU upgrade work—while leaving others immediately adjacent and of comparable or higher concentrations undisturbed. This is not a CERCLA response action designed to address and mitigate an actual threat to public health or the environment that existed in the absence of MPM's construction project; it is excavation of soils for construction purposes and the ancillary disposal of those soils as required by PCB voluntary cleanup guidelines. Testimony and internal MPM documents

27

regarding plans for continuation of the WWTU upgrade will demonstrate that plain fact. Because the reason for these costs is ultimately commercial, MPM should bear a significant majority of the future recoverable WWTU PCB costs. *See Diverse Real Estate Holdings Ltd. P'ship v. Int'l Mineral & Chem. Corp.*, No. 91 C 8090, 1995 WL 110138, at *9 (N.D. Ill. Mar. 13, 1995) (stating that had allocation been needed, the court would have allocated a "majority of the costs" to the owner because it needed to remove the contaminated fill for development purposes anyways); *BCW Assocs., Ltd.*, 1988 WL 102641, at *10-12, 22.

Second, MPM's future continuation of any work on the WWTU upgrade will once again be *creating* the only threat to public health or the environment that MPM purports to be at issue. If there is a risk, it arises from MPM's voluntary decision to excavate in the EP Area—an area that MPM has known, since acquiring the Site, housed historical waste management operations, is subject to deed notices, and contains contaminated soils (as determined by ENVIRON's Phase II sampling). Moreover, such a risk, if any, would only be to construction workers involved with excavation and could be readily mitigated with personal protective equipment, as demonstrated by MPM's Soil Management Plan which calls for such protective measures for the WWTU-related work. Because MPM will be creating the only purported risk, it should bear the future related costs. *See, e.g.*, *BCW Assocs., Ltd.*, 1988 WL 102641, at *10-12, 22 (allocating two-thirds of cleanup costs to current owner and tenant in part because both knew they were acquiring an environmental risk and the tenant created the hazardous condition).

Third, by the time MPM incurs any future WWTU PCB costs, it will have inevitably demonstrated a very low degree of care based on its eight-year-and-counting failure to meaningfully evaluate or address the WWTU PCBs despite now claiming for litigation purposes that such action is urgent and necessary. In fact, since aborting its haphazard and virtually

useless investigation in 2009, MPM has done nothing relating to PCBs at the Site.  This is completely contrary to the purpose of CERCLA, embodied in the NCP, to promptly determine the appropriate extent of response to releases of hazardous substances.  *See supra* Part II; 40 C.F.R. § 300.400(a), (c).  Moreover, MPM waited four years before notifying regulators of the WWTU PCBs, violating its notice obligations and denying or delaying regulators the chance to guide or at least timely review the results of MPM's careless investigation.  MPM's long-term disregard for PCBs that it claims warrant a response demonstrates a real lack of care, and thus warrants allocation of a significant majority of future WWTU PCB costs to MPM.  *See Diverse Real Estate Holdings*, 1995 WL 110138, at *9 (stating that had allocation been needed, the court would have allocated a "majority of the costs" to the current owner in part because it had taken no response action despite claiming that contamination posed a threat); *Farmland Indus.*, 944 F. Supp. at 1500-01 (allocating 85% of costs to current owner in part because it failed to exercise due care).

Finally, MPM will benefit economically from the remediation of WWTU PCBs, namely because the Site will be improved as a result.  Combined with other factors, this is another reason that MPM should bear a significant majority of any future PCB removal costs at the WWTU. *See NYSEG II*, 766 F.3d at 241 (finding a higher allocation appropriate where party "would benefit from the increased property value after remediation").

*        *        *

In sum, based on such relevant equitable factors, a significant majority of the costs should be allocated to MPM if the future WWTU work was viewed as removal.  As noted, however, the future WWTU costs are unrecoverable in this case because they are remedial or because they are really construction-related costs rather than CERCLA response costs in the first place.

