UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MPM SILICONES, LLC,

                Plaintiff,

v.                                             1:11-CV-1542 (BKS/ATB)

UNION CARBIDE CORPORATION,

                Defendant.
_____

Appearances:

<u>Counsel for Plaintiff</u>

**Jonathan M. Ettinger**
**Zachary Gerson**
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA 02210

<u>Counsel for Defendant</u>

**Karl S. Bourdeau**
**Harold L. Segall**
Beveridge & Diamond, P.C.
1350 I Street, N.W., Suite 700
Washington, DC 20005

**Megan R. Brillault**
Beveridge & Diamond, P.C.
477 Madison Avenue, 15th Floor
New York, NY 10022

**Edward M. Grauman**
Beveridge & Diamond, P.C.
98 San Jacinto Boulevard, Suite 1420
Austin, TX 78701

**Hon. Brenda K. Sannes, United States District Court Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiff MPM Silicones, LLC ("MPM") filed this action under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601–9675, to recover costs in responding to soil contaminated with polychlorinated biphenyls ("PCBs")[1] at a site it owns in Sistersville, West Virginia (the "Sistersville Site" or the "Site"). (Dkt. No. 1). Defendant Union Carbide Corporation ("UCC") is a previous owner and operator who used PCBs in its manufacturing process at the Site until the 1970s. (Dkt. No. 90-3, at 2–3). At the summary judgment stage, the Court found, *inter alia*, that: (1) UCC is liable under CERCLA § 107(a) to MPM for past necessary costs of response to PCBs at the Site; (2) UCC is liable under CERCLA § 107(a) for future necessary removal response costs for PCBs at the Site; and (3) MPM is liable in contribution under CERCLA § 113(f)(1) for its equitable share of any recoverable past or future response costs. The Court scheduled a bench trial on the remaining issues: the amount and allocation of past PCB response costs; whether future response costs should be allocated at this time; and if so, what the parties' equitable shares should be. Thereafter, the parties settled the issue of past response costs, leaving only the future PCB response allocation for trial. From January 31, 2017 to February 2, 2017, the Court held a four-day bench trial, at which three fact witnesses (one by video deposition) and four expert witnesses testified. The parties introduced hundreds of documents into evidence as well as the deposition transcripts of seven additional witnesses. On July 25, 2017, following extensive post-trial briefing, the Court held closing arguments. Having considered the documentary evidence, the

---

[1] PCBs are designated as a hazardous constituent under the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6901–6992k. 40 C.F.R. Part 261, Appendix VIII; 40 C.F.R. Part 264, Appendix IX.

testimony of the witnesses, and the arguments of counsel, the Court finds that allocation is warranted at this time and allocates ninety-five percent of future response costs to UCC and five percent to MPM.

In accordance with Fed. R. Civ. P. 52(a), after considering all of the testimony, the credibility of the witnesses, and all of the evidence, the Court makes the following findings of fact and conclusions of law.

## II.    FINDINGS OF FACT

The facts giving rise to this action are set forth in *MPM Silicones, LLC v. Union Carbide Corp.*, No. 1:11-CV-1542 (BKS/ATB), 2016 WL 3962630, 2016 U.S. Dist. LEXIS 98535 (N.D.N.Y. July 7, 2016), and incorporated herein.  MPM[2] owns and operates the Sistersville Site, where it manufactures silicone and silane products.  (Dkt. No. 233, ¶ 15).  The Sistersville Site is located in a rural area, occupies approximately 1300 acres of land, is traversed by a creek named Sugar Camp Run, and borders the Ohio River.  (Dkt. No. 233, ¶¶ 13, 15; D-191).[3]  The Site contains manufacturing facilities, a number of solid waste management units ("SWMUs"), including a wastewater treatment system, an active hazardous waste landfill, and two closed waste disposal areas referred to as the South Inactive Site and the North Inactive Site ("NIS").  (Dkt. No. 233, ¶ 14; Dkt. No. 238, ¶ 11).

As in many CERCLA actions, the record in this case contains significant factual gaps.  There are no witnesses with personal knowledge of Defendant UCC's hazardous waste practices when it was using PCBs in the 1960s and 1970s.  The parties rely principally on historical

---

[2] The sequence of Site ownership is as follows: UCC owned the Site from 1955 to 1993, when it sold the Site to OSi Specialties, Inc. ("OSi"), which later became Crompton Corporation (Crompton); in 2003, Crompton sold the Site to General Electric Company ("GE"); GE subsequently transferred the Site to one of its affiliates, which became MPM, the current owner of the Site.  *See MPM Silicones*, 2016 WL 3962630, at *2, 2016 U.S. Dist. LEXIS 98535, at *4.

[3] The Court refers to MPM's trial exhibits as "P-__" and UCC's trial exhibits as "D-__."

documents and records, created as part of the process under the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6901–6992k, as interpreted by UCC employees and expert witnesses.

### A.    UCC's PCB Use and Investigation

UCC owned and conducted manufacturing operations at the Site from 1955 to 1993.[4] (Dkt. No. 238, ¶ 2).  UCC used hundreds of thousands of pounds of PCBs, sometimes referred to by trade names Aroclor or Arochlor, in its manufacturing operations.  (*Id*. at ¶¶ 13, 17).  UCC used PCBs as both "pot chasers" and heat transfer agents in the manufacture of cyanoethyltriethoxysilane ("CNE") and A1100.  (*Id*. at ¶ 13).  UCC's PCB use "resulted in the generation of PCB-laden 'heavies,'" which it discarded.  (*Id*. at ¶¶ 20–21).  By 1970, environmental concerns about PCBs and their toxicity had arisen, and UCC had stopped using PCBs in its manufacturing processes.[5]  (*Id*. at ¶ 18).  UCC stopped using PCBs as a heat transfer agent in 1972.  (*Id*.).  There are no records indicating that UCC disposed of the PCBs off-site. Although UCC contends that the absence of such evidence does not foreclose the "possibility" that the PCBs were disposed of off-site, the available documentary evidence, as well as soil and water samples from around the Site, as discussed below, indicates that PCB waste remains at the Site.  (*Id*. at ¶¶ 21, 25).

In the late 1970s and early 1980s, Congress passed a series of environmental statutes focused on historical disposal of wastes, including: the Toxic Substances Control Act of 1976 ("TSCA"), 15 U.S.C. §§ 2601–2629; RCRA; CERCLA; and the Hazardous and Solid Waste Amendments of 1984, Pub. L. No. 98–616, 98 Stat. 3221.  In 1979, UCC began to investigate its

---

[4] The Site was undeveloped farmland prior to UCC's construction of manufacturing facilities.  (Dkt. No. 238, ¶12).

[5] MPM disputes that environmental concerns motivated UCC's discontinuance of PCB use.  (*Id*. at ¶ 18).  UCC's motive, however, is immaterial to the Court's determination.

historic waste disposal practices.  (Dkt. No. 238, ¶ 35).  Jerome Cibrik, a former UCC employee, testified that he believed that the investigation was "in anticipation or was part of gathering information for the RCRA survey" that had been issued by the government to a number of American corporations.  (Dkt. No. 175-1, at 29).  UCC Plant Manager A.W. Boyd wrote a note, dated March 6, 1979, regarding efforts to "better understand" UCC's "buried waste drums":

> We have several (?) locations around the plant. Please give thought.
> - Identification of spots with markers
> - A permanent file in our office which details the inventory
> - A probe of the downstream water table to see if we are leaving anything toward the river or other stream
> - Discussing . . . the wisdom of doing any work which will increase our awareness and accountability.

(P-31).

Sometime around June 1979, UCC tested the potable water at the Site; 10 parts per billion ("ppb") of PCBs were detected in the water.  (P-32).  A retest of the water in July 1979 was negative for PCBs.  (*Id*.).  UCC concluded that the presence of PCBs in the initial sample was the result of contamination at the lab.  (P-37, MPM0001541).

In or about 1979, a UCC employee who has since passed away, Clem Schubert, was tasked with investigating, identifying, quantifying, and determining the location of silicone and chlorosilane wastes that had been buried at the Site since UCC began operations.  (Dkt. No. 238, ¶ 37, P-55).  Schubert drafted a number of documents concerning this investigation.  In June 1979, Schubert prepared a map identifying buried waste disposal areas in the NIS and the area where neutralization sludge had been disposed of, which he sent to Mr. Boyd, among others. (Dkt. No. 238, ¶ 38).

According to a memorandum dated August 16, 1979, Schubert spoke about "buried wastes" with G.M. Fowles, the former head of UCC's utility systems and waste disposal department.  (P-38).  Fowles told Schubert that perforated drums were buried north of the plant

and that "chlorosilanes were disposed of in lime beds or ponds and that the north well water went bad from this practice." (*Id*.). Fowles also told Schubert that "when the waste water treatment facilities were built [in or about 1972] a considerable amount of the buried wastes were moved about." (*Id*.; Cibrik Dep. Tr. 121:15–20). Cibrik testified that the "buried wastes" might have been "the old lime ponds" or "former sludge waste" but that there was not enough information in Schubert's memorandum "to [know] what waste he is referring to." (Cibrik Dep. Tr. 118, 121).

In or about September 1979, Schubert asked engineers from a UCC group in Charleston, South Carolina, to visit the Site, consult regarding waste burial, and assist in the development of a soil and water sampling plan. (P-204, MPM0019159). The first task listed on unsigned notes from the September 6, 1979 visit was the following: "Check lab analyses. Make sure there is indeed a PCB problem. If not, may proceed with investigation at a less frantic pace." (P-43, UCC_005305). In the "Background" section, under "Newer Dumping Sites," the notes state: "plant has used 0.5 million pounds of PCB? some was burned, unknown how much. It's here somewhere." (*Id*. at UCC_005310). Following the visit, according to two memoranda by Schubert dated November 19, 1979, UCC instituted a sampling program "designed to determine whether the Sistersville buried waste sites may be contributing hazardous material to the underground aquifer" (P-54) and "to determine the effects of buried wastes upon the water in the immediate and vicinal areas, including the gravel aquifer underlying the sites and draining to Sugar Camp Run and/or the Ohio River." (P-53).

