UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MPM SILICONES, LLC,

                          Plaintiff,

v.                                                    1:11-CV-1542 (BKS/ATB)

UNION CARBIDE CORPORATION,

                          Defendant.
_____

Appearances:

*For Plaintiff*
Jonathan M. Ettinger
Zachary Gerson
Jeremy W. Meisinger
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA 02210

*For Defendant*
Harold L. Segall
Jack B. Zietman
Beveridge & Diamond, P.C.
1900 N Street, N.W., Suite 100
Washington, DC 20036

Megan R. Brillault
Beveridge & Diamond, P.C.
477 Madison Avenue, 15th Floor
New York, NY 10022

**Hon. Brenda K. Sannes, United States District Court Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.   INTRODUCTION AND PROCEDURAL HISTORY

In 2011, Plaintiff MPM Silicones, LLC ("MPM") filed this action under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601–9675, to recover costs in responding to soil contaminated with polychlorinated biphenyls ("PCBs")[1] at a site it owns in Friendly, West Virginia (the "Sistersville Site" or the "Site"). (Dkt. No. 1). Defendant Union Carbide Corporation ("UCC") is a previous owner and operator who used PCBs in its manufacturing process at the Site until the 1970s. (Dkt. No. 90-3, at 2–3).

At the summary judgment stage, the Court found that: (1) because UCC had begun remediation construction at the Site in the early 1990s, triggering the six-year statute of limitations to recover remedial action costs and because, under *NYSEG*,[2] "there can only be one remedial action at a site," MPM's claim for remedial action costs was time-barred by § 113(g)(2)(B) of CERCLA; (2) UCC was liable under CERCLA § 107(a) to MPM for past and future necessary costs of response to PCBs at the Site; and (3) MPM was liable in contribution under CERCLA § 113(f)(1) for its equitable share of any recoverable past or future response costs. *MPM Silicones, LLC v. Union Carbide Corp. ("MPM I")*, No. 11-cv-1542, 2016 WL 3964630, 2016 U.S. Dist. LEXIS 98535 (N.D.N.Y. July 7, 2016) (statute of limitations and UCC's CERCLA liability); (Dkt. No. 165 (MPM's contribution liability)).

---

[1] PCBs are designated as a hazardous constituent under the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6901–6992k. 40 C.F.R. Part 261, Appendix VIII; 40 C.F.R. Part 264, Appendix IX.

[2] *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp. ("NYSEG")*, 766 F.3d 212, 236 (2d Cir. 2014).

The Court held a bench trial from January 31, 2017 to February 2, 2017 on the remaining issues: (1) whether the allocation of future response costs was ripe for review; and, if so, (2) a determination of the parties' equitable shares.[3] On September 22, 2017, the Court issued Findings of Fact and Conclusions of Law finding that allocation for future response costs was warranted and allocating ninety-five percent of future response costs to UCC and five percent to MPM. *MPM Silicones, LLC v. Union Carbide Corp. ("MPM II")*, No. 11-cv-1542, 2017 WL 6408611, 2017 U.S. Dist. LEXIS 218201 (N.D.N.Y. Sept. 22, 2017).

MPM appealed the summary judgment decision, arguing that the Court "erred in concluding that MPM's claims for reimbursement of *remediation* costs are time-barred by § 113(g)(2)(B)." *MPM Silicones, LLC v. Union Carbide Corp. ("MPM III")*, 966 F.3d 200, 217 (2d Cir. 2020). UCC appealed the allocation decision, arguing that the Court "erred in determining that future allocation of *removal* costs was ripe for review, and further erred in allocating 95% of those costs against it." *Id.* The Second Circuit affirmed the Court's determination regarding ripeness and allocation but vacated the Court's "grant of partial summary judgment" on the statute of limitations issue regarding MPM's claim for remediation costs. *Id.* at 237. Concluding that this Court's "reliance on the single-remediation principle asserted in *NYSEG* did not necessarily support [the] conclusion that MPM's cost recovery action was untimely," the Second Circuit remanded "for further consideration of the timeliness of MPM's suit to recover its remediation costs." *Id.* at 206, 231.

Presently before the Court are the parties' motions for partial summary judgment following remand. (Dkt. Nos. 273, 274). The parties fully briefed the motions. (Dkt. Nos. 278, 279, 280, 281). The Court held oral argument on September 2, 2021. For the reasons that follow,

---

[3] The parties settled the issue of past response costs prior to trial.

the Court concludes that MPM's remedial activity addressed to buried PCBs is a "separate and distinct remediation, entitled to a new six-year limitation period," *MPM III*, 966 F.3d at 231, adopts its prior allocation determination, grants MPM's motion for partial summary judgment, and denies UCC's motion for partial summary judgment.

## II.   BACKGROUND[4]

The extensive facts giving rise to this action are laid out in *MPM I*, *MPM II*, and *MPM III*. The Court assumes familiarity with those facts, which are incorporated herein, and recounts the following additional facts, which are relevant to the determination of the issue for which the Second Circuit remanded this matter: whether the remediation of PCBs at the Sistersville Site, for statute of limitations purposes, is a continuation of the remediation UCC began at the Site in 1992 at the direction of the Environmental Protection Agency ("EPA"), or is better characterized "as a separate and distinct remediation entitled to a new six-year period for cost recovery." *MPM III*, 966 F.3d at 231. The Court lays out these facts, mindful of the Second Circuit's guidance regarding the appropriate inquest: "a helpful inquiry would be to examine whether the recent action (sought by [MPM] to be characterized as a new remediation) falls within the remedial scope of the previous remediation as revealed in the record before the regulatory agency." *Id.* at 230. These facts are undisputed.

### A.   Overview of Historical Operations and Wastes, the RCRA Process, and the Discovery of PCB Disposal

Plaintiff MPM currently owns and operates the chemical manufacturing facility at issue in this case; the Sistersville Site is a 1,300-acre property located on the Ohio River. (Dkt. No.

---

[4] The facts are drawn from the parties' Statements of Material Facts, (Dkt Nos. 273-2; 274-92), and the parties' responses to those statements, (Dkt. No. 42), to the extent the facts are well-supported by pinpoint citations to the record, as well as the exhibits attached thereto and cited therein, including the trial record. The relevant facts are largely undisputed, (Dkt. Nos. 278-1; 279-1). The facts are construed in the light most favorable to the non-moving party. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

274-92, ¶ 1–2, 6, 28). Defendant UCC owned and operated the Sistersville Site from 1955 to

1993. (Dkt. No. 238, ¶ 2). At the Site, UCC manufactured a broad range of silicone products and

generated a variety of hazardous wastes, including, among others, silicone gums, gelled methyl

silicones, chlorosilanes, distillation column pot residues, cyanoethyltriethoxy silane heavies,

toluene solutions, and filter cakes. (Dkt. No. 274-6, at 12). To handle and process these wastes,

UCC utilized a number of "Solid Waste Management Units" ("SWMU") at the Site, including

two landfills—the North Inactive Site ("NIS") and the South Inactive Site ("SIS")—where it

buried thousands of drums of waste. (*Id.*). UCC also utilized a Wastewater Treatment Unit,

Sludge Impoundments, Primary Clarification System, and many other SWMUs. (*Id.* at 4, 12;

Dkt. No. 274-12, at 3). In addition, until 1972, UCC used hundreds of thousands of pounds of

PCBs in its manufacturing operations. (Dkt. No. 273-2, ¶ 2; Dkt. No. 279-1, ¶ 2; Dkt. No. 274-

92, ¶ 32; Dkt. No. 278-1, ¶ 32). UCC disposed of PCB waste at the Site. (Dkt. No. 273-2, ¶ 7;

Dkt. No. 279-1, ¶ 7). As the Second Circuit described it:

> UCC disposed of [PCB] waste by burning it, or by depositing it into
> neutralization tanks or lime pits at the Site. After the lime pits filled
> with sludge, UCC drained them and dug them out, and used the
> PCB-laden sludge to backfill other areas of the Site. Some of the
> PCB-laden waste was deposited in the [NIS], a 5.5 acre landfill
> located uphill and northwest of the Site's waste water treatment
> facility and a creek that runs through the Site, known as Sugar Camp
> Run. *The precise locations of all the backfill areas are unknown*.

*MPM III*, 966 F.3d at 206 (emphasis added); (*see* Dkt. No. 274-92, ¶ 41; Dkt. No. 278-1, ¶ 41).

Following the enactment of RCRA and subsequent promulgation of corresponding

permitting regulations, owners or operators "of any 'facility that treats, stores, or disposes of

hazardous wastes'" were required to "seek[ ] and obtain[ ] a permit from the Environmental

Protection Agency ('EPA')." *MPM III*, 966 F.3d at 208 (quoting *Owen Elec. Steel Co. of S.C.,*

*Inc. v. Browner*, 37 F.3d 146, 147 (4th Cir. 1994), citing 42 U.S.C. § 6925(a)). As the Second

5

Circuit explained, "RCRA established a framework to 'ensure the proper treatment, storage, and disposal of [hazardous] waste.'" *Id.* (quoting *Prisco v. A&D Carting Corp.*, 168 F.3d 593, 608 (2d Cir. 1999)). RCRA "requires the EPA to evaluate the environmental risks of [facilities treating, storing, or disposing of hazardous wastes] and to issue permits requiring the owner or operator of a facility to undertake 'corrective action for all releases of hazardous waste . . . from any solid waste management unit.'"[5] *Id.* (quoting 42 U.S.C. § 6924(u)).

As a facility that treated, stored, or disposed of hazardous waste, RCRA required UCC to apply to the EPA for a permit to handle hazardous waste at the Sistersville Site; UCC began this process in 1981. (Dkt. No. 274-12, at 2–7). From 1981 until 1993, when it sold the Site, UCC worked with the EPA as part of the RCRA permitting process for handling hazardous wastes to investigate the hazardous wastes historically managed at the Site and any releases of hazardous wastes in the Site's soil, groundwater, and surface water, and to remediate areas where hazardous wastes had been detected. While UCC reported the hazardous wastes listed above, and many others, to EPA during this process, UCC did not affirmatively report its disposal of PCBs at the Site. Indeed, during the permitting process UCC took the position that any disposal of PCBs at the Site was speculative and that testing and analysis "showed no PCBs." (*Id.* at 13).

During the RCRA process, UCC and EPA identified the SWMUs from which hazardous constituents had been released into soil, groundwater, and the sediments of Sugar Camp Run. After much study of the Site and many corrective measures, UCC and EPA concluded that releases from other SWMUs around the Site had been addressed adequately, but that remediation of the NIS was required to stop the release of hazardous constituents. The construction of the

---

[5] EPA, in this case, defined SWMUs "as all units at a facility from which hazardous constituents might migrate irrespective of whether or not such units were intended for the management of solid and/or hazardous waste." (Dkt. No. 274-64, at 8) (emphasis omitted).

remedial measures began in 1992 and included placement of an earthen cap, the installation of

diversion ditches and interceptor trenches, and the stabilization of the banks of Sugar Camp Run.