## IV.    MPM'S RESTITUTION CLAIM FOR PAST COSTS FAILS.

Now that the Court has dismissed MPM's restitution claim as to future cleanup costs (Count VII), the only remaining restitution claim is Count VI, which seeks the same past costs relating to PCBs in the WWTU area that MPM seeks under CERCLA.  This remaining claim fails.  Under governing West Virginia law, a claim for restitution (i.e., unjust enrichment) requires a plaintiff to show, at a minimum: (1) a benefit conferred on the defendant by the plaintiff, and (2) the retention by the defendant of the benefit "under such circumstance that it would be inequitable and unconscionable to permit the [defendant] to avoid payment therefor."[11] *Realmark Devs., Inc. v. Ranson*, 542 S.E.2d 880, 884-85 (W. Va. 2000); *accord Town of Cowen v. Cobb*, No. 15-0438, 2016 WL 2969917, at *4 (W. Va. May 20, 2016).  The parties agree that West Virginia generally follows the approach of the Restatements of Restitution.  Renewed Summ. J. Hr'g Tr. at 27; *see Heartwood Forestland Fund IV, LP v. Hoosier*, 781 S.E.2d 391, 397 (W. Va. 2015) (Restatement (Third)); *Realmark*, 542 S.E.2d at 884-85 (Restatement (First)).  Applying West Virginia law and the Restatements, MPM cannot meet its burden of establishing either that it conferred a benefit on UCC or that there are "inequitable and unconscionable" circumstances.

Although evasive about its precise theory of unjust enrichment in its complaint and papers, MPM clarified at oral argument on December 8, 2016, and the Court recognized, that the

---

[11] Some federal courts relying on non-West Virginia authorities have added a third element: "an appreciation or knowledge by the defendant of the benefit."  *Johnson v. Ross*, 419 F. App'x 357, 361 (4th Cir. 2011).  The West Virginia courts have not expressly adopted this element.  *See CUMIS Ins. Soc'y, Inc. v. Raines*, No. CIV.A. 3:12-6277, 2013 WL 500305, at *2 n.4 (S.D.W. Va. Feb. 11, 2013) (noting that West Virginia Supreme Court of Appeals had arguably "refined" the test without including the "appreciation or knowledge" element); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. d (describing this purported element as "mysterious and potentially mischievous").  In any event, MPM cannot establish either of the other two elements, so its claim fails regardless.

benefit alleged by MPM is its performance of a legally enforceable duty owed by UCC under

CERCLA.  Renewed Summ. J. Hr'g Tr. at 29, 34; *see, e.g.*, *Dunlap v. Hinkle*, 317 S.E.2d 508,

512 n.2 (W. Va. 1984) (noting that benefit may consist of "satisfaction of a debt or duty owed

by" the unjustly enriched person).  Thus, despite its earlier attempt to invoke an amorphous

"general unjust enrichment theory," MPM must now concede that its claim is governed by § 22

of the Restatement (Third) of Restitution and Unjust Enrichment ("Restatement (Third)"), titled

*Performance of Another's Duty*.[12]  MPM further admitted at oral argument what has long been

evident in its complaint, *see* Compl. ¶¶ 47, 49—that the specific basis for its claim is the

"emergency assistance doctrine" stated in § 22(2)(c).  *See* Renewed Summ. J. Hr'g Tr. at 27-

28.[13]  Moreover, as detailed in UCC's renewed summary judgment papers, because the

circumstances here do not fit within one of the limited exceptions to the rule that there is no

liability in restitution for a benefit voluntarily conferred, there would be no plausible basis for

recovery under any other unjust enrichment theory or Restatement provision even apart from

---

[12] As the Court has held, the outcome in this case would be the same regardless of whether West Virginia adopted § 22 of the Restatement (Third) or its predecessor, § 115 of the Restatement (First).  Summ. J. Order at 74 n.63.