Of the documents Schubert prepared—indeed, of all the documents presented in this case—perhaps the most discussed has been his January 10, 1980 memorandum ("Schubert Memo"). (P-55). In it, Schubert summarized "the information [he had] collected . . . regarding

the identity and quantity of silicone and chlorosilane wastes buried in" the NIS as well as the

manner in which the Site handled waste treatment:

> A single sewer system collected cooling water and acid process waste streams and delivered these to lime ponds in the present E[nvironmental] P[rotection] area. Sewage treatment consisted of passing waste water through these ponds, over hauled-in limestone.  Chlorosilane wastes were discharged to these ponds or dumped in holes in the cinder piles.  As ponds filled with sludge they were drained and dug out, with the waste piled on the flats in the area.  Drums full of intractable materials accumulated in the flats, finally to be buried in trenches about 8–10 feet deep.

> For about ten years burnable materials were often dumped over a bank and burned in the open.  An open pit incinerator [("OPI")] followed for five years, and pumpable solvents were burned through a huge burner blasting across Sugar Camp Run, with smoke and fumes escaping to the atmosphere.

> . . .

> To complicate the situation, all wastes have not been allowed to rest in peace. When the No. 1 Landfill was constructed, clay for the impermeable lining was obtained from the hillside east of the buried waste area, and subsequently this area was backfilled with sludge from the lime ponds and other wastes in the area . . . .

> With allowances for material burned in the OPI, on the bank or in the open flame burners, it is reasonable to conclude that in the area of the Sistersville Plant site there are buried . . . A-1100 heavies with up to 250,000 pounds of PCB's [sic] used as chosen during A-1100 distillation.

(*Id*. at MPM0015738–39).

## B. RCRA Process[6] and Interaction with EPA

---

[6] As the Court previously explained:

> Under RCRA, the owner or operator of a facility that treats, stores, or disposes of hazardous wastes must obtain a permit from EPA and comply with various requirements in the Act.  *See* 42 U.S.C. §§ 6925(a), 6901-6992k; *Owen Elec. Steel Co. of S.C. v. Browner*, 37 F.3d 146, 147 (4th Cir. 1994).  A RCRA permit requires "corrective action for all releases of hazardous waste or constituents from any" SWMU at the facility.  42 U.S.C. § 6924(u).  The full RCRA permit for the Site includes a Corrective Action Permit issued by EPA in 1988 and revised in 1990 for the SWMUs, and a permit which was issued in 1988 by the West Virginia Department of Natural Resources ("WVDNR") for active hazardous waste management units including Landfill No. 2 ("the Part B Permit").  (Dkt. No. 79-20, p. 3; Dkt. No. 78-35, p. 1; Dkt. No. 89-1, ¶¶ 28, 33, 48-49, 103).

*MPM Silicones*, 2016 WL 3962630, at *3, 2016 U.S. Dist. LEXIS 98535, at *8.

In 1980, UCC submitted its first RCRA Part A permit application, which it revised and resubmitted in 1983.  (P-61, MM000028206).  These submissions do not indicate PCB use at the Site.

In a memorandum to Schubert, among others, dated May 3, 1981, Fred Dailey (who had worked for UCC since the early eighties in various roles, including plant manager) (Dkt. No. 233, ¶ 31), wrote that he advised an Environmental Protection Agency ("EPA") representative that UCC manufactured phenyltrichlorosilane from 1956 to 1962, but that UCC's "experts feel we did not make any PCBs" during that process.  (P-91, MPM0000133).  Dailey stated that he also informed the EPA representative that UCC had one PCB transformer and fifty to sixty capacitors with PCBs.  (*Id.* at MPM0000134).

On May 15, 1981, UCC sent EPA "completed 'Notification of Hazardous Waste Sites' forms for [its] Sistersville Plant as in accordance with CERCLA" Section 103(c).  (P-60).  UCC reported that "waste treatment, storage, or disposal began and ended" in 1955 at the South Inactive Site, and that "waste treatment, storage, or disposal" began in 1961 at the NIS and ended in 1972.  (*Id.* at MPM0001868).  Under "Waste Type," UCC checked the boxes next to organics, inorganics, solvents, acids, and silicone residues, but did not check the box next to PCBs.  (*Id.*).

In a March 1985 letter to UCC, EPA advised that the 1984 amendments to RCRA required that RCRA permits include "corrective action" for all historical releases from solid waste management units ("SWMU"), including releases of hazardous constituents such as PCBs.  (P-69, MPM0003969).  EPA instructed UCC to provide a description for each SWMU, "of all the wastes processed by the units with emphasis on hazardous wastes and hazardous waste constituents," and to "describe any release (or possible release) originating at the unit."  (*Id.* at MPM0003970).  EPA requested the information within forty-five days and advised that it

planned, in some cases, to make site visits "to gather additional information leading to a corrective action decision under terms of a final effective RCRA Permit." (*Id.* at MPM0003971). Despite knowing that it had used PCBs, which are hazardous constituents, in manufacturing processes at the Site (D-38, at MPM0034706; Dkt. No. 172-2, ¶¶ 26–27), UCC's June 10, 1985 response to EPA included no mention of PCBs. (P-72).

MPM flags UCC's June 10, 1985 response to EPA's request for information on all SWMUs at the Site that had "the potential to release hazardous wastes or hazardous constituents to the environment" as evidence of UCC's efforts to conceal the presence of PCBs at the Site. (P-72). MPM argues that a comparison of UCC's response with the Schubert Memo, on which it claims the response is based, is telling. The Schubert Memo states:

> [I]t is reasonable to conclude that in the area of the Sistersville Plant site there are buried [1] about 7000 drums of material which originally contained up to 3,500,000 pounds of silicones or chlorosilanes. Probably 1,000,000 of this was [2] crosslinked gum and another 500,000 pounds was [3] gelled methyl silicone, both of which are essentially solid, non-reactive, non- migrating materials.
>
> Another 1,000,000 would have been originally [4] chlorosilanes, [5] still pot heavies, [6] undesirable by-products, [7] etc. which could be expected to hydrolize to HCl and insoluble silicones; 750,000 pounds would have been [8] cyanoethyltriethoxy silane heavies, and [9] A-1100 heavies with up to 250,000 pounds of PCB's used as chosen during A-1100 distillation. The other 250,000 pounds comprised some [10] toluene solutions, [11] filter cakes of surfactant production campaigns, and a [12] myriad of wastes from the Pilot Plant.

(P-55). In its submission to EPA, UCC recounted the same list of waste components, in the same order, except "[9] A-1100 heavies with up to 250,000 pounds of PCB's used as chosen during A-1100 distillation":

> The [NIS] . . . operated from approximately 1961 until 1972 when it was covered with soil. It is believed that [1] approximately 7000 drums of material were buried in this area. This material is believed to consist[] of [2] silicone gums, [3] gelled methyl silicones; [4] chlorosilanes, [5] distillation column pot residues, [6] by-products, [7] etc.; [8] cyanoethyltriethoxy silane heavies; [10] toluene

9

solutions, [11] filter cakes from the production of surfactants and [12] miscellaneous wastes.

(P-72 at PA EPA 000975). Citing the testimony of its RCRA compliance expert witness, Laura Kelmar, UCC argues that its response to EPA "was consistent with the fact that UCC disclosed only the types of waste streams, and not individual waste constituents, in its SWMU submission," noting that "UCC did not identify any particular waste constituents, not just PCBs." (Dkt. No. 238, 71; T.T. 575). The absence of PCBs from UCC's June 10, 1985 submission to EPA is conspicuous upon comparison with the Schubert Memo.

In a memorandum to "SWMU File" dated June 8, 1987, reporting on a conversation that occurred with EPA over a year earlier regarding the NIS and "possible PCBs," Dailey wrote:

> During EPA's review of the Sistersville inactive disposal sites (SWMU inspection on 5/15/86) [EPA inspectors] noticed the words "magic chemical" listed as a material that would be analyzed for from wells placed around the [NIS]. They asked what that might be and I stated that during the plant's activity to look for PCBs during late 1978–1979, as a result of the PCBs law, it was speculated that as much as 500,000 lbs. of contaminated PCB heat fluid was generated during the plant's previous activities and its disposition was never determined. Thus, it could have been placed in an inactive site.
>
> As a result of that possibility ground water and the inactive sites were examined for PCBs along with other materials. All the results of the tests and analyses conducted showed no PCBs and that data was included in the information provided.
>
> Nothing more was asked about PCBs by the inspectors.

(P-80).

In a letter dated May 29, 1986, UCC replied to EPA's response for additional information on the Site's SWMU's. (D-16). To the letter, UCC attached a report on the NIS, which included analytical results showing that PCBs had been detected above detection limits (5 µg/L) in one well, (D-17, at MPM001674), and at low levels (1.5 µg/L and 2.0 µg/L) in samples taken from Sugar Camp Run, (D-18, at MPM0001748). UCC also attached Schubert's 1980 and 1981

memos concerning groundwater sampling at the Site and which indicated that testing results did not indicate the presence of PCBs. (D-17, at MPM0001733, 1736-43).

In a letter dated June 8, 1987 to UCC legal counsel Carol Dudnick, Dailey inquired whether UCC should revise its Notification of Hazardous Waste Form, (P-81), which indicated that the inactive disposal sites contained silicone wastes and residue but did not mention PCBs, "to state that there may be PCB waste at the inactive disposal sites at the Sistersville plant." (P-94, at 10–12). Dudnick responded that, in her opinion, there was "no legal basis" for revising the notification because "[b]ased on [her] review of the documents [Dailey] provided . . . information on PCBs is speculative at best" and "[n]one of the documents indicate that any plant personnel had actual knowledge of PCB disposal at" the NIS. (*Id*. at 10). Dudnick noted that "PCBs have not been detected as the result of actual monitoring conducted to date." (*Id*.).