    Prior to its purchase of the Site in 2003, GE Advanced Materials ("GE"), which later

became MPM, hired ENVIRON, an environmental consulting firm to review the Site;

ENVIRON's 2004 report noted that PCBs had been found at unexpectedly high levels in soil and

groundwater around the Site, including Sugar Camp Run, the Permitted Hazardous Waste

Storage Areas, the EP Area, (Dkt. No. 274-29, at 40, 45–46), the Waste Incineration area, (*id.* at

42–43), the Fly Ash Disposal Area, (*id.* at 50), the Main Septic Tank Area, (*id.* at 53), the

Northwest Plant Area, (*id.* at 54–55), the Main Plant Area, (*id.* at 56), the Contractor's Waste

Storage Area, (*id.* at 57–58), in the Electrical Substation, (*id.* at 63), the Railcar Storage area, (*id.*

at 64–65), the Trailer Parking Area, (*id.* at 68), and the ground water in the SIS, (*id.* at 71–72).

PCBs were not found in the NIS soil or groundwater samples. (*Id.* at 18).

    Figure 1: ENVIRON Phase II Investigation Areas at the Sistersville Site (Dkt. No. 274-

29, at 82).



A 2006 report by an environmental consulting firm concluded that PCB levels in certain areas of the site exceeded federal regulatory levels, and recommended soil characterization to determine the extent of PCBs in soil. (Trial Exhibit P-148). In 2008, MPM encountered discolored soils during an excavation in the EP Area containing "unexpected levels of PCBs." MPM subsequently discovered historical documents showing significant quantities of PCB usage. (Trial Transcript, at 156). Through this action, MPM seeks costs for the remediation of PCBs at the Site.

### B.      Regulatory Record 1981 to 1993

#### 1.      1981 Discussion with EPA and Notification of Hazardous Waste Site (Section 103(c) Form)

The first evidence of UCC's interaction with EPA concerning chemicals at the Site, as relevant here, is contained in an internal UCC memorandum dated May 3, 1981, by Fred Dailey who worked for UCC in various roles, including plant manager. (Dkt. No. 233, ¶ 31). The subject of the memorandum is "Conversations with USEPA concerning the production of phenyl trichlorosilane [('PTS')] and PCBs." (Trial Exhibit P-91, MPM0000133). In the memorandum, Dailey wrote that he had advised an EPA representative that: (1) UCC manufactured PTS from 1956 to 1962, and made products "prior to 1975 using PTS," but that UCC's "experts feel we did not make" or "generate[]" any PCBs during those processes; (2) "[a]nalysis of waste water" showed "no PCB"; (3) UCC has "sampled inactive landfill sites and found no PCB at levels above the detection limit"; and (4) UCC had one PCB transformer and fifty to sixty capacitors with PCBs "presently in use." (*Id.* MPM0000133–34).

On or about May 15, 1981, Dailey, on behalf of UCC, submitted a "Notification of Hazardous Waste Site" (Section 103(c) Form) to EPA as part of UCC's application for a RCRA permit to handle hazardous waste. (Dkt. No. 274-12, at 2–7). UCC reported that it had treated,

stored, or disposed of waste in 1955 at the SIS and from 1961 to 1972 at the NIS. (*Id.* at 3).

Under the section titled "General Types of Waste," UCC checked the boxes next to organics,

inorganics, solvents, acids, and silicone residues, but did not check the box next to PCBs. (*Id.*).

Next to "Description of Site," UCC wrote:

> There are two inactive waste disposal sites at the [Sistersville Site].
> One at the north and one at the south end of the plant. . . .
> Approximately 20,000 drums were disposed of in the [NIS] from
> 1961 to the early 1970's (approximately 455,000 [cubic feet] of
> silicone wastes and residues). At the [SIS] approximately 6750
> [cubic feet] of silicone wastes and residue were disposed of in 1955.

(*Id.* at 4).

### 2. 1983 EPA Consolidated Permits Application and RCRA Part B Application

On August 1, 1983, UCC submitted a "Consolidated Permits Program Application,"

which included its "Hazardous Waste Permit Application." (Dkt. No. 274-61, at 2, 4). UCC

described the nature of its business as: "Manufacturing Plant for the production of a broad range

of silicone products" and stated that "[t]he wastes originating from manufacturing these products

are processed through adjoining disposal facilities." (*Id.* at 3). In the Hazardous Waste Permit

Application, UCC reported how it stored hazardous wastes (e.g., in drum, tank, waste pile, and

surface impoundments), the method of disposal (e.g., landfill or surface impoundment), where it

treated wastes (e.g., tanks, surface impoundment, or incinerator), the types of hazardous wastes it

handled, and the "estimated annual quantity" of the different hazardous wastes, which ranged

from 1 pound to 3.5 million pounds. (*Id.* at 4–10). There is no evidence that UCC listed PCBs

among the hazardous wastes it handled in this application.

On or about August 12, 1983, UCC filed its RCRA Part B Application. (Dkt. No. 274-62;

Trial Exhibit P-62). It is a more than 300-page document that contains a description of the Site,

including maps and drawings, a list of wastes handled at the Site, and a description of the Site's

9

waste processes and SWMUs, including the No. 1 Sludge Impoundment/Landfill, No. 4 Emergency Pond, Copper Sludge Removal Pond, Panic Pond, No. 2 Sludge Impoundment, No. 1 and No. 2 Settling Basins, Equalization Basin, Incinerator, and Wastewater Treatment Facility. (Dkt. No. 274-62, at 4–9; Trial Exhibit P-62, MPM0028278–91). In addition, the RCRA Part B Application outlines the Site's groundwater monitoring system, sampling well locations, and procedures for preventing spills, mixing incompatible wastes, and water supply contamination. (Dkt. No. 274-62, at 10–11). PCBs are not mentioned anywhere in the RCRA Part B Application.

### 3. 1985 Report to EPA Detailing SWMUs at Site

In June 1985, at EPA's request, UCC submitted a report describing: (1) the Site's active and closed (or inactive) SWMUs "which have the potential to release hazardous wastes or hazardous constituents to the environment, primarily groundwater"; and (2) all known releases of hazardous wastes from the Site's SWMUs. (Dkt. No. 274-6, at 1, 3, 13–16). UCC's report did not mention PCBs.

The first part of the report provided additional information regarding the Copper Sludge Pit, the NIS, the SIS, the No. 3 Settling Basin, UNOX Reactors, and Primary Clarifier, including the location, dimension, waste capacity, the wastes handled, and whether the SWMU was closed, inactive, or in use. (*Id.* at 4–12). The report also described the NIS, indicating that it operated from "approximately 1961 until 1972 when it was covered with soil," that it "covers approximately 2.18 acres," and that its "disposal areas are felt to be about 20 feet deep." (*Id.* at 4, 12). According to the report, the NIS "received various plant waste during the life of the plant" and "and that it was "believed that approximately 7,000 drums of material were buried in this area," and that the drums contained "silicone gums, gelled methyl silicones; chlorosilanes,

distillation column pot residues, by-products, etc.; cyanoethyltriethoxy silane heavies; toluene solutions, filter cakes from the production of surfactants and miscellaneous wastes."[6] (*Id.* at 12).

In the second part of the report UCC outlined the "known release[s] [that] occurred at the active waste management units," including the type and quantity of "Material Released," the dates of the incidents, and the actions taken. (*Id.* at 13). None of the known releases concerned PCBs. (*Id.* at 13–16).

### 4.     March 1986 EPA Comments on UCC's SWMU Information

By letter dated March 13, 1986, the EPA provided comments "on the SWMU information UCC provided," and advised UCC that it had "identified additional information which will assist us in assessing the need for corrective-action at the above-referenced facility." (Dkt. No. 274-7, at 1). Regarding the NIS, the EPA noted that the NIS had been "covered with soil" but that UCC had provided "[n]o information . . . concerning surface drainage and infiltration controls" and that there had not been "a coordinated sampling program." (*Id.* at 4–5). EPA identified its "Information Needs" regarding the NIS as start-up and closure dates, number of drums, results of groundwater and soil analyses, "a list of Appendix VIII constituents that may have been disposed of in this fill," release controls, additional monitoring wells or boring logs and their locations, and "analysis procedures and techniques used for all soil and groundwater samples." (*Id.* at 5). EPA advised UCC that it also required "information on the water quality in

---

[6] As the Court noted in *MPM II*, "the absence of PCBs from UCC's June 10, 1985 submission to EPA is conspicuous upon comparison with" a January 1980 memo written by a UCC employee, Clem Schubert, who had been tasked with investigating, identifying, quantifying, and determining the location of silicone and chlorosilane wastes that had been buried at the Site." 2017 WL 6408611, at *2, 5, 2017 U.S. Dist. LEXIS 218201, at *14. Schubert described the waste that "it is reasonable to conclude" was buried "in the area of the Sistersville Plant site"; his list included "A-1100 heavies with up to 250,000 pounds of PCB's used as chosen during A-1100 distillation." (Trial Exhibit P-55, MPM0015738-39). UCC's submission to the EPA contains "the same list of waste components, in the same order" as the Schubert Memo, with the exception of "A-1100 heavies with up to 250,000 pounds of PCB's used as chosen during A-1100 distillation." *MPM II*, 2017 WL 6408611, at *5, 2017 U.S. Dist. LEXIS 218201, at *14.

Sugar Camp Run, both upstream and downstream of the fill area." (*Id.* at 6–8). EPA also asked for similar information regarding the SIS, Copper Sludge Pit, Settling Basin, UNOX Reactors, Primary Clarifiers, Process Sewer Neutralization Basin, Copper Pile, and Skimmer Basin, including results of any soil or groundwater analyses. (*Id.* at 3–4, 9, 13–17).

### 5. May 1986 EPA Visit to Sistersville Site and Additional Documentation

In letter dated April 16, 1986, UCC responded that because the information EPA had requested was "voluminous in some cases" and would require "historical research," a meeting appeared "to be the most efficient way to proceed in this matter." (Dkt. No. 274-8, at 1). On May 14 and 15, 1986, EPA visited the Sistersville Site. (Dkt. No. 274-9, at 1).

Fred Dailey wrote a memorandum to "SWMU File," over a year later, reporting a conversation that occurred with EPA during the May 15, 1986 visit. (Dkt. No. 274-12, at 13). Daily stated that EPA "noticed the words 'magic chemical' listed as a material that would be analyzed from wells around the north site" and asked "what it might be." (*Id.*). Dailey responded that "during the plant's activity to look for PCBs during late 1978-1979, as a result of the PCB law, it was speculated that as much as 500,000 lbs. of contaminated PCB heat fluid was generated . . . its disposition was never determined" and it "could have been placed in an inactive site." (*Id.*). Dailey also told EPA that the groundwater and "inactive sites" were examined for PCBs" but "[a]ll the results of the tests and analyses conducted showed no PCBs and that data was included in the information provided." (*Id.*).