[13] Section 22 of the Restatement (Third) states, in relevant part:

> (1) A person who performs another's duty to a third person or to the public is entitled to restitution from the other as necessary to prevent unjust enrichment, if the circumstances justify the decision to intervene without request.

> (2) Unrequested intervention may be justified in the following circumstances:

>> . . .

>> (c) the claimant may be justified in performing another's duty to the public, if performance is urgently required for the protection of public health, safety, or general welfare.

> (3) There is no unjust enrichment and no claim in restitution by the rule of this section except insofar as the claimant's intervention has relieved the defendant of an otherwise enforceable obligation.

31

MPM's concession.  *See* Dkt. No. 152-1 at 12-14; *see also* Restatement (Third) § 2(3); *id.* pt. II, ch. 3, intro. note.

Under the emergency assistance doctrine, the duty performed by MPM must have been one owed by UCC to the public.  *See* Restatement (Third) § 22(2)(c).  In addition, MPM must show that the circumstances justified its decision to intervene without request from UCC, *id.* § 22(1)—i.e., in the parlance of West Virginia law, that it would be "inequitable and unconscionable" to permit UCC to avoid repayment for MPM's unrequested intervention.  To do so, MPM must show both that its performance was "urgently required for the protection of public health, safety, or general welfare," Restatement (Third) § 22(2)(c), and that there was some "obstacle to prior agreement" that would have prevented MPM from obtaining UCC's pledge to pay for or undertake the performance, *id.* § 22 cmt. b.

The evidence at trial will show that MPM has failed to meet each of these requirements. In 2008-09, UCC was under no duty to investigate or clean up the PCB contamination at the WWTU; MPM's activities thus conferred no benefit on UCC.  Nor can MPM show that the PCB contamination it encountered in 2008 posed an urgent threat to public health, safety, or general welfare.  To this day, MPM has been unable to establish any threat whatsoever, let alone an urgent one.  Finally, given MPM's knowledge of the historical operations at the Site, as evidenced by the documents it admits reviewing after encountering the PCBs and that were available to MPM in due diligence in 2003, it should have been obvious in 2008-09 that UCC was the likely source of any PCB contamination.  If MPM believed that an urgent response was required, there was no reason it could not have asked UCC to undertake that response or agree to pay for it before doing the sampling (which MPM never completed in any event).

32

Any one of these defects would be fatal to MPM's restitution claim; all three are present here, as detailed below.

### A.      MPM Has Not Conferred a Benefit on UCC.

MPM's 2008-09 response to the PCBs at the WWTU did not discharge any legally enforceable duty owed by UCC (to the public or otherwise), and thus conferred no benefit. *See* Restatement (Third) § 22(3) & cmt. i, reporter's note i (no unjust enrichment unless defendant relieved of legally enforceable obligation). In earlier briefing, MPM sought to locate such a duty under both CERCLA and public nuisance law, but at oral argument it abandoned the latter ground. *See* Renewed Summ. J. Hr'g Tr. at 29:6-7.

#### 1.      UCC Owed No Duty Under CERCLA.

The fundamental defect in MPM's theory is that a CERCLA duty cannot form the basis of an unjust-enrichment claim under West Virginia law. This issue was squarely addressed in *Veolia Es Special Services, Inc. v. Techsol Chemical Co.*, No. CIV. A. 3:07-0153, 2007 WL 4255280 (S.D.W. Va. Nov. 30, 2007). Observing that CERCLA is a strict-liability statute that requires no wrongdoing or culpability on the part of the defendant, the court held that "[t]he allegations required to show that a party meets a statutory definition for strict liability are far different than allegations required to show that a party created an unjust—in West Virginia, inequitable and unconscionable—situation." *Id.* at \*10; *see also Price Trucking Corp. v. Norampac Indus., Inc.*, 748 F.3d 75, 82 (2d Cir. 2014) (noting that CERCLA "adopts a strict liability regime"). *Veolia*'s holding is dispositive with respect to West Virginia law.