In October 1987, an EPA contractor prepared a draft RCRA Facility Assessment ("RFA") of the SWMUs at the Site. (P-84). The RFA indicates that twenty-five RCRA-regulated hazardous waste management units were at the Site, including the South Inactive Site, the NIS, and the wastewater treatment system. (P-84, MPM0003354). The RFA recommended that UCC "continue RCRA compliance" "for all RCRA-regulated units." (*Id*.). The RFA does not mention PCBs.

In 1989, UCC was in discussions to transfer a nitrogen unit on Site to another company. (Heintzman Dep. 47–48). As part of the company's due diligence, it sampled soils near the nitrogen unit. (*Id*. at 48). The sample results indicated that "low levels"—amounts below a level requiring action—of PCBs had been detected in the soil. (*Id*. at 49). Dennis Heintzman, a

former UCC employee,[7] testified that that "it was thought maybe at some point in time PCBs may have been used in electrical transformers there and a little bit of it had been spilled." (*Id*.).

In March 1991, a RCRA Facility Investigation workplan was prepared for the NIS. (P-88). The workplan objectives were to, among other things, "[c]haracterize the nature, extent and rate of migration of releases from" the NIS and collect the information and data "necessary to develop a Corrective Measures Study selecting appropriate collective measures and outlining implementation of those corrective measures." (P-88, MPM0007592).

A UCC memorandum dated July 30, 1991, reported that the Site had "finally attained PCB 'free' status. Replacement of all PCB electrical equipment was completed July 1, 1991 by our Maintenance Department and all remaining OCB items shipped offsite for disposal on July 26, 1991." (P-89).

In a March 11, 1992 memorandum ("1992 Heintzman Memo") to several UCC staff regarding the NIS, Heintzman wrote: "Based on the limited information available, it is not possible to state unequivocally that PCB's were not placed in the north inactive site. Information suggesting disposal is purely speculative at this point, however. Monitoring data to date do not substantiate the speculation." (P-91, MPM0000127). Heintzman attached six documents to his memorandum from UCC's "inactive site disposal files relative to the potential of PCB's [sic] being disposed of in the north inactive site." (*Id*.). The first document was the "PCB analytical data" from the 1979 water testing, which indicated the presence of PCBs in the Site's potable water. (*Id*.). Heintzman wrote that this data "was later determined not to be valid" and was "what triggered the search for PCB's [sic] which might have been disposed of." (*Id*.).

---

[7] Dennis Heintzman worked at the Sistersville Site in 1984 as an environmental engineer for UCC. (Heintzman Dep. 19–20). Heintzman continued to work at the Site through subsequent sales, first as an OSi and Crompton employee and later as a GE and MPM employee. (Dkt. No. 233, ¶ 27 – 28).

Heintzman indicated that he could "find nothing in the files saying" that the data were not valid, "but all analyses conducted since then have not shown PCB's [sic]." (*Id*.). The second document was the Schubert Memo. (*Id*.). The third document was the May 3, 1981 Dailey memo regarding UCC's belief that its phenyltrichlorosilane production did not produce PCBs. (*Id*.). The fifth document was Dailey's June 8, 1987 memo to the SWMU file recounting the "speculation that PCB fluids might have been disposed of in" the NIS. (*Id*.). The sixth document was July 30, 1987 memo by UCC's legal counsel (Carol Dudnick), which, as Heintzman explained, stated "that there is no basis for revising the 1981 Notification of Hazardous Waste Site form." (*Id*.).

In January 1993, UCC reported to EPA that "due to an oversight," it had not sampled Sugar Camp Run surface water and sediments for PCBs. (D-40). UCC indicated that it "[u]pon realizing the deficiency," it conducted the sampling, which revealed PCBs in Sugar Camp Run just above the detection level. (*Id*.). EPA did not require further PCB sampling. (T.T. 588). EPA subsequently required, and UCC undertook corrective measures at the Site, as discussed in *MPM Silicones*, 2016 WL 3962630, at *4–6, 2016 U.S. Dist. LEXIS 98535, at *11–18. None of the corrective measures concerned PCBs.

MPM has forcefully argued that UCC acted deliberately to conceal its PCB wastes from the EPA. UCC, on the other hand, argues that it was "working with an incomplete and confusing historical record regarding PCB waste disposal that predated the regulatory record-keeping requirements designed to track disposal of hazardous wastes," and that it "disclosed to EPA all PCB sampling and analytical data it had as well as speculation regarding possible PCB disposal locations." (Dkt. No. 230, at 44). UCC also argues that it "made a good-faith effort to report information regarding PCBs that it believed was required." (Dkt. No. 230, at 50). On this

record, absent any witness with personal knowledge, and with decades-old documentary evidence, the Court finds insufficient evidence to allow a reliable conclusion as to whether UCC intentionally concealed information about its PCB wastes that it should have provided to EPA.

### C.    OSi Specialties, Inc. – Environmental Due Diligence

In 1993, OSi Specialties, Inc. ("OSi") acquired the Site.  (Dkt. No. 238, ¶¶ 240–41).  OSi retained Environment Strategies Corporation ("ESC") to conduct environmental due diligence prior to closing.  (*Id*.).  In a response dated February 5, 1993, to ESC's request for information about "materials disposed of at the [NIS]," Heintzman, on behalf of UCC, responded that "the listing of materials disposed of . . . as presented in the . . . SWMU summary and in the RCRA facility investigation workplan for the site are the most comprehensive listings."  (P-99).  According to UCC, the SWMU summary it provided indicated that the "[o]ther miscellaneous wastes" in the NIS "could possibly include substances such as raw materials, off-spec products and heat transfer fluids (containing PCBs)."  (P-204, MPM0002674).  Heintzman testified that the attachments to his 1992 Memo would have been "made available in some form" during the environmental due diligence process in connection with the OSi transaction.  (Dkt. No. 179-1, 74–75).

ESC's report contains five paragraphs on PCBs, three of which are devoted to PCB-containing electrical equipment, i.e., transformers and capacitors that generated PCB wastes.  (P-102, MPM0002714).  The other two paragraphs discuss the analysis of soil samples collected in April 1992 from the area around the "cryogenic nitrogen generator," which "contained between 0.62 mg/kg and 16 mg/kg of PCBs," and the 1993 report of samples from Sugar Camp Run sediments, which contained "up to 2mg/kg" of PCBs.  (*Id*.).  ESC noted that:

> Under the EPA's PCB spill cleanup policy, the action level for remediation of PCBs in soils is 25 mg/kg for commercial sites. The concentration of PCBs found in the site soils does not exceed this level. The source of the PCBs is unknown.
>
> According to facility personnel, soil samples were recently collected at a former transformer storage area and no PCBs above 1mg/kg were detected. There are no other areas of known or suspected PCM-containing materials.

(*Id*.). Heintzman testified that the last paragraph of ESC's report was correct in 1993, explaining that "[t]here were no other areas of known or suspected contamination," and that it was a reflection of "everything we knew to that point." (Dkt. No. 179-1, 220).

## D.      GE/MPM – Environmental Due Diligence

After acquiring the Site, OSi became Crompton Corporation, and in 2003, sold the Site to GE, as part of a larger transaction. (Dkt. No. 238, ¶ 258). Prior to the transaction, Crompton retained ESC to prepare a Phase I environmental site assessment. (P-105). ESC representatives conducted Site visits, interviewed "knowledgeable facility personnel," reviewed relevant environmental documents provided by the facility as well as historical aerial photographs, and "contacted representatives of various divisions of appropriate regulatory agencies." (*Id*.). Regarding PCBs, the report noted that the Site had attained "PCB free" status in connection with the replacement and removal of all PCB electrical equipment and discussed PCB-containing transformers. (*Id*. at GE_001261). It recounted the 1993 Phase I Assessment and referenced the 1992 Heintzman Memo's indication "that PCBs were potentially disposed of in the [NIS]" and conclusion that "existing monitoring data to date do not substantiate such disposal activity." (*Id*. at GE_001262). The report contains no discussion of UCC's use of PCBs in its manufacturing process.

John Wood, the global environmental manager for GE, led the environmental safety and due diligence for the transaction. (T.T. 40–41). Wood testified that his "role in the transaction"

began with a conversation with Joe Lomenzo, "the head of the environmental health and safety for Crompton."  (*Id*. at 44).  Lomenzo outlined for Wood the work that had been done at that Site as part of the "RCRA corrective action process" and explained that Crompton had "provided information to U.S. EPA as part of that" process.  (*Id*. at 45).  Lomenzo told Wood that the remediation work required on the SWMUs had been completed, "with the exception of some long-term operation and maintenance obligation for the groundwater sampling."  (*Id*. at 46).

GE hired ENVIRON,[8] an environmental consulting firm, to conduct a Phase I and Phase II review of the Site.  (T.T. 46–48).  Wood explained that environmental due diligence generally involved two phases.  (*Id*. at 42).  Phase I involved viewing "available records and information both in the regulatory files" and at the "facility itself," and interviewing people with "institutional knowledge about . . . long-term operations at the site," including Heintzman and Dailey.  (*Id*. at 43, 49).

Wood went to the Site during the Phase I process, where he met with Gordon Cobb and Jason Miller from ENVIRON.  (T.T. 52).  They had "a collaborative group conversation" with, among others, Heintzman and Dailey, "about what is this site, what does it do, what are the materials that are used, what do they produce, how do they store waste . . . what's their permit compliance program."  (*Id*. at 52–53).  Wood testified that "one of the key documents" Crompton shared with GE early on was ESC's Phase I report.  (*Id*. at 54).  At some point, Wood spoke to Heintzman, who told him there were "two aspects to PCBs on th[e] Site": first, the "PCB transformers and capacitators," which were no longer present at the Site; and second, that there was a memo by a former UCC employee, who "speculated that there was PCB use in the process and speculation of PCB waste disposal on the site" and that the memo caused "a lot of commotion."  (*Id*. at 72).  Heintzman told Wood that he personally investigated this issue and

---

[8] The parties agree that ENVIRON is a "highly experienced consultant."  (Dkt. No. 235, ¶ 2; Dkt. No. 238, ¶ 277).

concluded that "while he could not . . . rule out the possibility of PCBs used in the process were disposed, he could find no data to support that PCBs were in fact used." (*Id*. at 73).