On or about May 29, 1986, UCC provided EPA with the analytical results of sampling it had conducted at the NIS and SIS from 1979 to 1981; the samples were tested for PCBs. (Dkt. No. 274-9, at 1; Dkt. Nos. 274-10, 274-11). The 1979 to 1981 sampling results concerned the NIS and SIS, and while the January 1980 results showed that PCBs were detected in Sugar Camp

Run and in one of the wells sampled, one of which contained PCBs *above* detection limits, (Dkt. No. 274-11, at 18), (*see generally* Dkt. Nos. 274-10, 274-11; *see also* Dkt. No. 274-10, at 28 (map showing wells tested)), additional sampling in May 1980 and March 1981 at the Site (the documents are not clear as to where on the Site the samples were collected but seem to indicate the wells surrounding the NIS, (Dkt. No. 274-10, at 79–81)), all yielded PCB concentrations below detection limits, (*Id.* at 35, 41, 47, 53, 70, 81, 86).

### 6.    September 1987 Draft RCRA Facility Assessment

On October 16, 1987, EPA provided UCC with a draft RCRA Facility Assessment ("RFA"). (Dkt. No. 274-63, at 1). EPA described the Site as generating a "variety of hazardous wastes," including ignitable, corrosive, and reactive wastes and stated that the "waste management activities at the UCC facility include incineration, treatment, storage, and land disposal of solid and hazardous wastes." (*Id.* at 8). EPA identified a total of 43 SWMUs at the facility. (*Id.* at 10).

EPA examined the meteorologic conditions at the Site, the extension of the floodplain of the Ohio River into the north and south sides of the Site, the Site's location in the Ohio River Valley, (Dkt. No. 274-63, at 11), the sedimentary strata of the Site, (*id.* at 12), the groundwater at the Site, including the two "water-bearing zones" "beneath the No. 1 Surface Impoundment/Landfill," (*id.*), and the four water-bearing zones underlying the No. 2 Sludge Impoundment, (*id.* at 14). EPA assessed the "Release Pathways," i.e., "[t]he potential for release to groundwater," soils, and surface water. (*Id.* at 18–20). EPA found the potential for release to groundwater to be "high," given the "existence of unlined landfills and surface impoundments" at the Site, including the SIS, the NIS, and the No. 3 Sludge Pond. (*Id.* at 18). EPA determined the Site had "an overall moderate to high potential for release soils," observing that while UCC's

"[h]ousekeeping activities" were "fair," "many of the concrete pads which hold the SWMUSs were . . . in poor shape; containment dikes were eroded, the floors of the pads were cracked and [there were] discolored patches of concrete . . . on the bases of some of the pads." (*Id.* at 18). EPA concluded that "[i]n the event of a spill from a SWMU, these conditions indicate that such a spill would be able to reach underlying soils." (*Id.*). EPA considered the "overall potential for a release to surface water from the UCC site . . . moderate to high." (*Id.* at 19). Three facts informed this conclusion: the presence of "several SWMUs within the 100-year floodplain of the Ohio River"; the "poor to fair shape" of "many of the pads holding SWMUs"; and "past surface water releases from SWMUs." (*Id.*).

EPA evaluated the SIS, NIS, Process and Clean Sewer System, Hazardous Waste Loading and Unloading Area, Waste Drum Staging Areas, No. 3 Sludge Pond, Wastewater Treatment System, Clean Skimmer Basin, and Copper Sludge Pit, the wastes managed, release controls, and history of releases at each SWMU. (*Id.* at 21–33). Regarding the NIS, EPA noted that it was "covered with approximately six inches of compacted on-site native clay," but that there was "gullying due to inadequate surface drainage control" that was "eroding the clay cap in certain areas" and that drainage at the NIS "from the east part of the fill . . . drains into Sugar Run." (*Id.* at 22–23). EPA further stated that groundwater contamination had been detected "primarily at the north end of the facility," that contamination was "suspected at the [SIS]," (*id.* at 4), and that the Clean Sewer System, No. 3 Sludge Pond, Copper Sludge Pit, and the No. 1 Surface Impoundment/Landfill "may also be contributing to groundwater contamination," (*id.* at 4, 6), and therefore recommended that UCC undertake "further action," including the sampling and analysis of groundwater, (*id.* at 6). EPA stated that if contamination were confirmed, UCC

would be tasked with the implementation of a corrective action plan. (*Id.*). There is no discussion of PCBs in the RFA.

       **7.**       **October 1988 RCRA Part B Hazardous Waste Management Permit**

On October 26, 1988, the West Virginia Department of Natural Resources, Division of Waste Management, sent UCC the West Virginia Hazardous Waste Management Permit for the Sistersville Site. (Dkt. No. 274-13, at 3). This is also known as the 1988 RCRA Part B Permit. (*See* Dkt. No. 274-1, ¶ 14 (referring to Trial Exhibit D-031 as "RCRA, Part B Permit, dated November 2, 1988")). It permitted UCC "to operate a hazardous waste drum storage unit, storage and treatment tanks, surface impoundment, incinerator and landfill in Friendly, West Virginia." (Trial Exhibit D-31, MPM0029443). It contained reporting, recording keeping, and response requirements, identified the wastes UCC was permitted to store, and set out extensive instructions regarding storage, placement, containers, and leak detection systems, among other things. (*Id.* MPM0029443–71). The Permit also contained groundwater monitoring requirements and set out sampling and analysis procedures. (*Id.* MPM0029472–75). Finally, it contained a section requiring "Corrective Action," the objective of which was "to minimize the potential for further releases and as needed, to achieve hydraulic control and promote groundwater restoration by groundwater recovery and treatment." (*Id.* MPM0029732). The Corrective Action was to "be phased, with the results of one phase used to confirm or modify plans for the next phase." (*Id.*). The objective of the first phase of the Corrective Action was to define the area of groundwater contamination in the EP and Copper Pond Area and evaluate the potential for restoration and groundwater control restoration. (*Id.*). During the second phase, UCC was tasked with, among other things, closing the Copper Sludge Removal Pond, installing a wastewater sludge dewatering system, constructing "spill control dikes and lined ditches, and completing a cover

enhancement" for the No. 1 Landfill.[7] (*Id.*). The Permit noted that "[s]everal of these items [were] already complete as of July, 1988." (*Id.*). The "third phase will include installation and operation of a groundwater recovery well." (*Id.*). The Permit also outlined "Contingent Corrective Action Plans" in the event that there were "the detection of a significant increase in groundwater monitoring parameters and/or the subsequent detection of hazardous constituents . . . in any of the other areas of the site." (*Id.* MPM0029734). PCBs are not discussed in the RCRA Part B Permit.[8]

### 8.    December 1990 RCRA Permit for Corrective Action

On December 14, 1990, EPA sent UCC a RCRA permit for Corrective Action ("CA Permit"). (Dkt. No. 274-14, at 1). It stated that RCRA, and its regulations, required "corrective action for all releases of hazardous waste or hazardous constituents from any [SWMUs], regardless of when waste was placed in the unit, for all permits issued after . . . 1984." (*Id.* at 13). It required UCC "to conduct a Verification Investigation and, if necessary, a RCRA Facility Investigation (RFI) for suspected releases from specific solid waste management units (SWMUs) and a Corrective Measures Study at the facility." (*Id.*). The CA Permit listed eight SWMUs requiring a Verification Investigation: the SIS, the NIS, which also encompassed the Copper Sludge Pit and Storage Pile, and the Platinum Filter Cake (referred to collectively as the NIS), the No. 3 Sludge Pond (Settling Basin), the Wastewater Treatment System, the Waste Drum Staging Areas, and the Copper Shanty. (*Id.* at 18).[9]

---

[7] This is a different landfill than the NIS. (*See* Dkt. No. 274-29, at 82 (Site map)).

[8] The Part B Permit, which is more than 300 pages in length, notes that in 1983, UCC took groundwater samples from "several wells [in connection with the No. 2 Landfill] for various organics; PCBs, inorganic, and priority pollutants." (Trial Exhibit D-31, MPM0029702). The Permit does not contain the results of those samples; this is the sole reference to PCBs.

[9] The formulation of the CA Permit appears to have been the result of an interactive process between EPA and UCC during which UCC filed numerous objections to the provisions in the CA Permit. (Dkt. No. 274-64). The regulatory record reflects an extensive process in which EPA carefully scrutinized each area of the Site where there was a

known or possible release of hazardous constituents. For example, UCC objected to the requirement that it conduct a Verification Investigation for the above-referenced SWMUs, arguing that there was no evidence of a release. (*Id.* at 7). EPA explained that based on the RFA, it had concluded that releases from the nine SWMUs at issue "are likely to have occurred" and EPA denied UCC's objection. (*Id.* at 7–8). In response to UCC's argument that at least one of the SWMUs, the Process Sewer System, was not "by definition, a solid waste management unit," (*Id.* at 8), EPA stated that it defined a SWMU "as all units at a facility from which hazardous constituents might migrate irrespective of whether or not such units were intended for the management of solid and/or hazardous waste." (*Id.*) (emphasis omitted). Utilizing that definition, EPA explained that "the purposes for which wastes were placed in a unit, in this instance conveyance, is irrelevant in determining its designation as a SWMU," and that the Process Sewer System is properly categorized as a SWMU. (*Id.* at 9). And in response to UCC's objection that the Copper Shanty was not a SWMU because there was no evidence of a release from the unit, EPA noted that during the Site visit, the "partially inground concrete unit was observed to have areas of significant concrete deterioration," which justified "submission of further information through a Verification Investigation." (*Id.* at 12–13).

With respect to UCC's objection to the inclusion of the "no. 3 sludge pond" on the ground that there was "no evidence of a release," EPA explained that because such units "typically leak" and "because groundwater contamination of low pH has been documented downgradient of the unit, it is reasonable to conclude that releases have occurred in the past and that the unit has contributed to that contamination." (*Id.* at 9). EPA further explained that the Verification Investigation "would supply the information necessary to ascertain whether or not the sludge pond is an actual source of contamination." (*Id.*).

UCC objected to the inclusion of the Wastewater Treatment Plant on the ground that "it knows of no evidence of a release from this unit." (*Id.* at 10). EPA responded that based on its visual inspection of the Wastewater Treatment Plant and the design of the Equalization Basin, it concluded that "leaks of hazardous wastes from the basin occurred in the past." (*Id.*). In addition, EPA noted that photographs from the site visit showed "cracks in the soil-cement layer protecting the underlying clay liner of the equalization basin." (*Id.*). EPA advised that if, following the Verification Investigation sampling program, UCC could demonstrate "that releases to groundwater from units other than surface impoundments have not occurred, those units could be excluded from the workplan." (*Id.*).