Moreover, there can have been no duty under CERCLA as a matter of law to respond to PCBs at the time that MPM encountered them during its 2008 upgrade. CERCLA does not in itself impose a cleanup obligation on any party; it is a cost-recovery statute that in itself imposes

33

no cleanup obligation.  CERCLA § 107(a) creates four classes of "*potentially* responsible parties," but a PRP's duty to reimburse cleanup costs does not arise until after the responding party has incurred such costs.  *See NYSEG II*, 766 F.3d at 220.  Although the government can issue a cleanup order under CERCLA, it has never done so here.  Nor did MPM act under governmental order or compulsion; its response at the WWTU was entirely voluntary.  No order has been issued to MPM to this very day.  Even if MPM had done nothing in 2008-09, CERCLA would not have required UCC to clean up the PCBs.  Again, CERCLA is simply a cost-recovery statute and imposes no duty unless a government order is issued, which was not done here.  For this reason as well, MPM's response at the WWTU conferred no benefit on UCC.

Finally, insofar as MPM bases its claim on UCC's duty under CERCLA to pay its equitable share of response costs voluntarily incurred by MPM, the question is academic. MPM's restitution claim cannot provide any relief beyond what would be available under CERCLA (which the Court has found is limited to removal cost recovery), as it can only recover to the extent it has relieved UCC of a *legally enforceable* obligation.  *See* Restatement (Third) § 22(3) (requiring discharge of "otherwise enforceable obligation"); *id.* cmt. i; *id.* reporter's note i (requiring "discharge of a legal duty").  MPM is already seeking its past costs through its CERCLA § 107(a) claim.  To the extent those costs are recoverable under CERCLA, MPM will recover them through that claim.[14]  To the extent they are not recoverable under CERCLA, they are not recoverable in restitution either.  MPM thus cannot leverage the Court's ruling that UCC is liable for certain CERCLA *removal* costs to obtain recovery of CERCLA *remedial* costs, for which the Court has already determined that UCC is not liable, *see* Summ. J. Order at 77.  Nor

---

[14] Moreover, as MPM admitted at oral argument, under CERCLA's double-recovery bar, 42 U.S.C. § 9614(b), any costs MPM recovers under CERCLA cannot also be recovered under state law.  *See* Renewed Summ. J. Hr'g Tr. at 29-30.

can it use restitution to recover those removal costs that the Court finds are unrecoverable under CERCLA because they are either not necessary or not consistent with the NCP.  MPM's restitution claim is not only legally defective, but superfluous.

### 2. UCC Owed No Duty Under Public Nuisance Law.

As it told the Court, MPM no longer asserts public nuisance law as a basis for its restitution claim.  *See* Renewed Summ. J. Hr'g Tr. at 29:6-7 ("THE COURT: What is the legally enforceable duty?  MR. ETTINGER: They are liable under CERCLA.").

In any event, MPM cannot make the threshold showing that the PCBs encountered in 2008 constituted a public nuisance, as there is no evidence they posed a threat to the general public.  *See State ex rel. Smith v. Kermit Lumber & Pressure Treating Co.*, 488 S.E.2d 901, 921 (W. Va. 1997) (defining public nuisance as "an act or condition that unlawfully operates to hurt or inconvenience an indefinite number of persons"); *see also id.* at 925 (describing public nuisance as a "harm which affects the public health and safety").  Indeed, MPM did not assert a public nuisance claim in this case, and with good reason.  The PCBs were buried underground, the Site is an industrial facility located far from any residential area, the WWTU is a small, discrete area well within the facility boundaries, and there is no evidence of any PCBs beyond the confines of the Site.  *See Sharon Steel Corp. v. City of Fairmont*, 334 S.E.2d 616, 626 (W. Va. 1985) (holding that whether a given site is a public nuisance depends on "the reasonableness or unreasonableness of the use of the property in relation to the particular locality involved" (citation omitted)).  MPM has never even assessed the risk to public health, safety, or the environment from the PCBs at the WWTU, let alone determined that such a threat exists.  To this day, MPM has not completed the investigation at the WWTU that it suspended in September 2009—reflecting the lack of risk and urgency.  Indeed, the only possible risk MPM has speculated about is a risk to its own construction workers engaged in the WWTU upgrade