Wood and ENVIRON "looked at the permit applications and the permit themselves," which identified "the chemicals used at the Site [and] the wastes generated" but did not reference PCBs. (T.T. 58). Wood also looked at the body of information related to the Site's RCRA corrective action program in order to "understand . . . both the day-to-day operational requirements from a management perspective and compliance prospective [sic], as well as trying to understand historical issues and liabilities." (*Id*. at 59). The parties dispute whether GE or ENVIRON received the 1992 Heintzman Memo and its attachments. (Dkt. No. 238, ¶ 288). Even assuming, however, that GE and ENVIRON reviewed the 1992 Heintzman Memo and attachments, Heintzman had concluded, after reviewing the attachments, that while "it is not possible to state unequivocally that PCB's were not placed in the" NIS, "[i]nformation suggesting disposal is purely speculative," and not substantiated by monitoring data. (P-91, MPM0000127).

### 1.    Phase I

On or about January 21, 2003, ENVIRON issued a draft Phase I report as well as a "48 Hours Red Flags Report," which outlined "the most significant issues that emerged from" the Phase I analysis. (T.T. 62; P-112). Regarding PCBs, it stated: "According to documentation in facility files, the site has been free of PCB-containing equipment and appurtenances since 1991." (P-112, ENVIRON_007673). Wood read this report to indicate that "from ENVIRON's view, the most significant issue relating to PCBs is that the facility is free of PCB containing [electrical transformers and capacitators] since 1991." (T.T. 63–64). Regarding "Key Soil and Ground Water Contamination Issues," ENVIRON reported, in relevant part, that "R[CRA] F[acility]

I[investigation] data indicate that soils in some portions of the manufacturing area are contaminated with [polyaromatic hydrocarbons], dioxin and PCBs.  The USEPA has not required any action to cover, remove or otherwise remediate these soils." (P-112, ENVIRON 007675).  ENVIRON indicated that "[i]n the reasonable worst case, limited soil removal may be required to address localized areas of elevated soil contamination" and could cost up to $2 million.  (*Id.*).  Wood testified that both he and ENVIRON believed "that the source of PCBs" discussed in the Red Flags report "was connected to the former use of PCB containing equipment"—capacitors and transformers.  (T.T. 65).

On January 29, 2003, ENVIRON issued an updated remedial costs table.  (P-113).  In it, ENVIRON wrote that there was limited information available on the nature of the materials disposed of in the NIS but that "institutional knowledge" indicated that "the wastes likely include silicon product intermediates, chlorinated solvents, and, potentially, [PCBs]."  (*Id.* at ENVIRON_007636).  It did not mention PCBs in connection with any other area of the Site.  (P-113).  ENVIRON based this table on information its representatives obtained during a Site visit and a review of the RCRA Corrective Action documentation.  (*Id.* at ENVIRON_007640).

## 2.     Phase II

GE's next step was to do a Phase II soil and ground water sampling investigation.  (T.T. 67).  Wood explained that because "a lot of data . . . existed from the site having gone through the RCRA corrective action program . . . . [Crompton] had long-term programs for ground water monitoring" and "obligations to conduct ground water monitoring and reporting activities to EPA," the "primary objective" of the "Phase II investigation "was to collect our own data to see if it's consistent with what was previously known."  (*Id.*).

On April 24, 2003, GE and Crompton entered into a Purchase and Exchange Agreement providing for the transfer of ownership of the Site.  (P-117).  It also included a partial indemnity to GE for preexisting environmental conditions at the Site, subject to a number of limitations and qualifications.  (*Id*. at MPM0052286–93).

In a letter to Wood dated April 29, 2003, ENVIRON submitted a proposal for the Phase II investigation that included the installation of 86 soil borings, collection of 166 surface and subsurface soil samples, and the sampling of 36 ground water wells and 8 new ground water wells.  (P-119, ENVIRON_007471).  ENVIRON planned to conduct the investigation beginning that week.  (*Id*. at ENVIRON_007472).

 Wood received a draft of the Phase II investigation report in May or June 2003.  (T.T. 68; D-72).  ENVIRON reported that PCBs had been detected above regulatory thresholds in ground water samples in the fly ash disposal area, waste treatment area, railcar storage area and facility perimeter, (D-72, ENVIRON_006582, 85–86, 99, 006617–018), in soil samples in the waste incineration area, hazardous waste storage areas, septic tank area, northwest plant area, contractor's waste storage area (*id*. at ENVIRON_ 006585–86, 99, 006601–02, 14, 15), and in Sugar Camp Run sediments (*id*. at ENVIRON_006591).  ENVIRON noted that the presence of PCBs in these areas indicated "a release," and in some areas, "a significant release," but did not identify a source for these releases.  (*Id*. at ENVIRON_ 006583, 86).  "Given the potential for PCB-containing transformers and other electrical equipment to have been utilized" at the electrical substation, ENVIRON also tested substation soil for PCBs.  (*Id*. at ENVIRON_006606).  ENVIRON reported that though PCBs were detected in those samples, the levels were "well below" regulatory thresholds.  (*Id*.).

19

Wood explained there "were a relatively small number of samples where PCBs were detected at concentrations that in ENVIRON's view and in my view we considered to be significant because they were higher than what we would have been comfortable leaving behind and I think what the regulations would have . . . driven us to allow be left behind."  (T.T. 75–76).  Wood concluded, based on the records reviewed and his conversations with Heintzman, that the likely source of the PCBs was transformers "given the locations and concentrations" of the PCBs.  (*Id*. at 76).  Wood stated that he also believed, at the time, that PCBs had not been used or generated in UCC's manufacturing process at the Site historically.  (*Id*.).  Wood explained that the RCRA corrective action documents, none of which reported or indicated PCBs, played a role in his conclusion that the presence of PCBs was likely due to transformers.  (*Id*. at 77).

UCC argues that Wood's testimony regarding his belief that the source of PCBs was likely transformers is not credible in light of the fact that ENVIRON made no connection in the report between its detections and transformers.  (Dkt. No. 238, ¶ 349 (UCC Response)).  UCC's environmental due diligence expert, Philip Newton, testified that, in his opinion, GE (and by extension MPM) was on notice based on the sampling results in the draft Phase II report, that the potential existed for the Site "to have PCB liability—or PCB impact . . . that was undefined and that may result in future investigation or remedial obligations."  (T.T. 388).  He further opined that the sampling results put MPM "on notice that more activity is required to . . . to define the extent of contamination."  (*Id*. at 447).  While MPM was on notice, prior to the closing, that there were PCBs at the Site that required further investigation, Wood credibly testified that he still believed any PCB contamination was due to PCB electrical equipment.  (*Id*. at 76).  Indeed, Wood's testimony is consistent with Heintzman's.  Heintzman, who had been employed at the Site for nearly twenty years at that point, testified that it was not until 2008, after PCBs were

discovered in the soil during excavation, that he began to consider whether it was possible that the contamination was caused by manufacturing operations, and not by "incidental spills from transformers." (Heintzman Dep. 193).[9]

On July 31, 2003, the transaction between GE and Crompton closed and the GE affiliate that later became MPM acquired the Site.[10] (Dkt. No. 238, ¶ 332). Heintzman[11] testified that he saw the Phase II report in draft form (the record does not indicate which draft or whether he saw it before the closing) and that when he saw that PCBs had been detected in the waste storage and waste incineration areas, he was "surprised," explaining that "[t]his was new information" and he and facility personnel familiar with the Site had not been "aware of any previous contamination there." (Heintzman Dep. 170–72). In May 2004, ENVIRON issued a final Phase II report. (P-121). According to the Phase II report, "[s]urficial soils in the waste incineration area and the waste storage area contain PCBs" exceeding "the TSCA low occupancy level of 25 mg/kg." (*Id.* at MPM0015861) (citing 40 C.F.R. § 761(a)(4)(B)).

ENVIRON wrote:

> Although Facility representatives are no longer concerned about PCBs in the [NIS],[12] unexpected levels of PCBs were found in some Facility soils and selected ground water samples during the Phase II investigation. As there is no obvious source for these PCBs, resampling of ground water, and further investigation of soil, is suggested.

(P-121, MPM0015799). It further wrote:

> With respect to soils, because PCB concentrations are present in excess of regulatory standards, it is recommended that additional sampling and analysis be

---

[9] Heintzman explained that "the earlier efforts had focused on disposal records . . . [e]verybody was looking for any kind of evidence of disposal, and none was found." (Heintzman Dep. 208). Heintzman noted that "[t]here were lots of things that were used for lots of years that . . . were never introduced into the environment." (*Id.* at 210).

[10] The Court refers to GE as MPM from this point forward for convenience.

[11] Heintzman and Dailey continued to work at the Site, as GE/MPM employees after closing. (Dkt. No. 233, ¶ 28).

[12] Both the Schubert Memo and Heintzman's 1992 Memo addressed the potential of PCBs being disposed of in the NIS. (P-55; P-91).

completed to determine the nature and extent of the PCBs impacts so that appropriate remedial actions can be developed and implemented to comply with 40 CFR 761.3.[13]  Regarding groundwater, the detection of PCBs up to 1.7 ug/l is unexpected due to the very low solubility of PCBs in water.  It is recommended that additional sampling and analysis be conducted, with special attention on analytical QA/QC and data validation, to determine whether PCBs are really present in groundwater at the site.

(*Id*. at MPM005861) (footnote added).  Heintzman testified that after receiving the ENVIRON

Phase II report, Site personnel "had great concern" about the presence of PCBs in areas other

than the NIS "because for the first time" there was evidence that there were PCBs "not only" in

the NIS but "in the areas that we had no previous indication of having seen them before.  So a

great deal of concern about where those might have come from."  (Heintzman Dep. 234).