UCC objected to analyzing samples of sediments in Sugar Camp Run. (*Id.* at 11). EPA explained sampling was needed because during periods of heavy precipitation, UCC's wastewater treatment facility and storm sewers "cannot handle the increased runoff" leading to possible "overflow . . . into Sugar Camp Run" leaving hazardous wastes and constituents in the sediment. (*Id.* at 12).

UCC objected to the Permit's requirement that it install "a groundwater system," "designed to operate for 30 years and that will be capable of immediately detecting statistically significant amounts of hazardous wastes or constituents migrating from each SWMU where the RCRA Facility Investigation ('RFI') reveals the release of hazardous constituents to groundwater from identified SWMUs." (*Id.* at 15). EPA responded that "a sound groundwater monitoring system is essential to the characterization of a contaminant plume and the monitoring of the effectiveness of any required remedial action." (*Id.*). It further stated that the "groundwater monitoring system required by the permit contains those elements . . . that will enable [UCC] to accurately identify the plume of hazardous waste and constituents and to help it evaluate the progress of corrective measures' implementation." (*Id.* at 15–16).

Finally, UCC objected to the provision of the Permit requiring it to "analyze for constituents released to the groundwater from process areas adjacent to SWMUs." (*Id.* at 18). EPA responded that it was allowing UCC "to analyze for constituents known to be in the waste and handled in adjacent process areas." (*Id.*). At no point did PCBs figure in UCC and EPA's discussion of the corrective action at the Site.

17

9. **March 1991 RCRA Facility Investigation Workplan for the NIS[10]**

In March 1991, UCC submitted a RFI Workplan for the NIS. (Dkt. No. 274-65). The

objectives of the March 1991 RCRA Facility Investigation Workplan for the NIS were to:

> Characterize the nature, extent and rate of migration of releases from
> the [NIS] into the environment.
>
> Determine the information and data necessary to develop a
> Corrective Measures Study selecting appropriate corrective
> measures and outlining implementation of those corrective
> measures.
>
> Development of a detailed geologic and hydrogeologic
> characterization of the area surrounding and underlying the [NIS]
> site.

(Dkt. No. 274-65, at 4). The RFI Workplan recounted the history of the waste discarded at the

NIS, including approximately 7,000 drums of waste. (*Id.* at 6). It was recommended that the NIS

be "capped with a low permeability cover" and that "surface water diversion [be] devices

installed." (*Id.*). The cap was proposed to be "[m]ulti-layer" and comprised of clay, sand, and

topsoil. (*Id.*).

10. **August 1992 RCRA Facility Investigation Report for the NIS**

In an August 1992 RCRA Facility Investigation Report ("RFI") for the NIS, the

objectives identified were "to evaluate the potential release of hazardous wastes from three waste

management units comprising the [NIS]; to evaluate site-specific conditions and characteristics

that could affect potential contaminant migration; and to identify the need for corrective

measure(s)." (Trial Exhibit P-96, MPM0007856). To "further define the nature and extent of the

release from the [NIS] eight additional monitoring wells were installed," and UCC obtained

groundwater samples from these wells "plus nine existing wells." (*Id.* MPM0007857). UCC also

---

[10] From this point forward, it appears that UCC and EPA pursued two separate investigations as part of the CA
process: one of the NIS and one of the SIS and other SWMUs.

conducted "bedrock aquifer" sampling, (*id.*), and surface water and sediment sampling from

Sugar Camp Run at three sample points—upstream, adjacent to, and downstream from the NIS,

(*id.* MPM0007858). "Based on data generated during this investigation . . . the [NIS] has been

confirmed as a source of groundwater and sediment contamination (likely due to surface water

runoff)." (*Id.*). UCC further noted that it believed there was "an additional source(s) of

contamination . . . present within the plant area in the vicinity of wells 4212 and 4213,

approximately 600 feet downgradient of the [NIS]" and concluded that "[b]ased on the

contaminants present, this source does not appear to be associated with the [NIS]." (*Id.*). UCC

indicated that "stabilization of the [NIS] within an earthen cap . . . would result in a substantial

reduction in the contamination being released from the [NIS] to Sugar Camp Run sediment and

to the alluvial aquifer" and, "in conjunction with an existing downgradient groundwater pump

and treat remediation system, would minimize future environmental impacts for the [NIS]." (*Id.*

MPM0007858–59). It also recommended "evaluation, and modification, if necessary, of the

existing downgradient groundwater pump and treat remediation system. (*Id.* MPM0007859).

PCBs did not factor in the RFI for the NIS.

 UCC submitted, and EPA approved, a workplan for the completion of these proposed

corrective measures; later that year, UCC constructed an earthen cap and diversion ditches at the

NIS. (Dkt. No. 274-92, ¶ 104; Dkt. No. 278-1, ¶ 104).

    **11. October 1992 Verification Investigation Report – SIS and Other SWMUs**

 In 1992, UCC submitted a report to EPA regarding its Verification Investigation of the

SIS, Waste Drum Staging Areas (Main Lab, Demolition and Construction, Small Scale

Production, and Maintenance and Contractors), and the Copper Shanty. (Trial Exhibit P-97,

MPM0013700). The Number 3 Sludge Pond and BTEX Area were also looked at during this

phase of the process. (*Id.* MPM0013746, MPM0013757). "The main objective of the VI was to determine whether the migration of hazardous wastes or constituents into the soil and/or groundwater from [these SWMUs] has occurred." (*Id.* MPM0013698). The VI Report noted that hazardous constituents were detected in soil and groundwater samples from areas around the above-listed SWMUs—including, among others, ethylbenzene, toluene, and xylene, metals, methylene chloride, and ignitables, solvents, paint wastes, and metals. (*Id.* MPM0013737, MPM0013739, MPM0013741, MPM0013744, MPM0013749). There is no evidence that PCBs were tested for or detected.

Prior to its closure in 1988, the Number 3 Sludge Pond "was a 450,000 gallon impoundment used for settling copper hydroxide from a non-hazardous waste stream." (*Id.* MPM0013746). "Closure of this impoundment included removal of all waste sludge and placement of approximately 12 feet of clay fill compacted in lifts." (*Id.*). "To maintain the integrity of the pond as closed, no invasive sampling was conducted"; however, a "deep groundwater monitoring well (Well # 4209)" was installed. (*Id.* MPM0013746–47; Dkt. No. 274-18, at 56 (map of No. 3 Sludge Pond and Well #4209)). The samples were tested for volatile organics, semi-volatile organics, and metals; only metals were detected. (Trial Exhibit P-97, MPM0013749). There is no evidence that PCBs were tested for or detected.

Based on the data collected regarding the Waste Drum Storage Areas and Copper Shanty, and Sugar Camp Run, the VI concluded no additional investigation was required. (*Id.* MPM0013772). However, as "[d]ata collected during the VI confirm[ed] that there has been a release of contaminants to the groundwater in the vicinity of [the BTEX Area,] and that constituents were present in the groundwater at levels in excess of the appropriate action levels," and that data "failed to identify a source for these constituents," it was "recommended this area

be included in the RFI for the Sistersville facility." (*Id.* MPM0013773). As it was determined that portions of the SIS were used for waste disposal activities, it was recommended that those portions also be included in the RFI for the Site. (*Id.* MPM0013774).

### 12.    January 4, 1993 UCC Update to EPA Regarding PCB "Oversight"

In a letter dated January 4, 1993 to EPA, UCC wrote that upon reviewing the final report for the NIS, it "discovered that due to an oversight . . . PCB analyses were not performed on any of the Sugar Camp Run surface water samples or sediment samples." (Dkt. No. 274-16, at 1). UCC explained that it had instructed the laboratory "not to perform any pesticide or herbicide analyses," as the facility "had never produced pesticides or herbicides," but subsequently learned that the laboratory "groups their PCB analysis in the same class as pesticides/herbicides." (*Id.*). Upon recognizing this omission, UCC collected surface water and sediment samples from three "[s]ampling points" from Sugar Camp Run. (*Id.*). UCC attached the results to the letter; the results revealed that PCBs were detected in some of the sediment and soil samples "slightly above the detection limit of hits for PCBs."  (Trial Transcript, at 588; Dkt. No. 274-16, at 2–16).

This appears to be the end of the regulatory record as it pertains to UCC, which sold the Site later that year.

### C.    UCC's Internal Discussion of PCBs During the RCRA Process

### 1.    June 1987 Legal Advice Regarding Reporting PCBs

On June 8, 1987, Fred Dailey wrote a memorandum to Carol Dudnick, of UCC's law department as a "follow up to our conversation" regarding "Section 103C Notice/Wastes Placed in Old Inactive Disposal Sites." (Dkt. No. 274-12, at 1). Dailey attached copies of the Sistersville Site's 1981 Section 103(c) EPA submission; handwritten notes from 1979 questioning "How much stuff buried" "what kind of [stuff buried]," "specifically PCB," (*id.* at 8), noting that

"Arochlor 1242"[11] was used at the plant until 1966, "Arochlor 1248" was "used" until 1970, and "Arochlor 1232" was "used" until 1972, (*id.* at 9); and the previously described memorandum, also dated June 8, 1987, regarding Dailey's conversation "with EPA during the May 15, 1986 visit," (*id.* at 1, 13).

In a letter response dated July 30, 1987, Dudnick wrote:

> You asked me whether Sistersville's 1981 Notification of Hazardous Waste Site form . . . should be revised to state that there may be PCB waste at the inactive disposal sites at the Sistersville Plant. . . . The form indicates that these inactive sites contain silicone wastes and residues. No mention is made of PCBs.

(Dkt. No. 274-15, at 13). Dudnick recounted reviewing Dailey's June 8, 1987 memorandum and observed that this information "indicates that PCBs were used at the plant and that there is speculation that significant amounts of PCBs <u>may</u> have been buried in the [NIS]." (*Id.*). Dudnick noted that Daily had "orally conveyed" "this 'speculation'" to the EPA inspectors during the May 1986 EPA inspection. (*Id.*). Noting that PCBs had not been detected in groundwater monitoring at the NIS, Dudnick opined there was no legal basis for revising the 1981 form. (*Id.*). Dudnick cited Dailey's reliance, in 1981, on "knowledge and recollections of a person who had worked in the EP department at Sistersville for 25 years and was familiar with plant disposal practices"; she noted that the documentation regarding PCB disposal was "speculative at best," "PCBs have not been detected as the result of actual monitoring conducted to date"; and she further noted that "[a]ny corrective action will be mandated as part of [UCC's] RCRA permit." (*Id.* at 13–14).

---

[11] PCB is sometimes referred to by trade names Aroclor or Arochlor. (Dkt. No. 238, ¶¶ 13, 17).