project, not to the public at large.  For their part, neither WVDEP nor EPA has required any remediation of the PCBs.  Simply put, there is no evidence that the PCBs MPM encountered in 2008 constituted a public nuisance that in theory might have imposed a duty to abate on UCC.[15]

### B.   There Are Not "Inequitable and Unconscionable" Circumstances.

Finally, MPM cannot show "inequitable and unconscionable" circumstances under the emergency assistance doctrine.  First, MPM cannot establish that its initial, limited response to the PCBs at the WWTU was "urgently required for the protection of public health, safety, or general welfare," Restatement (Third) § 22(2)(c).  To meet this requirement, "the nature of the danger must be *acute and severe*, not merely serious or problematic." *Chase Manhattan Bank, N.A. v. T&N plc*, No. 87 CIV. 4436, 1996 WL 603934, at *9 (S.D.N.Y. Oct. 22, 1996) (emphasis added) (applying Restatement (First) § 115), *aff'd*, 162 F.3d 1147 (2d Cir. 1998) (table); *accord City of New York v. Nat'l R.R. Passenger Corp.*, 960 F. Supp. 2d 84, 99 (D.D.C. 2013), *aff'd*, 776 F.3d 11 (D.C. Cir. 2015).  Yet, as noted, MPM has not shown that the PCBs encountered at the WWTU in 2008 posed *any* threat to the public, let alone an "acute and severe" one.

---

[15] Moreover, a prior owner of land ceases to be liable for a public nuisance once a subsequent owner discovers the nuisance and has "reasonable opportunity to abate it."  Restatement (Second) of Torts § 840A; *cf. New York v. Shore Realty Corp.*, 759 F.2d 1032, 1050-51 (2d Cir. 1985).  The Court has already found that MPM has known about PCB contamination at the Site since at least 2004, and the evidence at trial will show that MPM was aware of such contamination even before it acquired the Site in July 2003.  At that time, MPM knew that there were PCBs not only at the Site generally, but also, as UCC's due-diligence expert Philip Newton will testify, in the EP Area where the WWTU is located.  Yet aside from the limited post-closing investigations undertaken by Chemtura—which resulted in no actual remediation—MPM did nothing to address the PCB contamination that it became aware of through due diligence.  The five years that passed before MPM encountered the PCBs at the WWTU constitutes a reasonable opportunity to abate as a matter of law. *See Royal Indem. Co. v. Caleco, Inc.*, No. CIV.A.03-CV-2281, 2004 WL 2612288, at *5-7 (E.D. Pa. Nov. 9, 2004) (collecting cases).  Thus any possible duty on the part of UCC has lapsed, and there is no basis for holding UCC liable in restitution under a public nuisance theory.

In fact, MPM's own actions compel the opposite conclusion. On summary judgment, the Court noted that "MPM has not cited to evidence that its response was an 'immediate necessit[y].'" Summ. J. Order at 75. There is no evidence that MPM's initial activities after June 2008—disposing of PCB-contaminated soils, decontaminating construction equipment, and purchasing steel shoring—were necessitated by an urgent threat. More tellingly, MPM waited an entire year (until June 2009) to begin its investigation at the WWTU. That investigation was suspended several months later and remains incomplete to this day. MPM then waited several more years, until March 2012, to report the PCBs at the WWTU to government regulators, who in turn have not required any PCB remediation. Summ. J. Order at 19; Renewed Summ. J. Hr'g Tr. at 37. If anything, the hallmark of MPM's approach has been an utter lack of urgency; certainly, it was not responding to an acute and severe threat requiring immediate action. *Cf. City of New York*, 960 F. Supp. 2d at 99 (delay of "several years" showed no "immediate necessity"); *Chase Manhattan Bank*, 1996 WL 603934, at *10 (same, where plaintiff was "aware of the hazard . . . for many years" and engaged in its "own delay"); *Corp. of Mercer Univ. v. Nat'l Gypsum Co.*, No. CIV.A. 85-126-3-MAC, 1986 WL 12447, at *9 (M.D. Ga. Mar. 9, 1986) (same, one-year delay).