### E.    Request for Indemnity and Further Sampling

On July 23, 2004, MPM provided a copy of the Phase II report to Crompton, noted that

PCBs were detected at the Site in excess of EPA limits, that further investigation and

remediation was required, and that because PCBs constituted "Pre-Closing Contamination,"

Crompton was responsible under the 2003 Purchase and Exchange Agreement for any costs

associated with PCB investigation and remediation.  (P-124).  Crompton, while objecting to the

timeliness of MPM's request for indemnification, (P-126), retained Environmental Strategies

Consulting LLC ("ESC") [14] to investigate the presence of PCBs identified in ENVIRON's Phase

II report.  (P-128).

ESC investigated the PCB contamination in the two areas ENVIRON identified as having

"soil with PCB concentrations that exceeded the Toxic Substances Control Act": the waste

incineration area and the permitted hazardous storage waste area.  (D-89, MPM0016232).

---

[13] Part 761 governs "Polychlorinated Biphenyls (PCBs) Manufacturing, Processing, Distribution in Commerce, and Use Prohibitions."  40 C.F.R. § 761.  Section 761.3 provides the definitions for Part 761 and specifies the levels of PCB concentrations subject to regulation.  *Id*. § 761.3.

[14] At some point during the investigative process, ESC became WSP Environmental Strategies.  The Court refers to both entities as ESC for convenience.

According to ESC's final report, dated May 30, 2006, "[t]he PCB concentrations for 35 of the 50 samples collected . . . exceeded the TSCA criterion." (*Id.* at MPM0016239). ESC recommended a second phase of sampling in order to define the extent of the soil containing PCBs at concentrations above the TSCA criterion in both areas.[15] (*Id.* at MPM0016240).

On November 16, 2006, ESC issued a final report on its second phase of PCB characterization and recommended a follow-up third phase of investigation involving the delineation "in the vicinity of the sampling points where concentrations of PCBs exceed" the TSCA criterion. (P-138, MPM0016464). On June 13, 2007, and in a supplement on August 28, 2007, ESC submitted a proposed sampling approach for the Phase III investigation to EPA. (P-144; P-146; P-145). On October 22, 2007, EPA responded that the plan was acceptable. (P-148). The third phase of the sampling plan was not implemented.

## F.    Wastewater Treatment Upgrade and Discovery of PCBs

Before acquiring the Site in 2003, GE (and by extension MPM) knew that the Site was "not able to reliably meet their wastewater discharge permit limits." (T.T. 81; P-112, ENVIRON_007669). Gretchen Govoni, GE's water programs lead, toured the Site during the 2003 due diligence, and looked "at the design flow of the wastewater treatment plant and their history of water exceedances," including the Site's monthly compliance reports and water permit. (Govoni Dep. 14). "[T]he wastewater treatment plant is designed to treat the waters coming from the production units, which have impurities in them." (T.T. 135). The wastewater

---

[15]According to an email dated October 21, 2005, ESC was in contact with Kelly Bunker, Environmental Scientist/PCB Coordinator for EPA Region II, regarding the sampling proposal. (P-131, MPM0016360; P-148; Dkt. No. 238, ¶¶ 367–68). There is, however, no evidence that GE (or MPM) was in contact with EPA or the West Virginia Department of Environmental Protection ("WVDEP") at that point. ESC was in contact with Bunker again on or about February 12, 2007, (P-140), and that later that month, had shared its findings with EPA and was working to develop an approach to further sampling that would be acceptable to EPA. (P-141). There is evidence that ESC informed MPM that it was in contact with Bunker in March 2007 concerning approval of additional investigation sampling. (P-142). Bunker asked ESC "for the names of the EPA and WVDEP corrective action contacts," and that information was provided. (Dkt. No. 236, ¶¶ 379-380; P-142).

treatment plant neutralizes certain impurities "to be neutral and environmentally friendly." (*Id.* at 136). Additionally, the treatment plant removes "solids and oils which could potentially put a sheen on the [Ohio] [R]iver and it will break down . . . organic compounds [and] solvents . . . to render them effectively pure." (*Id.* at 136). The wastewater treatment plant is subject to a permit under the National Pollutant Discharge Elimination System ("NPDES") that sets "quantitative limits for the amount of impurities that we can release to the . . . Ohio River at different points." (*Id.* at 136). The levels of impurities are regulated by the West Virginia Department of Environmental Protection ("WVDEP"). (*Id.* at 136–37). ENVIRON recommended that the primary clarifiers be replaced or upgraded, and that a "separate clarifier" be installed. (*Id.*). ENVIRON indicated that the "most likely" cost for this corrective action was $3 million, and that the "reasonable worst case" cost was $6 million. (*Id.*). Additionally, "[b]ecause the wastewater treatment system was designed for a smaller wastewater flow volume, the facility has insufficient hydraulic containment capacity to manage wastewater flows and storm water run-on. It is conceivable that a 'release' to the process sewer in combination with a storm water event would exceed the storage capacity of the settling basin and panic pond . . . and result in overflow directly to Sugar Camp Run." (*Id.*). ENVIRON indicated that, in order to satisfy RCRA regulations, "the facility likely would need to install a series of covered aboveground tank units," which would cost $2.5 to $5 million. (*Id.*).

In 2003 MPM began a wastewater upgrade project within the EP area. (T.T. 138). There were two concerns: first, the Site averaged ten to twelve exceedances[16] per year; and

---

[16] Exceedances occur when the chemicals contained in Site wastewater discharged into the river exceed the numerical limits specified in the NPDES permit. (T.T. 142).

second, there were a "number of overflows[17] out of the . . . waste sewer system . . . that led to

discharge of those waters to [Sugar Camp Run or] places other than" permitted outfalls, which

GE viewed "as a big liability."  (*Id*. at 141–43).  In 2005, after, among other things, extensive

sampling of processed sewer waters to identify the chemicals "getting into the wastewater in the

concentrations that they were," MPM formulated "a conceptual design for a waste treatment

plan" to be implemented in a number of phases.  (*Id*. at 143–45).

One aspect of the plan was the installation of a two-million-gallon above-ground storage

tank for emergency diversion storage in the event of a large rain event to capture water.  (T.T.

145).  MPM planned to construct a pump station nearby to get "water up into the tank."  (*Id*. at

146).  In June 2008, MPM began construction on the pump station, which required excavation.

(*Id*. at 148).  During the excavation, MPM encountered soils that were "black and a little . . .

slimy looking."  (*Id*.).  As the soils were "uncharacteristic" of the area, they stopped excavation

to analyze the soils.  (*Id*.).  The outside lab to which MPM sent samples of the soils indicated that

the samples contained what MPM considered "fairly high concentrations" of PCBs.  (*Id*. at 148–

49).  Because MPM did not know "where [the PCBs] came from or the extent of contamination,"

MPM decontaminated the construction equipment, segregated soils, sent soils off-site for

disposal, and delayed the project, leaving an "open hole" at the excavation site.  (*Id*. at 149–50;

Dkt. No. 238, ¶ 411)).

MPM notified Crompton in July 2008 of the PCBs detected in the soil.  (T.T. 164–65).

In a letter dated August 25, 2008, MPM provided formal notification of the newly discovered

PCB contamination.  (*Id*. at 165; P-159).  On September 26, 2008, MPM sent Crompton an

invoice requesting payment for PCB contaminated equipment costs.  (P-164).  In a letter dated

---

[17] An overflow occurs when "the water in [the Site's] sewer system or treatment system becomes excessive" and can no longer by contained hydraulically within the intended boundaries of the plant or the sewer itself.  (*Id*.).

December 8, 2008, Crompton disclaimed responsibility on the grounds that MPM's notification was untimely (i.e., more than thirty days after MPM recognized that PCB decontamination and remediation was required) and MPM failed to cite an environmental law requiring remediation, as required by the Purchase and Exchange Agreement. (P-168; P-117).

### G. Clean Harbors Sampling and Search for Records

In June 2009, MPM retained Clean Harbors Environmental Services, Inc. to investigate and remediate the PCBs detected at the pump station excavation. (P-179; Smith Dep. 84; Dkt. No. 238, ¶ 424). Clean Harbors conducted soil sampling from July to September 2009, and on October 8, 2009, reported that it found "[t]he majority of the contamination . . . near the pump station and along the . . . pipeline running parallel to the road and abandoned equalization basin." (D-142; P-200). It found PCBs near the old equalization basin, current equalization basin,[18] and primary clarifier. (P-190). The "[r]esults ranged from non-detect to 1744ppm." (D-142, MPM0054896). Clean Harbors noted that its initial sampling grid was 558 square meters, that it expanded the grid to 1,359 square meters, but that as of October 8, 2009, "a boundary ha[d] not been clarified to determine the extent of the [PCB] contamination." (*Id.*). Clean Harbors indicated "that [f]urther sampling and analysis would be required to provide that boundary." (*Id.*). No further sampling has been conducted at the Site. (Dkt. No. 233, ¶ 150). MPM put the wastewater treatment program on hold as a result of the PCB contamination. (P-196, MPM0051645; Dkt. No. 238, ¶ 438). Although there was evidence in the form of expert

---

[18] In its Phase II report, ENVIRON noted that:

> Until the mid-1970s, rudimentary wastewater treatment was conducted in the Environmental Protection area by addition of limestone to acidic wastewater as it flowed through man-made retention ponds. In-ground concrete tanks or clay-lined basins subsequently replaced these wastewater treatment ponds. The ponds were located in the area currently occupied by the now-closed equalization basin and the currently-active equalization pond, and the area immediately to the north.

(P-121, MPM0015789).

testimony that the contaminated soil might be "fill materials," there is no evidence that would allow a definitive conclusion as to whether the area at issue was filled with soil that already contained PCBs.  (*See* Dkt. No. 238, ¶¶ 439–41; UCC Response to ¶¶ 439–41 (discussing Malcom Beeler testimony, TT. 667–69)).