### 2.   March 1992 Internal Memorandum Regarding PCB Disposal Files

In an internal memorandum dated March 11, 1992, UCC employee Dennis Heintzman wrote regarding the "inactive site disposal files relative to the potential of PCB's being disposed of in the [NIS]." (Dkt. No. 274-15, at 1). Heintzman attached internal memoranda from 1980 to 1987 concerning the use of "up to 250,000 pounds of PCB's" that "may have been disposed of" at the NIS. (*Id.*). Heintzman concluded that "[b]ased on the limited information available, it is not possible to state unequivocally that PCB's were not placed in the [NIS]" and that "[i]nformation suggesting disposal is purely speculative" and "[m]onitoring data to date do not substantiate the speculation." (*Id.* at 2).

### D.   Regulatory Record 1993 to 2003

### 1.   1993 Transfer of Corrective Action Permit to OSi Specialties, Inc.

In 1993, UCC sold the Site to OSi Specialties, Inc. ("OSi") as part of an Asset Purchase and Sale Agreement dated April 24, 1993.[12] (Dkt. No. 274-92, ¶ 8). In July 1993, the Corrective Action Permit for the Sistersville Site was transferred from UCC to OSi, which continued the corrective action work and investigation required by the CA Permit. (Dkt. No. 274-91, at 73).

### 2.   August 1993 VI Report and RCRA Facility Investigation for SIS and Other SWMUs

On August 31, 1993, EPA approved UCC's October 1992 VI report and required implementation of a RCRA Facility Investigation for the SIS, Wastewater Treatment System, Number 3 Sludge Pond, and BTEX Area. (Dkt. No. 274-18, at 8). The objectives of the RFI Workplan were "to characterize the nature, extent, and rate of migration of releases" from the

---

[12] OSi retained Environment Strategies Corporation ("ESC") to conduct environmental due diligence prior to closing. (Dkt. No. 238, ¶¶ 240–41). ESC's report contains five paragraphs on PCBs, most of which concern PCB transformers at the Site. (Trial Exhibit P-102, MPM0002714). Although it references soil samples and Sugar Camp Run sediment samples containing PCBs, the report notes that the PCB concentrations detected were below EPA action levels. (*Id.*).

SWMUs into groundwater and soil. (*Id.*). According to the RFI report, there had been "[n]o release to the environment . . . from waste buried at the" SIS. (*Id.* at 12). While arsenic was detected near the Number 3 Sludge Pond and there was contamination in the BTEX Areas, the "[g]roundwater in both" areas was "effectively captured by the existing on-site recovery well." (*Id.* at 12). The Wastewater Treatment System was found not be a current source of release to the environment. (*Id.* at 95). Based on this information, it was determined that while inspections and groundwater monitoring should continue at regular intervals, "no further investigation or corrective actions" were necessary with respect to these SWMUs. (*Id.* at 13). Again, there are no references to PCBs.

### 3.     April 1994 Corrective Measures Study NIS

On or about October 5, 1993, EPA issued a Notice of Deficiency ("NOD") regarding the NIS RFI Reports. (Dkt. No. 274-71, at 1). In response, OSi proposed performing a Corrective Measures Study ("CMS") on the NIS. (*Id.* at 1–2). OSi outlined the NIS history and the corrective actions that had been undertaken "to decrease surface water infiltration into the [NIS] and improve runon/runoff control," (*id.* at 2), including:

- construction of a "V-shaped diversion ditch along the east side of the [NIS] to intercept surface water from the hillside and divert it away from the disposal area";

- installation of an "engineered earthen cap" on the NIS "to address copper runoff from the site into Sugar Camp Run";

- stabilization of "400 feet of Sugar Camp Run" by "widening and regrading this 400 foot section of the creek to form a uniform trapezoidal channel" and lining it with "grouted riprap"; and

- placement of new fencing "along the east, southeast and northeast sections of the disposal area."

(*Id.* at 3). OSi represented that periodic inspections of the earthen cap, ditches, and fencing were being conducted to identify maintenance needs and that there was no "existing contamination of

the groundwater at levels requiring corrective actions" and that the earthen cap was "acceptable for the purpose for which it was designed, i.e. elimination of surface contamination runoff into Sugar Camp Run" and limiting "the amount of surface water infiltration into the disposal area such that the transport of contaminants into the groundwater is minimized." (*Id.*). OSi also stated that "[t]he drainage ditches installed around the perimeter and through the center of the site further reduce the potential for infiltration." (*Id.* at 3–4). However, OSi proposed that an interceptor trench be installed at the base of the hillside "in order to insure continued integrity of the existing earthen cap and drainage ditches[,] to reduce the amount of surface and groundwater entering the [NIS]" and "to intercept the source [of the groundwater] and direct it away from the [NIS]." (*Id.* at 4). In addition, OSi proposed semi-annual groundwater monitoring, inspection of the earthen cap, cleaning of diversion ditches, and inspection of the stability of Sugar Camp Run's banks. (*Id.* at 4–5).

After further discussions with EPA, OSi submitted an engineered design of the proposed interceptor trench for EPA's review and approval, (Dkt. No. 274-72, at 6), and its agreement to submit a comprehensive groundwater study to EPA and West Virginia regulatory agencies within six months, (*id.* at 9). In a letter dated June 21, 1994, EPA approved the proposal, (Dkt. No. 274-73, at 1), and the interceptor trench construction was completed in December 1994, (Dkt. No. 274-19, at 12).

Throughout the remainder of its ownership, OSi operated the Site under the RCRA permit, conducted a comprehensive groundwater study, (Dkt. No. 274-76), monitored the SWMUs subject to the RFI (including the SIS, Wastewater Treatment System, Number 3 Sludge Pond, and BTEX Area) by conducting sampling of groundwater monitoring wells, soil, and sediment but found no releases of concern, and determined that the on-site recovery well

effectively captured groundwater from the BTEX and Number 3 Sludge Pond Areas, obviating the need for further investigation or corrective action, (Dkt. No. 274-18, at 8–9, 12; Dkt. No. 274-19, at 4, 9). OSi implemented the "schedule for inspections and maintenance of the [NIS] . . . as described in the amended CMS/Stabilization Study Proposal," including inspection of the groundwater monitoring wells, earthen cover, diversion ditches, brush and weed control, and stability of Sugar Camp Run's banks. (Dkt. No. 274-19, at 3–4). The groundwater monitor parameters included the constituents previously detected, but not PCBs. (*Id.* at 4).

### E.   GE/MPM's Purchase of the Sistersville Site and Discovery of PCBs

OSi, which had become Compton Corporation, sold the Sistersville Site in 2003 to a GE affiliate, which subsequently became MPM. (Dkt. No. 238, ¶ 332). On July 30, 2003, EPA approved the transfer of the RCRA Corrective Action Permit from Compton Corporation to GE. (Dkt. No. 274-74).

GE hired ENVIRON, an environmental consulting firm to conduct a two-phase environmental due diligence review of the Site. (Trial Transcript, at 46–48). This environmental review, discovery of PCBs in soil and groundwater samples at the Site in 2003, MPM's conduct following the discovery, as well as its discovery of PCBs in the soil while upgrading the wastewater treatment plant is set forth in detail in the Court's decision following the bench trial in this matter and is incorporated here. *MPM II*, 2017 WL 6408611, at *8–15, 2017 U.S. Dist. LEXIS 218201, at *22–44. Briefly, according to ENVIRON's May 2004 Final Report, "unexpected levels of PCBs were found in some [Site] soils and ground water samples." (Dkt. No. 274-29, at 12). ENVIRON suggested resampling of ground water and further investigation of soil because "there is no obvious source for these PCBs." (*Id.* at 12). PCBs were not found in the NIS soil or ground water. (*Id.* at 18). PCBs were, however, as specifically described earlier,

26

found in the soil and groundwater in a number of areas outside the NIS area, *see supra* Section II.A. (Dkt. No. 274-29, at 40, 42–43, 45–46, 50, 53–58, 64–65, 68, 71–73).

From 2004 to 2007, additional sampling and investigation of PCBs, principally in the Waste Incineration Area and the Permitted Hazardous Waste Storage Area, were conducted. (Trial Exhibits D-89, P-138, P-144 to P-146). Sampling continued to show PCB concentrations in these areas exceeding the Toxic Control Substances Act criterion. (*See, e.g.*, Trial Exhibit D-89, MPM0016239). Further sampling was recommended by the environmental firms conducting the investigation and sampling, and such sampling was approved by EPA in October 2007. (Trial Exhibit P-148). This sampling was not implemented.

In June 2008, MPM began construction on a pump station in the EP Area as part of its ongoing efforts to upgrade the wastewater treatment plant. (Trial Transcript, at 145–48). During the excavation, MPM encountered discolored soils; testing of the soils revealed "fairly high concentrations" of PCBs. (Trial Transcript, at 148–49). Soil sampling of approximately 1,359 square meters in the EP Area detected the presence of PCBs; a boundary, which would help "determine the extent of the contamination," was not found. (Trial Exhibit D-142). Subsequently, MPM employees located historical UCC documents indicating that UCC had purchased and used "'significant quantities' of PCBs in production at the Site." *MPM II*, 2017 WL 6408611, at *14, 2017 U.S. Dist. LEXIS 218201, at *41–42 (quoting testimony of Dennis Heintzman, who had worked at the Sistersville Site since the time of UCC's ownership: "When we found the accounting records, purchasing records . . . that was kind of, oh, gee, this does have potential to be something that was used here at the plant"). There is no evidence that the historical records account for the PCBs' disposal.

The allocation of responsibility for the costs associated with MPM's removal action, i.e., its clean-up and decontamination of the area where the discolored soils were found, was resolved during a bench trial in January and February 2017. To date, MPM has not performed, nor has EPA required, remedial action in connection with the PCBs at the Sistersville Site.

## III.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). When the material facts are undisputed, "summary judgment is appropriate only where application of the law to those undisputed facts will reasonably support only one ultimate conclusion." *Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 605 (2d Cir. 2006) (quoting *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 438 (2d Cir. 1999)). When considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Emp. & Rest. Emp. Union, Local 100 of New York, N.Y. & Vicinity v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002) (quoting *Heublein v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) (internal quotation marks omitted)).

## IV.   DISCUSSION

### A.   Statute of Limitations

UCC maintains that MPM's 2011 claim for remedial costs relating to PCB releases is time-barred by CERCLA's 6-year statute of limitations because UCC initiated the on-site

construction of the earthen cap and diversion ditch in 1992. (Dkt. No. 274-93, at 15). MPM argues, based on the Second Circuit's opinion in *MPM III*, that "any remedial activity addressing PCBs is categorically outside of UCC's historical remediation," and its "remedial cost claim is entitled to a new six-year statute of limitations." (Dkt. No. 273-1, at 10).