MPM also cannot meet a second requirement of the emergency assistance doctrine—that there was an "obstacle" that would have prevented MPM from obtaining UCC's prior agreement to pay for or undertake a response to the PCBs at the WWTU, *see* Restatement (Third) § 22 cmt. b. MPM has previously claimed that at the time it encountered those PCBs in June 2008, it was hindered from requesting UCC's participation because it lacked knowledge that UCC might have been responsible for their original release. The facts show otherwise. As the Court has held, no later than 2004 (and in fact, by 2003) MPM was generally aware of PCB contamination

37

at the Site, owned the "assets associated with the Site" (including the PCB inventory and purchase records maintained by UCC), and employed personnel, including Dennis Heintzman, who had previously worked for UCC and had knowledge of past PCB disposal by UCC. *See* Summ. J. Order at 39-40. MPM also knew or should have known that the use of PCBs in the United States was largely banned in 1979, *see NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682, 688 (7th Cir. 2014) (citing 40 C.F.R. § 761.1 *et seq.*); *United States v. M/V SANCTUARY*, 540 F.3d 295, 297 (4th Cir. 2008) (citing 15 U.S.C. § 2605(e)(2)), and was aware, as disclosed in ENVIRON's final Phase II report, that UCC had removed all PCB-containing transformers from the Site by 1991, while UCC was still the owner. There was simply no other evident source for the PCBs than UCC, and yet MPM never reached out to UCC before undertaking its 2008-09 activities at the WWTU. For this reason as well, MPM's unrequested intervention was not justified.

*      *      *

MPM cannot establish either element of a restitution claim under West Virginia law. First, MPM's 2008-09 cleanup activities at the WWTU did not confer a benefit on UCC, as they discharged no legally enforceable obligation owed by UCC (under CERCLA or otherwise). Second, there were not "inequitable and unconscionable" circumstances justifying MPM's unrequested intervention, both because its activities were not "urgently required for the protection of public health, safety, or general welfare" and because there was no "obstacle to prior agreement" between the parties. MPM's restitution claim fails and should be denied.

38

## CONCLUSION

For all of the foregoing reasons, and based on the evidence that will be introduced at trial, virtually all of MPM's past cost claim should be denied, MPM should be allocated a significant majority of any past removal costs recoverable under CERCLA, and there should be no allocation of future costs in this case.

Dated:  January 9, 2017

Respectfully submitted,

BEVERIDGE & DIAMOND, P.C.

By: s/  Harold L. Segall
    Karl S. Bourdeau (Bar Roll No. 103740)
    Harold L. Segall (Bar Roll No. 103741)
    1350 I Street, N.W., Suite 700
    Washington, DC 20005
    Tel.: (202) 789-6000
    Fax: (202) 789-6190
    kbourdeau@bdlaw.com
    hsegall@bdlaw.com

    Megan R. Brillault (Bar Roll No. 511541)
    477 Madison Avenue, 15th Floor
    New York, NY 10022
    Tel.: (212) 702-5400
    Fax: (212) 702-5450
    mbrillault@bdlaw.com

    Edward M. Grauman (Bar Roll No. 517387)
    98 San Jacinto Boulevard, Suite 1420
    Austin, TX 78701
    Tel.: (512) 391-8000
    Fax: (512) 391-8099
    egrauman@bdlaw.com

    *Attorneys for Defendant*
    *Union Carbide Corporation*