Heintzman testified that PCBs were found "in more locations and in greater quantities than could be explained from incidental spills from transformers."  (Heintzman Dep. 208).  After receiving the results from Clean Harbors, MPM began a search of records in attempt to understand from a historical perspective how the PCBs ended up in the EP area.  (T.T. 155). Historical UCC documents dating back to 1970 indicated that UCC purchased and used "significant quantities" of PCBs in production at the Site.  (Klarman Dep. 99; T.T. 156). Heintzman testified that, when the PCB purchase records were found,

> I think we questioned them ourselves, is it even possible that we could have had this kind of level of PCBs from purchased materials versus incidental spills from transformers or the kind of . . . minor contamination that we thought had occurred previously.  When we found the accounting records, purchasing records . . . that was kind of, oh, gee, this does have potential to be something that was used here at the plant.

(Heintzman Dep. 193).  The Court credits Heintzman's testimony.

In a letter dated September 28, 2010, MPM advised UCC that it had "discovered potentially significant amounts of . . . PCBs . . . in the soil at the Sistersville facility.  Historical records clearly show that this contamination is the result of Union Carbide's use and disposal of hundreds of thousands of pounds of PCBs at the Facility."  (P-195).  MPM proposed a meeting with UCC to address how to resolve the contamination at the Site.  (*Id*.).  The record does not indicate whether UCC responded this letter.

### H.    MPM's Notification to WVDEP

In a letter to WVDEP dated March 16, 2012, MPM wrote to request a meeting "[i]n connection with its RCRA Permit . . . to present information about the presence of PCBs in the subsurface of its Sistersville facility in the vicinity of the current wastewater treatment facility and the historical operations which appear to have resulted in the subsurface PCBs." (P-198). MPM met with WVDEP in May 2012. (T.T. 163; P-201). After that meeting, EPA requested, under CERCLA §104(e) and RCRA § 3007(a), information related to PCBs at the Site. (P-203). MPM responded to EPA's inquiry in a letter dated August 12, 2012, and provided EPA all information in its possession relating to PCBs at the Site. (*Id*.; P-204; Dkt. No. 238, ¶ 456).

### I.    Plans to Resume Wastewater Treatment Upgrade

In 2010, MPM retained an engineering firm and explored "a variety of options" for getting the wastewater treatment upgrade "back on track." (T.T. 157). Later, MPM considered options that would reduce costs and enable it to do the construction work in areas away from PCB contaminated areas. (*Id*. at 157–58). MPM hired a second consultant to investigate whether wastewater treatment improvements, a storage tank, for instance, could be moved or installed outside the EP area. (*Id*. at 158). MPM, however, was unable to find a "realistic alternative" that would avoid construction in the area contaminated with PCBs, and concluded that the original wastewater treatment upgrade plan was the design that would work the most efficiently. (*Id*.).

MPM has approved funding to resume the wastewater treatment upgrade at the Site as originally designed. (T.T. 158). The reasons for the initial plan to upgrade the Site's wastewater treatment, reducing permit exceedances and eliminating system overflows, also drive MPM's current upgrade plan. (*Id*.). As the plan is the same as the original, MPM plans to install a pump

station in the same location as where PCBs were encountered and construction stopped in 2008. (*Id*. at 161). Excavation in the same general area will be required for the new storage tank. (*Id*. at 182). Consequently, MPM will need to excavate the PCB containing soils it first encountered in 2008. (*Id*. at 186).

In anticipation of the excavation, MPM prepared a soil management plan and submitted it to WVDEP for comments. (P-228, P-229, P-230, P-231, P-232, P-233, P-235, P-237). WVDEP has advised MPM that it has "no further comments" on the soil management plan and that it "may advance to the final stage." (P-237). To date neither EPA nor WVDEP has required PCB sampling or remediation or determined that the PCBs pose an unreasonable risk to public health or the environment. (T.T. 639–44).

## III.    CONCLUSIONS OF LAW

### A.    Whether to Allocate

#### 1.    Ripeness

"In practice, courts generally bifurcate a CERCLA proceeding, determining liability in Phase I, and then apportioning recovery in Phase II." *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 131 (2d Cir. 2010). "The proper remedy for future response costs is not a present lump-sum payment of anticipated expenses but instead a declaratory judgment award dividing future response costs among responsible parties." *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 92 (2d Cir. 2000) (citing 42 U.S.C. § 9613(g)(2)).

During Phase I, the Court found, *inter alia*, that: (1) UCC is liable to MPM under CERCLA § 107(a) for future necessary removal response costs consistent with the National Contingency Plan ("NCP") for PCBs at the Site (Dkt. No. 148); and (2) MPM is liable in contribution for its equitable share of any recoverable future response costs under CERCLA §§

113(f)(1), (g)(2) (Dkt. Nos. 165, 168).  As the parties settled past response costs, the Phase II

bench trial concerned allocation of future removal costs.  UCC, however, argued before, during,

and after trial that the issue of allocation of future removal costs is not ripe for determination.

Accordingly, the Court first considers whether declaratory judgment as to allocation is warranted

at this time.

UCC argues that the issue of allocation as to future cleanup costs is not ripe for

declaratory judgment because (1) the "circumstances of any hypothetical future removal action

by MPM are too speculative;" and (2) "the only planned PCB-related work at the Site—the

management and disposal of PCB-contaminated soils in connection with the WWTU upgrade—

would not constitute a CERCLA removal action."  (Dkt. No. 230, at 50).  MPM argues that

"uncertainty about future costs is not a bar to allocating future costs" and that allocation is

"fundamental to achieving CERCLA's goals of encouraging timely cleanups and placing the

costs of cleanups on those who created the pollution."  (Dkt. No. 227, at 97).

"The standard for ripeness in a declaratory judgment action is that 'there is a substantial

controversy, between parties having adverse legal interests, of sufficient immediacy and reality

to warrant the issuance of a declaratory judgment.'"  *Duane Reade, Inc. v. St. Paul Fire &*

*Marine Ins. Co.*, 411 F.3d 384, 388 (2d Cir. 2005) (quoting *Maryland Cas. Co. v. Pac. Coal &*

*Oil Co.*, 312 U.S. 270, 273 (1941)).  Declaratory relief "should be granted only as a matter of

judicial discretion, exercised in the public interest."  *Eccles v. Peoples Bank of Lakewood*

*Village*, 333 U.S. 426, 431 (1948).  The primary issues in assessing the appropriateness of

declaratory relief are: "(1) whether the judgment will serve a useful purpose in clarifying or

settling the legal issues involved; and (2) whether a judgment would finalize the controversy and

offer relief from uncertainty." *Dow Jones & Co., v. Harrods, Ltd.*, 346 F.3d 357, 359 (2d Cir.

2003). Other factors relevant to this assessment include:

> (1) whether the proposed remedy is being used merely for "procedural fencing" or a "race to res judicata"; (2) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and (3) whether there is a better or more effective remedy.

*Id*. at 359–60.

The Court has found UCC and MPM are liable for response costs for PCBs at the Site.

"'A case is ripe where the essential facts establishing the right to declaratory relief have already

occurred.'" *Arawana Mills Co. v. United Technologies Corp.,* 795 F. Supp. 1238, 1247 (D.

Conn. 1992) (quoting *Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 893 (9th Cir.

1986)). Not only has there been, as the Court previously found, a release of PCBs at the Site—a

prerequisite to declaratory judgment—but there are PCBs remaining in the soil near the

wastewater treatment area, the amount of which is still unknown. *See id.* at 1247 ("Inasmuch as

plaintiff has alleged that there was a release of hazardous substances on the Property during the

time defendants operated the overhauling and servicing facility, plaintiff has alleged 'the

occurrence of the essential facts establishing its right to a declaratory judgment.'") (quoting

*Cadillac Fairview/Cal., Inc. v. Dow Chem. Co.*, 840 F.2d 691, 696 (9th Cir. 1988)).

UCC's contention that the Court should decline to allocate future response costs stems

from the Second Circuit's indication in *New York v. Solvent Chemical Co., Inc.*, 664 F.3d 22, 26

(2d Cir. 2011), that there may be reasons for declining to allocate in a CERCLA case. In that

case the district court awarded Solvent Chemical contribution from adjoining chemical

manufacturing facilities for past costs, but denied its request for a declaratory judgment as to

future cleanup costs. The Second Circuit reversed, finding that a declaratory judgment as to

future costs should have been issued.  The Court noted that, while the district court's reasons for declining to issue a declaratory judgment "might justify a  refusal to *allocate* cleanup responsibility," they did not "support[] a refusal to grant a declaratory judgment as to *liability* itself."  664 F.3d at 26.  Even assuming that the reasons cited in *Solvent Chemical* would have supported a decision not to allocate between the three facilities in that case, those reasons are inapposite here.  *See id.* at 25-26 (citing to "the failure of  testifying experts to provide the court with a basis for interpreting the scientific data presented," the extent to which the contaminant contributed by one of the facilities had already been taken into account in the assessment of past costs, and the uncertainty regarding the remedy for the contaminant contributed by one of the facilities).

Here, UCC asserts that the following reasons justify a refusal to allocate in this case: (1) the absence of evidence that MPM is likely to incur future PCB removal costs at the Site; (2) the absence of any directive from a governmental agency regarding cleanup; (3) MPM's poor history of cooperation with regulators; (4) the economic benefit MPM may accrue in connection with PCB removal; (5) the possibility of indemnity by Crompton; (6) the possibility that MPM may exacerbate PCB contamination; (7) the possibility that MPM may engage in "secondary disposals of PCBs at other areas of the Site;" (8) the absence of an environmental threat to the public; and (9) the possibility that future removal could happen at an area of the 1,300 acre Site where the circumstances of the presence of PCBs may be different.  (Dkt. No. 240, at 54–57).