CERCLA's statute of limitations for the "recovery of the costs referred to in section [107]" requires that an initial action be commenced "for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action." 42 U.S.C. § 9613(g)(2)(B). Courts have derived a "single-remediation principle" from this statutory provision, interpreting § 9613(g)(2)(B) to mean that "there can only be one remedial action at a site." *MPM III*, 966 F.3d at 223 (quoting *NYSEG*, 766 F.3d at 236); *see id.* at 228 (referring to the "single-remediation principle" as a "notion invented by the courts"). In addressing MPM's appeal of this Court's dismissal of its claim for remedial costs as time-barred, the Second Circuit noted that while the single-remedial principle "is a reliable prescription in the great majority of cases," the principle does not control "if the circumstances of a case would render it *illogical* and *unfair*, and would *defeat* the statutory designs or objectives of RCRA and CERCLA. *Id.* at 226–27; *see also id.* at 227–28 (discussing statutory purposes of RCRA and CERCLA, describing "cost-recovery as an essential motivator in the RCRA/CERCLA framework" because it incentivizes private parties and regulators "to ensure that cleanups are conscientious and thorough," and observing that "CERCLA's manifest purpose [is] to 'encourag[e] the timely cleanup of hazardous waste sites' by private parties by 'placing the cost of that cleanup on those responsible for creating or maintaining the hazardous condition.'" (quoting *Consolidated Edison Co. of New York, Inc. v. UGI Utils., Inc.*, 423 F.3d 90, 94 (2d Cir. 2005)). Where, for instance, "[a] subsequent remediation that seeks to address a different set of problems—*e.g.* problems that were non-

29

existent, unknown, elsewhere, or undisclosed to the regulators and unrevealed in an earlier

remediation plan—[the subsequent remediation] should not be considered part of the [first]

remediation" and would be entitled to a new six-year statute of limitations. *Id.* at 230.

Concluding that this Court's "reliance on the single-remediation principle asserted in

*NYSEG* did not necessarily support its conclusion that MPM's cost recovery action was

untimely," the Second Circuit remanded this matter with the following instruction:

> Consistent with our discussion above, the district court's analysis on
> remand should address whether MPM's remedial activity addressed
> to buried PCBs is part of the remediation begun by UCC in the
> 1990s, such that the instant suit filed in 2011 is untimely, or should
> be deemed a separate and distinct remediation, entitled to a new six-
> year limitation period.

*Id.* at 231.

MPM argues that the Court has already found the facts necessary to deem its remediation

of PCBs as separate and distinct from the remediation at the Site in the early 1990s. (*See* Dkt.

No. 273-1, at 9–10). Specifically, MPM cites the Court's observations in the ruling it issued

following the bench trial that UCC did not disclose its use of PCBs to regulators and none of the

corrective measures UCC implemented as part of its RCRA corrective action concerned PCBs.

(*Id.* (citing Dkt. No. 244, at 39)). While the Court ultimately concludes that MPM is entitled to a

new six-year limitation period, the Court disagrees with MPM's suggestion that the Court need

go no further than its prior findings to conclude a remediation of PCBs would qualify as a

"separate and distinct remediation." First, these are conclusions the Court reached after assessing

the facts relevant to the allocation determination, which required consideration of certain

equitable factors aimed at apportioning liability between the responsible parties. Second, the

guidance the Second Circuit provided regarding the evaluation of whether remediation of PCBs

would "constitute a separate and distinct remediation" requires approaching the factual record

from a different angle:

> A helpful inquiry would be to examine whether the recent action (sought by the remediator to be characterized as a new remediation) falls within the remedial scope of the previous remediation as revealed in the record before the regulatory agency. In many cases, the record of the correspondence between the regulatory agencies and the original remediators will reveal much about the nature and scope of the problem to be remediated as it was initially conceived.
> . . .
>
> An assessment of the documentary record associated with the prior remediation will often show whether subsequent action is a continuation of it or distinct in its remedial purpose and scope. When, for example, the record reveals that the more recent remediation addresses a different problem than the previous remediation, e.g., a "release or threatened release of a hazardous substance" that was unrecognized or had not even occurred at the time of the previous remedial activity, that would suggest that the recent remediation should be treated as a new and distinct remediation for statute of limitations purposes. On the other hand, the more the agency record shows that the recent remedial activity seeks to bring about essentially the same "permanent remedy" of the same problem as was the goal of the prior remediation, the more appropriate to consider the recent remediation as a continuation of the prior remediation.

*MPM III*, 966 F.3d at 230–31. With this guidance in mind, the Court turns to the evidence from

the RCRA permitting and Corrective Action process that led to UCC's (and later OSi's) remedial

activities to consider (1) whether PCBs were "unknown" or "undisclosed" to the EPA and (2)

whether the application of the single-remediation principle would be illogical and unfair and

defeat the statutory purposes of RCRA and CERCLA.

### 1.    Unknown or Undisclosed to Regulators

Here, the remedial actions at the Site—the installation of the earthen cap, the diversion

ditches, the stabilization of the banks of Sugar Camp Run, and the interceptor trench between

1992 and 1994—had a singular goal: to stop hazardous constituents in the NIS from

contaminating ground and surface water, including Sugar Camp Run. (Dkt. No. 274-71, at 3). EPA and UCC's decision to embark on this course of remediation was made only after conducting nearly ten years of reporting on the history of releases of hazardous constituents at the Site, on-Site visits by EPA to inspect the dozens of SWMUs at the Site, and multiple phases of groundwater, surface water, and soil sampling to delineate and define the borders of the contamination at the Site. While, as discussed below, there was some discussion of PCBs, at no point were buried PCBs considered as a potential problem at the Sistersville Site.

During the RCRA permitting and Corrective Active process, the majority of which occurred from 1981 to 1994, UCC and EPA went through numerous rounds of Site-wide proposals for investigations and workplans, implementation investigations of workplans, groundwater, surface water, soil, and sediment sampling, and reporting on sampling results to determine whether corrective action was needed with respect to the release of hazardous constituents at the Site and to delineate groundwater, surface water, and soil contamination. (Dkt. Nos. 274-7, 274-18, 274-65, 274-71, 274-76; Trial Exhibits P-96, P-97). This regulatory process generated not only correspondence between UCC and EPA but thousands of pages of documents, very few of which contain any reference to PCBs. Indeed, at the start of the RCRA permitting process, in 1981, UCC submitted the 103(c) Form reporting the general types of wastes it handled and left the box next to "PCBs" unchecked. (Dkt. No. 274-12, at 2–7). And in none of UCC's reporting to EPA, which otherwise contained detailed listings of hazardous constituents handled at the Site, (Dkt. No. 274-6, at 12), and descriptions of hazardous constituents involved in releases at the Site, (*id.* at 13–16), did UCC report its use or disposal of PCBs. Further, with the exception of the 1993 sampling of Sugar Camp Run for PCBs discussed below, PCBs were not included in the sampling parameters used at the Site in assessing sources of contamination.

(Dkt. Nos. 274-7, 274-18, 274-65, 274-71, 274-76; Trial Exhibits P-96, P-97). As UCC observes, however, these records do reflect three communications between EPA and UCC regarding PCBs. (Dkt. No. 279, at 14). UCC argues that this evidence shows that "historical PCB releases at the site" were within the scope of "the Corrective Action remedy begun in 1992." (*Id.* at 13–14). The Court disagrees.

The first reference to PCBs was in 1981, prior to UCC's filing of the Section 103(c) Form: in an internal memorandum, UCC employee Fred Dailey reports that he advised an EPA representative that UCC's "experts feel we did not make" or "generate[]" any PCBs during its manufacturing processes prior to 1975, and that UCC had found no PCBs in wastewater but that it did have PCB capacitors and one transformer in use at the Site. (Trial Exhibit P-91, MPM0000133–34). Second, during a 1986 Site visit, Dailey told EPA representatives that "it was speculated that as much as 500,000 lbs. of contaminated PCB heat fluid was generated during the plant's previous activities and its disposition was never determined," but that "[a]ll the results of tests and analyses," which Dailey later sent to EPA, "showed no PCBs." (Dkt. No. 274-12, at 13). Indeed, with one exception,[13] all PCB concentrations reflected in the test results Dailey sent to EPA were below detection limits. (Dkt. No. 274-9, at 1; Dkt. Nos. 274-10, 274-11). Third, in 1993, UCC sent EPA test results showing PCBs had been detected "slightly above the detection limit" in sediment and soil samples from Sugar Camp Run. (Dkt. No. 274-16, at 2–16; Trial Transcript, at 588).

None of these records allow an inference that UCC informed EPA, or that EPA was aware, that UCC had used and disposed of hundreds of thousands of pounds of PCBs at the Site.

---

[13] One well from the NIS contained higher levels of PCBs, (Dkt. No. 274-11, at 4 (Sugar Camp Run 1979)), but it appears PCB concentrations in later testing were below detection limits, (*id.* at 5).

In Dailey's 1981 interaction with the EPA, he informed the EPA representative that UCC believed it "did not make" or "generate[]" "any PCBs," and that PCBs had not been detected when UCC analyzed wastewater at the Site. (Trial Exhibit P-91). This communication, therefore, does not provide a basis for inferring that PCBs were a known problem at the Site. Dailey's 1986 interaction with EPA representatives visiting the Site echoed his prior communication; though Dailey did tell the representatives that it was "speculated" that 500,000 pounds of "contaminated PCB heat fluid" had been generated at the Site, he reported that "its disposition was never determined" and that UCC had investigated the possibility of on-Site disposal, but "[a]ll the results of the tests" "showed no PCBs." (Dkt. No. 274-12, at 13). Thus, neither of these communications provides a basis for inferring that buried PCBs were known or contemplated as a problem at the Site. Rather, they show that UCC twice stated to EPA that it had found no evidence that PCBs had been disposed of at the Site. As to UCC's 1993 reporting to EPA of the presence of PCBs in Sugar Camp Run samples, the Court notes that all PCB concentrations in those test results appear mostly below detection limits with some "slightly above the detection limit." (Trial Transcript, at 588; *see* Dkt. No. 274-11, at 54 (identifying detection limit as 10 ug/l)). But even viewing the disclosure of the 1993 test results in the light most favorable to UCC, the most it is possible to infer is that EPA intended to remediate any PCBs contaminating Sugar Camp Run by addressing the NIS, which was believed to be the source of contamination in Sugar Camp Run. These samples do not provide a basis for inferring that subsequent steps to remediate PCBs buried outside the NIS was "foreseen" or even "contemplated" at the start of the NIS remediation. *MPM III*, 966 F.3d at 224. The Court therefore concludes that the remediation of the NIS, and the various response actions UCC undertook throughout the Site as part of the RCRA Corrective Action process, were conducted without any disclosure to EPA of a fact now

undisputed: that UCC used hundreds of thousands of pounds of PCBs in its manufacturing processes, which generated substantial PCB-laden chemical wastes that were buried outside the NIS. *Cf. id.* at 229 ("[W]hen a remediation is undertaken under a remediation plan based on full disclosure of the known problem, successive remedial steps undertaken in furtherance of the original objective are part of a single remediation for purpose of the statute of limitations."). The Court therefore concludes that the problem of buried PCBs was unknown to EPA at the time the remediation began in the 1990s.