As to UCC's first reason, MPM has shown that it is likely to incur future costs in responding to PCBs at the Site because MPM plans to upgrade its wastewater treatment facilities, doing so will require that MPM respond appropriately to PCBs in the soils, and MPM has a soil management plan that WVDEP has approved.  UCC argues that this would not be a

necessary removal action, but that issue is not now before the Court.[19]  Thus, to the extent that

MPM is required to show that "future response costs . . . are 'likely to be incurred'" before

allocation may be determined, it has done so.  (Dkt. No. 240, at 54 (quoting *Tosco Corp. v. Koch

Indus., Inc.*, 216 F.3d 886, 897 (10th Cir. 2000))).  UCC's second reason is also unavailing: "a

government order or prior government approval is not a prerequisite to [a] plaintiff's ability to

recover in a private CERCLA suit," *Arawana Mills Co. v*, 795 F. Supp. at 1246; UCC offers no

legal authority that supports the proposition that a government directive is required before

allocation may be determined.  UCC's third, fourth, and fifth reasons (cooperation with

regulators, economic benefit, and indemnity) are discussed *infra* at III.B., and are relevant to the

Court's determination of allocation in this case.  Finally, UCC's sixth, seventh, eighth, and ninth

reasons (concerns regarding MPM's handling of PCBs, threat to public health, and location of

removal action at the Site) will not come into play unless or until MPM makes an application for

removal costs.  At that point they may become relevant to the Court's determination of whether

such costs are "necessary" and consistent with the National Contingency Plan.  42 U.S.C. §

9607(a)(4)(B); *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.* (*NYSEG*), 766 F.3d 212, 220

(2d Cir. 2014).  Thus, the Court finds that the reasons UCC cites are insufficient to justify

delaying the allocation determination.

UCC cites *Port of Portland v. Union Pacific Railroad Co.*, No. CV98-886-PA, 2001 WL

36135190, at *10 (D. Or. Mar. 26, 2001),[20] in support of its argument that future removal costs

are too speculative to justify allocation.  There, following a bench trial, the court found that the

---

[19] MPM also argues that further response costs are likely and necessary to evaluate "the potential effect of PCB contamination on Sugar Camp Run, the potential for PCB contamination to be present in flood zones, the potential for erosion in PCB-contaminated areas, and the fact that PCBs may be present at the surface."  (Dkt. No. 227, at 99).  UCC, on the other hand, notes that "EPA has had all relevant PCB information from the Site since 2012 and expressed no concern, nor requested or directed any PCB work at the Site."  (Dkt. No. 236, ¶ 480).

[20] No LEXIS cite available.

defendant was "responsible for ten percent of plaintiff's already incurred remedial action costs" but that it was "premature to establish responsibility for future costs." *Id*. at *2. The court noted that the contamination had "not been fully studied" and that "[a]llocating responsibility for future costs" would be "difficult because of the site's long history and many possible sources of contamination." *Id*. at *10. The court further noted that the plaintiff had "made little effort to identify the sources of metals such as zinc, lead, and cadmium" that contaminated the site and "ignored contamination caused by spillage during the transfer of lead and zinc ores." *Id*. Unable to "determine by a preponderance of the evidence which of the many substances contaminating [the] sediments will be targeted for removal," the court concluded that "a declaratory judgment determining the parties' responsibilities would be based on speculation." *Id*. In this case, unlike *Port of Portland*, PCBs are the sole contaminant subject to removal and there is no question as to the source of contamination.

UCC also relies on *Exxon Mobil Corp. v. United States*, 108 F. Supp. 3d 486, 536–37 (S.D. Tex. 2015), where the court declined, at the summary judgment stage, to issue a declaratory judgment for fault allocation, reserving the issue of allocation for "Phase II" and observing that "the court may issue a declaratory judgment equitably assigning the parties' shared of future costs if the evidence is not unduly speculative or otherwise subject to challenge." The court noted that the parties differed as to the method of allocation and that the United States had asked the court to wait "until it receives more evidence during Phase II of this case, including the opinion of the United States' expert on CERCLA allocation." *Id*. at 535. Here, the parties have completed Phase II and have had the opportunity to present the evidence they deemed relevant. For the reasons discussed, the Court does not find the evidence informing the allocation determination to be unduly speculative.

UCC cites *United States v. Davis*, 31 F. Supp. 2d 45, 59 (D.R.I. 1998), for the proposition that "seeking allocation before the remediation process has progressed to a point that response costs and the relative responsibility of each party can be assessed accurately is not a practice that should be encouraged." There, however, the court found "the evidence presented . . . sufficient to enable the Court to make a meaningful allocation based upon the facts presently available." *Id.* The factors the court utilized in allocating fault included (1) "the quantity or volume of hazardous waste attributable to each party"; (2) the "level of culpability," noting that "the generators bear primary responsibility for proper disposition of the hazardous wastes that they produced" and "[t]hat responsibility cannot be delegated to others"; (3) the degree of benefit the party derived "from disposal of hazardous waste"; and (4) the "ability to pay"—in order to "ensure that the party seeking contribution will not bear sole responsibility for any portion of the joint liability otherwise attributable to defendants from whom recovery is unlikely." *Id.* at 64–66. The evidence concerning each of these factors is presently before the Court and unlikely to change. Indeed, the two factors that weigh most heavily in the Court's allocation of responsibility in this case—UCC's status as the sole entity responsible for using and disposing of PCBs at the Site and MPM's delay in reporting its discovery of PCBs to environmental regulators—are settled.

Furthermore, determination of the most contentious issues in this case—whether UCC intentionally concealed PCBs from environmental regulators during the RCRA process and whether GE, and by extension, MPM, knew or should have known about the PCBs at the time of acquisition—will inform the Court's allocation in this case and help to finalize the controversy. It would be unjust to table these issues until after MPM is again engaged in PCB cleanup; the cost and time involved in litigating this case has no doubt been considerable. To require MPM to

wait for allocation until MPM has ascertained future PCB response costs would be "wasteful." *Solvent Chemical Co., Inc*., 664 F.3d at 27. "Moreover, this is not a case in which the dispute is 'otherwise destined to disappear by [itself].'" *Arawana Mills*, 795 F. Supp. at 1247 (quoting *In re Combustion Equip Assoc., Inc.*, 838 F.2d 35, 37 (2d Cir. 1988)).

Determining allocation will save the litigants in this case substantial time and money, and will leave open only the issue of whether any costs MPM incurs in responding to PCBs are recoverable under CERCLA. Thus, the Court concludes that declaratory judgment serves a useful purpose in settling the legal issues involved, is not being used for procedural gamesmanship or a race to res judicata, and will not increase friction between sovereign legal systems, and that there is no better or more effective remedy. Providing the parties with the certainty of an allocation will advance CERCLA's "dual goals of cleaning up hazardous waste and holding polluters responsible for their actions." *NYSEG*, 766 F.3d at 220. Finally, if and when MPM brings an action to recover future removal costs, UCC will be entitled to raise appropriate objections. *See New York v. Green*, 420 F.3d 99, 111 (2d Cir. 2005) ("[I]f and when the State brings an action to recover the future costs of remediating the Site, Defendants will be entitled at that time to raise any appropriate objections to the amount of the State's costs—for example, that the costs were not actually incurred or that they were inconsistent with the national contingency plan—though Defendants will not be entitled to litigate their liability for such costs.").

### 2.    Removal Action

UCC argues that there is no basis on which to allocate future removal costs because MPM's planned work at the WWTU would not be a necessary removal action. (Dkt. No. 230, at 59). The parties adduced limited testimony and documentary evidence at trial concerning

MPM's current plans to upgrade the WWTU.  While UCC's arguments may carry force at the next stage of the litigation, when the Court may need to determine whether MPM's actions fall within CERCLA's definition of a removal action, the Court declines to consider them now.

### B.    Allocation

Once liability has been established under CERCLA, "the court must allocate response costs among liable parties in an equitable manner."  *Goodrich Corp. v. Town of Middlebury*, 311 F.3d 154, 168 (2d Cir. 2002).  Allocation "is an equitable determination based on the district court's discretionary selection of the appropriate equitable factors in a given case."  *Id*. at 170. "Section 113(f) does not limit courts to any particular list of factors."  *Id*. at 176 (internal quotation marks omitted).  "Instead, the statute's expansive language . . . affords a district court broad discretion to balance the equities in the interests of justice."  *Id*. (internal quotation marks and brackets omitted).

 In *Niagara Mohawk*, the Second Circuit observed that "Congress noted examples of the factors that it thought courts should consider in apportioning costs":

> (1) The ability of the party to demonstrate that his contribution to the release can be distinguished; (2) The amount of hazardous substance involved.  Of course, a small quantity of highly toxic material, or above which releases or makes more dangerous another hazardous substance, would be a significant factor; (3) The degree of toxicity of the hazardous substance involved; (4) The degree of involvement of the person in the manufacture, treatment, transport, or disposal of the hazardous substance; and (5) The degree of cooperation between the person and the Federal, State, or local government in preventing harm to public health or the environment from occurring from a release.  This includes efforts to mitigate damage after a release occurs.

*Niagara Mohawk*, 596 F.3d at 130 (quoting S. Rep. No. 96–848, at 345–46 (1980)).[21]  The

second set of factors district courts have considered are those contained in *Davis*, 31 F. Supp. 2d

at 63, which include:

> 1.  The extent to which cleanup costs are attributable to wastes for which a party is responsible.
>
> 2.  The party's level of culpability.
>
> 3.  The degree to which the party benefitted from disposal of the waste.
>
> 4.  The party's ability to pay its share of the cost.

*Id.*; *see, e.g.*, *Yankee Gas Servs. Co. v. UGI Utils., Inc.*, 852 F. Supp. 2d  229, 247 (D. Conn.

2012) (citing *Davis*).   In this case, UCC was the only entity to bring PCBs onto the Site, use

them in its manufacturing processes, and dispose of them at the Site.  This factor weighs heavily

in the Court's decision to allocate the majority of the responsibility for future removal costs to

UCC.  UCC used and disposed of hundreds of thousands of pounds of PCBs at the Site.