### 2.    Logic, Fairness, and Statutory Purpose

UCC argues that "[a]ny PCB remedial action in which MPM may engage is logically a continuation of the RCRA Corrective Action remedial measures initiated by UCC." (Dkt. No. 274-93, at 16). It is undisputed that MPM remains subject to the RCRA Corrective Action Permit and that MPM is subject to the RCRA Permit's reporting, monitoring, and response action requirements. (Trial Exhibit D-036, MPM002890–96). However, a remediation to address and bring a "permanent remedy" to the problem of buried PCBs, which appear to located outside the NIS, (Dkt. No. 274-29, at 40, 42–43, 45–46, 50, 53–58, 64–65, 68, 71–73), "addresses a different problem than the previous remediation" of the NIS, which, as the agency record shows, sought to stop contamination from leaving the NIS and prevent its flow into Sugar Camp Run, groundwater, and soil. *MPM III*, 966 F.3d at 230. Thus, it would be illogical to consider a remediation of PCBs buried outside the NIS as a continuation of the prior remediation of the NIS.

UCC next argues that Corrective Action measures at the NIS were "not specific to any particular contaminant; they were designed to stop *any and all* contaminants from migrating," (Dkt. No. 279, at 15), and analogizes the facts of this case to the remediation of coal tar

contamination at the Owego manufactured gas site at issue in *NYSEG*. (*Id.* at 15–17). UCC argues that its "prior remedial measures addressing waste areas contaminated by historical operations with PCBs and other constituents dictate that any further remediation of PCBs deriving from such historical operations with PCBs and in those waste areas is part of the same facility-wide remedial action." (*Id.* at 16–17). The Court finds not only that UCC's argument is unavailing, but that comparison of the circumstances of this case with those at the Owego site in *NYSEG* shows that the application of the single-remediation principle here would be illogical and unfair.

In *NYSEG*, the plaintiff argued that the discovery of coal tar contamination and consequent response activity in 2003 was a "separate and distinct remediation from the remedial work" that was begun in 1994 to eliminate coal tar contamination at the one-acre Owego site. *MPM III*, 966 F.3d at 224 (citing *NYSEG*, 766 F.3d 235–36). The district court, however, found that the "claim was time-barred, reasoning that the 1994 response and the 2003 response were part of the same 'remedial' project, in part because both actions addressed 'the same source and constituent contamination.'" *Id.* (citing *N.Y. State Elec. & Gas Corp. ("NYSEG") v. FirstEnergy Corp.*, 808 F. Supp. 2d 417, 511 (N.D.N.Y. 2011) (district court opinion)). The Second Circuit agreed, "characterizing [the response activity in 2003] rather as a continuation of the earlier project." *Id.* (citing *NYSEG*, 766 F.3d at 235).

Here, unlike the one-acre Owego site, the Sistersville Site encompasses approximately 1,300 acres of land; the "main production area," where much of the RCRA Corrective Action work took place, encompasses "approximately 50 acres of land," (Dkt. No. 172-2, ¶¶ 2–3); and the NIS was itself more than two acres, (Dkt. No. 274-6, at 4, 12). Further, there is no argument that remediation of the buried PCBs would be addressing the same contamination as the

remediation of the NIS in the 1990s: there is no evidence that the NIS is the source of the buried PCBs. And while subsequent steps to address contamination from the NIS are easily contemplated—the RCRA permit requires continued and routine soil and groundwater monitoring of the NIS for contaminants, the problem perceived at the outset—there is no evidence before the Court that suggests PCBs buried outside the NIS was a problem perceived at the outset; it seems entirely unconnected. *Cf.*, *MPM III*, 966 F.3d at 224 (noting that subsequent steps to address coal tar contamination at the Owego site were "at least contemplated" because the later remediation was "of a contamination problem perceived at the outset." (citing *NYSEG*, 766 F.3d at 235)). Finally, unlike the plaintiff in *NYSEG*, who owned the site at the time of the start of the remediation and could have initiated suit then, MPM did not own the Site when the remediation began in 1992 or at any point during the next six years; it acquired the Site in 2003, approximately five years *after* the statute of limitations expired. *Cf. MPM III*, 966 F.3d at 225 (explaining that the application of the single-remediation principle was "logical[]" in its application to the "circumstances" in *NYSEG*, in part because "nothing would have prevented the plaintiff," who owned the Site at the start of the remediation, "from suing the contaminator, both to recover remediation costs already expended, and for a declaratory judgment as to liability and allocation of future costs, within the six years allowed for such a suit"). Under these circumstances, the application of the single-remediation principle would be illogical and unfair because MPM's window to file suit against UCC for PCB contamination would have closed, due to no fault of its own, before MPM even owned the Site. *Cf. MPM III*, 966 F.3d at 225 (explaining that a "plaintiff whose suit is time barred" because the plaintiff "postponed the bringing of suit by characterizing subsequent phases of the initial project as new remediations"

has suffered no unfairness as the preclusion was simply the result of the plaintiff's needless

delay").

Finally, UCC argues that none of the Second Circuit's three examples of "inappropriate

application[s] of the single-remediation principle" is analogous to this case. (Dkt. No. 274-93, at

26–28). The Court agrees with respect to the first and second examples,[14] but disagrees as to the

third, which, while not perfectly analogous, nevertheless supports the conclusion that the

application of the single-remediation principle would be inappropriate here. The third example

was as follows:

> If . . . the original polluter implemented an inadequate remediation
> pursuant to a regulatory approval that was procured by inadequate
> disclosure, and then held the site for six years after the misguided
> project began, a later owner who discovers the contamination that
> the prior remediation failed to address would nevertheless be
> obliged to disclose and remediate it, but could not recover its costs
> if the single-remediation principle were applied. The original
> polluter would enjoy an undeserved immunity as a result of its
> inadequate disclosure of what needed to be remediated, and its
> retention of the site for six years after initiating its incomplete
> remediation.

*MPM III*, 966 F.3d at 227. The circumstances of this case vary slightly from the scenario in the

third example, because here there is no contention that the remediation of the NIS was

inadequate. Like the third example, however, in this case, the regulatory approval, i.e., the

---

[14] The first example involved an operator that, "following a remediation . . . creates a different contamination, caused by different processes and a different contaminating substance." *MPM III*, 966 F.3d at 227. Since "a suit to recover the cost of a remediation from the contaminator would [under the single-remediation rule] be untimely by reason of a prior remediation decades in the past that had nothing to do with the present contamination," the Second Circuit indicated that it did "not believe" the "single-remediation principle" would "apply in such a circumstance." *Id.* The second example involved the discovery of a contamination that was "previously unsuspected and "unrelated to, and perhaps far distant from, a previously remediated contamination" on a "tiny corner" of a 10,000 acre site. *Id.* The Second Circuit explained that the application of the "single-remediation principle" would be "illogical and inappropriate" because the new owner "would be unfairly precluded from utilizing CERCLA's cost-recovery mechanism to recover the necessary costs of cleanup from the party responsible." *Id.* Neither of these examples is applicable here.

Corrective Action process which ultimately required no remedial activity with respect to the area outside the NIS, was procured by a lack of disclosure: at no point was EPA informed that UCC used hundreds of thousands of pounds of PCBs in its manufacturing processes and disposed of PCBs at the Site. UCC's apparent determination that it was "speculative" whether PCBs had been disposed of on Site supports the conclusion that buried PCBs were an unknown problem at the Site. And while UCC did not retain the Site for the entire six years after initiating the remediation in 1992—it sold the Site to OSi in 1993—OSi, which held the Site for the remainder of the statute of limitations, appears to have been under the impression that any PCBs were attributable to electrical equipment and transformers. (Trial Exhibit P-102, MPM0002714). Applying the single-remediation principle under these circumstances, therefore would provide UCC immunity from any remediation that might have been required had EPA known about the buried PCB problem. Allowing UCC to enjoy such immunity would defeat the statutory purpose, which is to "'encourage[e] the timely cleanup of hazardous waste sites' by private parties by 'placing the cost of that cleanup on those responsible for creating . . . the hazardous condition.'" *MPM III*, 966 F.3d at 228 (quoting *Consolidated Edison*, 423 F.3d at 94). Thus, MPM is entitled to a new six-year period for cost recovery. *Id.* Accordingly, the Court concludes that MPM's action against UCC for remedial costs under CERCLA § 107(a) for future remedial costs consistent with the National Contingency Plan ("NCP") for PCBs at the Site is timely.

### B. ALLOCATION

Having found that UCC is liable for remedial costs under CERCLA § 107(a) and that MPM is liable in contribution for its equitable share of any recoverable future response costs under CERCLA §§ 113(f)(1), (g)(2), (Dkt. Nos. 165, 168), the Court must consider whether its entry of declaratory judgment as to liability should include allocation. *See Gussack Realty Co. v.*

*Xerox Corp.*, 224 F.3d 85, 92 (2d Cir. 2000) ("The proper remedy for future response costs is not a present lump-sum payment of anticipated expenses but instead a declaratory judgment award dividing future response costs among responsible parties." (citing 42 U.S.C. § 9613(g)(2)).

### 1.    Ripeness

UCC argues that in light of the evidence that: (1) "MPM did not encounter PCB-contaminated soils or groundwater in connection with its W[aste] W[ater] T[reatment] U[nit] upgrade"; and (2) "EPA has confirmed that MPM has no obligation to remediate PCBs elsewhere because they were disposed prior to 1978," the issue of allocation is not ripe for determination. (Dkt. No. 279, at 19–20). UCC asserts that "the Court has no basis to conclude that MPM is 'likely' to incur PBC remedial costs—much less that PCB remedial costs are 'certainly impending,' as required for ripeness." (*Id.* at 20 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013))). MPM maintains that allocation is ripe for determination. (Dkt. No. 280, at 8). The Court agrees.