Although UCC notes that PCBs in subsurface soils are stable if undisturbed, (Dkt. No. 240, at

39), in view of the evidence that MPM is likely to encounter PCBs when it resumes the

wastewater treatment upgrade project the Court finds, in this case, the general stability of PCBs

does not provide a basis for reducing UCC's responsibility for future removal costs.  *See* II.I.,

*supra*; *see also* (P-180, MPM0016311 (noting PCB concentrations from Phase I samples (surface

and subsurface) exceeded TSCA criterion)).

Although MPM argues that UCC intentionally concealed its PCB use from environmental

regulators during the RCRA process, the Court notes that during much (if not all) of the time

UCC used PCBs at the Site, hazardous waste was not regulated.  Thus, UCC's disposal practices

---

[21]These "so-called 'Gore Factors'" come from the legislative history surrounding three failed bills (one sponsored by then-Congressman Al Gore) that together informed CERCLA" when it was enacted in 1980. *Yankee Gas Servs. Co. v. UGI Utils., Inc.*, 852 F. Supp. 2d 229, 247 (D. Conn. 2012).

were undocumented.  While there were omissions, the evidence is insufficient to allow a reliable conclusion that UCC's failure to disclose PCBs was driven by an intention to conceal information that it should have provided to environmental regulators.

With respect to the degree to which UCC "benefitted from disposal of the waste," the Court finds UCC disposed of the PCB waste at the Site, and was not required to engage in any corrective action with respect to PCBs at the Site during the RCRA process or pay for any remedial action with respect to PCBs at the Site.  This factor therefore weighs in favor of allocating future removal costs to UCC.

MPM argues that, notwithstanding the Court's finding that it is liable in contribution under CERCLA § 113(f)(1), the Court should allocate 100 percent responsibility to UCC for future removal costs.  (Dkt. No. 227, at 70).  The Court previously found that MPM could not satisfy the elements of the innocent landowner or bona fide prospective purchaser defenses under CERCLA §§ 107(4)(1) and 101(4) and that it was liable in contribution for its equitable share of any recoverable past or future response costs.  UCC advances of number of arguments in support of its contention that the Court should assign significant responsibility to MPM for future removal costs.  For the reasons that follow, the Court allocates to MPM five percent responsibility for future removal costs.

First, UCC argues that MPM should "[b]ear a substantial majority" of any future response costs because GE, and by extension, MPM had notice of the PCBs and assumed the risk of future PCB-related response costs when it acquired the Site.  The evidence at trial established that Wood, who was GE's global environmental manager and involved in the environmental due diligence reviewed a draft of the ENVIRON's Phase II report prior to the July 2003 closing.  As discussed *supra*, II.D.2., however, while MPM was on notice, prior to the closing, that there

were PCBs at the Site that required further investigation, Wood credibly testified that he still believed that any PCB contamination was due to PCB electrical equipment.  Thus, the Court does not find that this factor supports an allocation of future response costs to MPM.

Second, UCC argues that GE/MPM "likely made economic calculations that PCBs were not of particular economic concern in the scale of the Site acquisition, which occurred in the larger context of an exchange of businesses."  (Dkt. No. 230, 69).  There is no evidence, however, concerning the terms of the sale between Crompton and GE.  The Court therefore finds that this factor does not provide a basis for allocating responsibility to MPM.

Third, UCC argues that MPM's failure to report the sampling results indicating PCB contamination in its 2004 or 2007 RCRA Part B permit application to WVDEP[22] (D-77; D-78; D-100; D-101) and that its delay in reporting PCBs to EPA violated the terms of its RCRA permit (D-36, at MPM002893) warrants allocation to MPM.  The parties dispute whether MPM was required to notify EPA regarding the sampling results.  (Dkt. No. 237, at 36–37).  The Court credits Wood's and Heintzman's testimony (*see* II.D.2.; II.G., *supra*) that MPM did not know at that point that PCBs had been released from UCC's former SWMUs.  Thus, UCC's argument is unavailing.

The Court reaches a different conclusion with respect to the RCRA permit.  The Site's RCRA permit states: "Whenever the Permittee becomes aware that it failed to submit any relevant facts in the permit application, or submitted incorrect information in a permit application or in any report . . . the Permittee shall notify [environmental regulators] of such failure within 7 days."  (D-36, at MPM002893).   In 2008 MPM discovered PCB-contaminated soil during

---

[22] The applicable regulations required MPM to "submit all available information pertaining to any release of hazardous wastes or hazardous constituents from" one or more solid waste management unit or units.  40 C.F.R. § 270.14(d)(2).

excavation and subsequently discovered historical documents showing UCC's purchase of large quantities of PCBs. The first evidence of MPM's contact with any environmental regulator, however, is not until 2012, when it sent a letter, dated March 16, 2012, requesting a meeting with WVDEP "[i]n connection with its RCRA Permit . . . to present information about the presence of PCBs in the subsurface of its Sistersville facility in the vicinity of the current wastewater treatment facility and the historical operations which appear to have resulted in the subsurface PCBs." [23] (P-198).

The Court has considered MPM's argument that any delay in reporting was due to the "confusion resulting from the extent of UCC's concealment," but finds it unavailing to justify the length of the delay here. (Dkt. No. 232, at 35). MPM discovered PCB-contaminated soils in 2008, discovered files showing UCC's historical use of PCBs at the Site in 2009, and, in 2010, contacted UCC regarding this contamination. Despite knowing that the RCRA permit required notification of "relevant facts" within seven days, MPM did not notify WVDEP until March 2012. (D-146). MPM argues that its delay in reporting did not have a detrimental effect on human health or the environment. But, viewed as a whole, the Court finds that MPM's delay in reporting violates one of CERCLA's "primary purposes . . . 'to encourage the timely cleanup of hazardous waste sites.'" *Price Trucking Corp. v. Norampac Indus., Inc.*, 748 F.3d 75, 79 (2d Cir. 2014) (quoting *W.R. Grace & Co.-Conn. v. Zotos Int'l, Inc.*, 559 F.3d 85, 88 (2d Cir. 2009)). Accordingly, the Court allocates five percent responsibility to MPM for its delay in notifying regulators about its discovery of the PCB release at the Site.

---

[23] MPM notes that EPA was involved in the sampling process that ESC undertook at Crompton's behest. There is no evidence, however, that MPM was involved in ESC or Crompton's interaction with EPA. At best, there is evidence that ESC informed MPM that it was in contact with an EPA representative in March 2007 concerning approval of additional investigation sampling. (P-142).

Fourth, UCC argues that the indemnity between MPM and Crompton warrants allocating responsibility to MPM. "'[T]he policy underlying the collateral source rule—to provide the innocent party with the benefit of any windfall—is simply not advanced in [CERCLA] cases.'" *NYSEG*, 766 F.3d at 238 (quoting *Friedland v. TIC-The Indus. Co.*, 566 F.3d 1203, 1207 (10th Cir. 2009)); *Beazer E., Inc. v. Mead Corp.*, 412 F.3d 429, 446–48 (3d Cir. 2005) ("CERCLA expressly authorizes private indemnity agreements."). Courts may, for example, reduce a CERCLA "recovery in light of [an] insurance payment." *NYSEG*, 766 F.3d at 238. And CERCLA permits the parties to allocate their environmental liability by contract. *Beazer E., Inc.*, 412 F.3d at 447. But in this case MPM has not been indemnified, nor is there any reason to conclude that it will be: Crompton has disclaimed responsibility under the indemnity agreement. The Court does not find that the mere existence of an indemnity agreement between MPM and Crompton provides any basis to increase MPM's allocation of responsibility as to UCC. In the event, however, that future removal actions are required, the parties will be free to raise the issue of indemnification and adduce evidence concerning any indemnification MPM has received.

Finally, UCC argues that MPM should bear the majority of the responsibility in allocation because it will derive commercial benefit from any future removal action when it upgrades the wastewater treatment unit. Specifically, UCC contends that the only reason MPM would excavate PCBs would be "to have more consistent wastewater treatment capacity, maintain full plant production without violating water discharge permit requirements, and thereby allow for greater production and profits." (Dkt. No. 230, at 74). While a relevant consideration, there is no evidence that MPM would realize a meaningful increase in property value as a result of a PCB cleanup in this case. *See NYSEG*, 766 F.3d at 241 (finding that the "district court did not abuse its discretion in allocating the response costs" and "reasonably took

42

into account the fact that I.D. Booth would benefit from the increased property value after remediation"). Indeed, any recovery will be limited to cleanup costs associated with PCB removal that is required as a result of MPM's activities. Thus, the Court finds the possibility of such benefit does not warrant a change in allocation.

Accordingly, having considered all the evidence presented at trial, the Court allocates ninety-five percent responsibility for future necessary and NCP-compliant PCB removal costs to UCC and five percent to MPM. *See Nashua Corp. v. Norton Co.*, 116 F. Supp. 2d 330, 352 (N.D.N.Y. 2000) (allocating ninety percent of past and future response costs to Norton, which "contributed the major portion of the toxic substances released to the subsurface environment" and ten percent to Nashua, which contributed "a very minor portion of the contamination at the Site" and "did not immediately undertake clean-up efforts or notify appropriate environmental authorities"); *Bedford Affiliates v. Sills*, 156 F.3d 416, 430 (2d Cir. 1998) (affirming allocation of ninety-five percent of costs to waste-producer and five percent to property owner that waited three years after learning of contamination to contact government agency and begin cleanup).

## IV.    CONCLUSION

Accordingly, it is

**ORDERED** that the Clerk of the Court is directed to enter a declaratory judgment with respect to the allocation of future removal costs as follows: UCC is responsible for ninety-five percent of future removal costs and MPM is responsible for five percent of future removal costs; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Dated:  September 22, 2017

Brenda K. Sannes
U.S. District Judge

43