First, as MPM notes, the Second Circuit has already found UCC's assertion that "MPM must show future removal costs are *certainly impending*" to be "a misreading of *Clapper*," explaining that "[t]he Supreme Court in that case—and in future rulings—clarified that a 'substantial risk' of harm will suffice to meet Article III's case or controversy requirements." *MPM III*, 966 F.3d at 233 n.47 (quoting *Clapper*, 568 U.S. at 414 n.5). Next, the evidence UCC cites in support of its contention that allocation is not ripe for determination is a March 29, 2017 email between EPA officials regarding MPM's soil management plan for the Wastewater Treatment Unit area. (Dkt. No. 279-4). In it, EPA employee Scott Rice discusses MPM's soil management plan for the Wastewater Treatment Unit and any "PCB cleanup" and writes if MPM "can determine that the soils were impacted pre 1978, then there is no impetus for them to

conduct a PCB remediation to address other areas of the Site." (*Id.* at 2). MPM objects to this

email as hearsay. But even if the Court were to consider the email, it would not alter its

conclusion that the issue of allocation is ripe for determination. MPM, as holder of the RCRA

permit, will be subject to any remediation requirements imposed by EPA. That there may not, at

present, be a remediation planned is inapposite given the undisputed widespread release of PCBs

at the Site for which both UCC and MPM are legally responsible. *See Kelley v. E.I. DuPont du

Nemours & Co.*, 17 F.3d 836, 844–45 (6th Cir. 1994) ("[T]he wide-ranging contamination [at the

site] makes it more certain than speculative that the [claimant] will have to expend resources in

the future."). Accordingly, the Court concludes that the allocation issue is constitutionally ripe

for review.

UCC also advances a prudential ripeness argument. (Dkt. No. 279, at 20). As the Second

Circuit explained, "The doctrine of prudential ripeness requires a court to ask 'whether the claim

is fit for judicial resolution' and 'whether and to what extent the parties will endure hardship if

decision is withheld' and permits a court to decline to exercise its jurisdiction upon determining

that 'the case will be better decided later.'" *MPM III*, 966 F.3d at 233 (quoting *In re Methyl

Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 725 F.3d 65, 110 (2d Cir. 2013)). UCC

argues that even if the Court grants declaratory relief as to liability, allocation is not required at

this stage as "the Court is missing relevant facts that could impact the allocation equities" such as

(1) "whether or the extent to which MPM's own construction or operations will have contributed

to or exacerbated future hypothetical costs"; (2) "whether MPM will have timely complied with

RCRA reporting or other requirements and adequately cooperated with regulators"; (3) "whether

MPM might successfully invoke its environment indemnity from the seller"; and (4) "whether

the remedial action provides economic benefits to MPM" if "the Site is," for example, "widely

remediated for a more lucrative use." (Dkt. No. 279, at 20). MPM observes that both this Court and the Second Circuit have rejected these exact arguments. (Dkt. No. 280, at 8); *see also MPM III*, 966 F.3d at 234 (rejecting identical arguments, explaining that the "district court was clear that the two factors on which it primarily relied were (a) UCC's sole responsibility for the PCB contamination at the Site, and (b) MPM's delay in cooperating with regulators after its discovery of PCB-contaminated soil" and that the "evidence supporting these two determinative facts was 'unlikely to change'"); *MPM II*, 2017 WL 6408611, at *16–17, 2017 U.S. Dist. LEXIS 218201, at *50 (finding "the reasons UCC cites are insufficient to justify delaying the allocation determination"). The Court declines to address these arguments for a second time and rejects them for the same reasons it articulated previously. Accordingly, the Court finds UCC's ripeness arguments to be without merit and proceeds to determine allocation.

Furthermore, given the extensive litigation in this case and the undisputed fact that UCC used and disposed of PCBs at the Site, and that they remain buried there, it would be "wasteful" to require MPM to wait for allocation until after MPM has ascertained future PCB remedial costs. *New York v. Solvent Chem. Co., Inc.*, 664 F.3d 22, 27 (2d Cir. 2011). "Moreover, this is not a case in which the dispute is 'otherwise destined to disappear by [itself].'" *Arawana Mills v. United Techs.*, 795 F. Supp. 1238, 1247 (D. Conn. 1992) (quoting *In re Combustion Equip. Assocs., Inc.*, 838 F.2d 35, 37 (2d Cir. 1988)).

Determining allocation will save the litigants in this case substantial time and money and will leave open only the issue of whether any costs MPM incurs in remediating PCBs are recoverable under CERCLA. Thus, the Court concludes that declaratory judgment serves a useful purpose in settling the legal issues involved, is not being used for procedural gamesmanship or a race to res judicata, and will not increase friction between sovereign legal

systems, and that there is no better or more effective remedy. Providing the parties with the certainty of an allocation will advance CERCLA's "dual goals of cleaning up hazardous waste and holding polluters responsible for their actions." *NYSEG*, 766 F.3d at 220. Finally, if and when MPM brings an action to recover future remedial costs, UCC will be entitled to raise appropriate objections. *See New York v. Green*, 420 F.3d 99, 111 (2d Cir. 2005) ("[I]f and when the State brings an action to recover the future costs of remediating the Site, Defendants will be entitled at that time to raise any appropriate objections to the amount of the State's costs—for example, that the costs were not actually incurred or that they were inconsistent with the national contingency plan—though Defendants will not be entitled to litigate their liability for such costs.").

### 2.   Apportioning Costs

Not surprisingly, MPM and UCC have differing views as to cost apportionment. MPM argues for the Court's allocation of 95% of its future remedial costs to UCC. (Dkt. No. 273-1, at 14). UCC argues that MPM's share should be at least 45%. (Dkt. No. 279, at 22). The Court finds nothing in the parties' submissions that warrants a shift in the allocation determination.

Once liability has been established under CERCLA, "the court must allocate response costs among liable parties in an equitable manner." *Goodrich Corp. v. Town of Middlebury*, 311 F.3d 154, 168 (2d Cir. 2002). Allocation "is an equitable determination based on the district court's discretionary selection of the appropriate equitable factors in a given case." *Id*. at 170. "Section 113(f) does not limit courts to any particular list of factors." *Id*. at 176 (internal quotation marks omitted). "Instead, the statute's expansive language . . . affords a district court broad discretion to balance the equities in the interests of justice." *Id*. (internal quotation marks and brackets omitted).

In *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, the Second Circuit observed that "Congress noted examples of the factors that it thought courts should consider in apportioning costs":

> (1) The ability of the party to demonstrate that his contribution to the release can be distinguished; (2) The amount of hazardous substance involved. Of course, a small quantity of highly toxic material, or above which releases or makes more dangerous another hazardous substance, would be a significant factor; (3) The degree of toxicity of the hazardous substance involved; (4) The degree of involvement of the person in the manufacture, treatment, transport, or disposal of the hazardous substance; and (5) The degree of cooperation between the person and the Federal, State, or local government in preventing harm to public health or the environment from occurring from a release. This includes efforts to mitigate damage after a release occurs.

596 F.3d 112, 130 (2d Cir. 2010) (quoting S. Rep. No. 96–848, at 345–46 (1980)).[15] The second set of factors district courts have considered are those contained in *United States v. Davis*, 31 F. Supp. 2d 45, 63 (D.R.I. 1998), which include:

1. The extent to which cleanup costs are attributable to wastes for which a party is responsible.

2. The party's level of culpability.

3. The degree to which the party benefitted from disposal of the waste.

4. The party's ability to pay its share of the cost.

*Id.*; *see, e.g.*, *Yankee Gas Servs.*, 852 F. Supp. 2d at 247 (citing *Davis*, 31 F. Supp. 2d at 63).

UCC raises many of the same arguments the Court previously considered, including that: (1) MPM assumed "'remedial' risks when it acquired the Site"; (2) "future PCB-related measures would be triggered solely by MPM's construction work"; (3) MPM failed "to timely report PCBs to regulators"; and (4) UCC's responsibility for historical PCB disposal is just one

---

[15]These "so-called 'Gore Factors' come from the legislative history surrounding three failed bills (one sponsored by then-Congressman Al Gore) that together informed CERCLA" when it was enacted in 1980. *Yankee Gas Servs. Co. v. UGI Utils., Inc.*, 852 F. Supp. 2d 229, 247 (D. Conn. 2012).

of many factors relevant to an equitable allocation determination. (Dkt. No. 279, at 22–29). The Court considered and rejected arguments (1), (3), and (4) in its prior decision, *MPM II*, 2017 WL 6408611, at \*19–21, 2017 U.S. Dist. LEXIS 218201, at \*58–63 (finding argument (1) that MPM assumed the risk of "future PCB-related response costs when it acquired the Site" did not "support an allocation of future response costs to MPM" because although MPM was on notice there were PCBs at the Site requiring additional investigation, there was also a belief that "PCB contamination was due to PCB electrical equipment," finding argument (3) that MPM "delay[ed] in notifying regulators about its discovery of the PCB release at the Site" had merit and allocating 5% responsibility to MPM, and considering (4) UCC's disposal of PCB waste without having "to engage in any corrective action . . . or pay for any remedial action" as weighing in favor of allocating "future removal costs to UCC"). In support of argument (2)—that PCB remediation would not be required unless MPM engaged in construction work—UCC cites the Court's prior finding that to date, no government regulator has required PCB sampling or remediation as well as EPA's determination that PCBs in the Wastewater Treatment Unit did not require remediation unless disturbed. (Dkt. No. 279, at 28 (citing *MPM II*, 2017 WL 6408611, at \*15, 2017 U.S. Dist. LEXIS 218201, at \*44)). This argument, however, is best reserved for a later date—when and if MPM makes an application for remediation costs, at which point the Court will evaluate whether such costs are "necessary" and consistent with the National Contingency Plan. 42 U.S.C. § 9607(a)(4)(B); *NYSEG*, 766 F.3d at 220. Accordingly, the Court adopts and incorporates its prior allocation ruling, *MPM II*, 2017 WL 6408611, at \*18–21, 2017 U.S. Dist. LEXIS 218201, at \*56–64.[16]

---

[16] The Court declines UCC's request for a "re-opener" or "contingency" provision to allow the parties "to raise relevant future facts once they arise." (Dkt. No. 279, at 21 (citing *Beazer East, Inc. v. Mead Corp.*, 412 F.3d 429, 449 (3d Cir. 2005)). In *Beazer East*, the Third Circuit noted the defendant's argument that an allocation might later prove unfair if, after investigation, the remediation were directed to an area of the site where the plaintiff was

V.     **CONCLUSION**

Accordingly, it is

**ORDERED** that MPM's motion for summary judgment (Dkt. No. 273) is **GRANTED**; and it is further

**ORDERED** that UCC's motion for summary judgment (Dkt. No. 274) is **DENIED**; and it is further

**ORDERED** that Clerk of the Court is directed to enter a declaratory judgment with respect to the allocation of future remedial costs as follows: UCC is responsible for 95% of future remedial costs and MPM is responsible for 5% of future remedial costs; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Dated: September 20, 2021

Brenda K. Sannes
U.S. District Judge

---

responsible for majority of the contamination and agreed that any declaratory judgment "should contain some kind of provision authorizing the parties to re-litigate the allocation of those costs for good cause shown in response to new events or new evidence that would reasonably bear upon the equity of the allocation." 412 F.3d at 449. Here, the facts bearing on allocation, namely UCC's status as the sole polluter and MPM's delay in reporting PCBs to environmental regulators, are unlikely to change. Moreover, as discussed, the parties are free to present new evidence concerning the appropriate award of remediation costs if and when MPM seeks such costs.